18-08278-rdd   Doc 1-2   Filed 08/21/18   Entered 08/21/18 16:18:35   ntcrem   Pg 1
Case 7:18-cv-06900-KMK   Document 1   Filed 08/03/18   Page 1 of 4
of 194

Goetz Fitzpatrick LLP
One Penn Plaza, 31st Floor
New York, New York 10119
Telephone: 212-695-8100
Fax: 212-629-4013
By:   Gary M. Kushner, Esq.
      Scott D. Simon, Esq.

***Attorneys for Plaintiff***

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------X
                                                       :
PIERSON LAKES HOMEOWNERS              :        Case No. 18-cv-06900
ASSOCIATION, INC.,                              :
                                                       :
                        Plaintiff,                  :
                                                       :
        -against-                                  :
                                                       :
EONS PROPERTIES, LLC,                     :
                                                       :
                        Defendant.              :
-------------------------------------------------------------X

## NOTICE OF REMOVAL OF STATE COURT ACTION
## TO BANKRUPTCY COURT UNDER 28 U.S.C. § 1452 AND RULE 9027(a)
## OF THE FEDERAL RULES OF BANKRUPTCY PROCEDURE

**PLEASE TAKE NOTICE** that Pierson Lakes Homeowners Association, Inc., the debtor

and debtor-in-possession (the "Debtor"), by and through its attorneys, Goetz Fitzpatrick LLP,

hereby submits this Notice of Removal ("Notice") in accordance with Rule 9027 of the Federal

Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and 28 U.S.C. §§ 157 and 1452, of the

action styled *Pierson Lakes Homeowners Association, Inc. v. EONS Properties, LLC*. (the "EONS

Action"), which is pending in the Supreme Court of the State of New York, County of Rockland,

to the Bankruptcy Court for the Southern District of New York, where the Debtor's chapter 11

case is docketed. Copies of the EONS Action pleadings, along with an index, are attached hereto.

1.      On March 27, 2018 (the "Petition Date"), the Debtor filed a voluntary petition under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Southern District of New York. The Debtor's case was assigned Bankruptcy Case No. 18-22463-rdd (the "Bankruptcy Case").

2.      The Pierson Lakes Development (the "Development") is an exclusive residential development located in Sloatsburg, New York in the town of Ramapo. The Development is a gated community of approximately 1,064 acres that contains wooded nature areas and two lakes of approximately 100 acres each.

3.      The Debtor owns, operates and maintains the common areas of the Development and the facilities located thereon. The common areas include but are not limited to the security gatehouse and guardhouse, the boathouse, private roadways, the fire protection system, hiking trails, bridle paths, certain septic tanks, the common storm and solid waste disposal systems, lakes, wooded and landscaped areas, and greenbelt.

4.      On October 16, 2017, the Debtor commenced the EONS Action by filing a summons and complaint in the Supreme Court of the State of New York, County of Rockland. The EONS Action was assigned Index No. 035039/2017.

5.      The Debtor's complaint in the EONS Action alleged that EONS Properties, LLC ("EONS") is the owner of a lot in the Development, that EONS was invoiced for maintenance fee assessments and, since March 8, 2017, EONS has failed and refused to pay the Debtor the amounts of such assessments. As of October 1, 2017, EONS owed the Debtor $30,539.46 in delinquent assessments, which amount was increasing at the rate of $1,755 per month, plus late

18-08278-rdd    Doc 1-2    Filed 08/21/18    Entered 08/21/18 16:18:35    Exhibit B - interim   Pg 3
Case 7:20-cv-06900-KMK   Document 1   Filed 08/03/20   Page 3 of 194
of 194

fees of $9.92 per month, plus additional fees and attorneys' fees.

6.      On January 28, 2018, EONS filed an answer with counterclaims in the EONS Action. EONS' counterclaims sought $900,000 plus interest based upon allegations that the Debtor breached its fiduciary duties to homeowners and committed waste of its members' and homeowners' assets.

7.      Since the Petition Date, the EONS Action has been stayed by operation of the automatic stay arising under section 362(a) of the Bankruptcy Code.

8.      On June 25, 2018, EONS filed a proof of claim in the Bankruptcy Case, asserting a claim for breach of fiduciary duty and waste in the amount of $900,000 (the "Proof of Claim"). The Proof of Claim was assigned Claim No. 11 by the Clerk of the Court.

9.      When EONS filed its Proof of Claim in the bankruptcy case, it submitted to the equitable jurisdiction of the Bankruptcy Court, especially with respect to the very subject matter of the EONS Action, which is identical to the subject matter of the Proof of Claim. That conferred jurisdiction upon the bankruptcy court to consider EONS' claim as a core matter under both the express language of 28 U.S.C. § 157(b)(2)(B) and the more generalized caselaw addressing the nature of core matters. *See*, *e.g.*, *In re Adelphia Communications Corp.*, 307 B.R. 404, 418 (Bankr.S.D.N.Y.2004). Thus, the determination of EONS' claim is a core proceeding.

10.     The Debtor would have refuted the counterclaims and prosecuted the EONS Action in the state court had it become necessary, but because EONS filed the Proof of Claim, the Debtor has removed the EONS Action instead.

11.     In the event that any claim or cause of action asserted in the EONS Action is determined to be "non-core," the Debtor consents to the entry of final orders or judgment by

the Bankruptcy Judge.

**NOW, THEREFORE**, all parties to the EONS Action are **HEREBY NOTIFIED**, under Bankruptcy Rule 9027(e), as follows: Removal of the EONS Action and all claims and causes of action therein was effected upon the filing of a copy of this Notice with the Clerk of the United States District Court for the Southern District of New York under Bankruptcy Rule 9027(c). The EONS Action is removed from the Supreme Court of the State of New York, Rockland County, to the United States Bankruptcy Court for the Southern District of New York.

Dated: New York, New York
       August 1, 2018

                        GOETZ FITZPATRICK LLP
                        *Attorneys for Debtor*

             By:    /s/Gary M. Kushner
                    Gary M. Kushner
                    A Partner of the Firm
                    Scott D. Simon
                    One Penn Plaza, 31st Floor
                    New York, New York 10119
                    (212) 695-8100

NYSCEF

**Document List**

Rockland County Supreme Court

Index #  **035039/2017**

Created on:07/30/2018 05:04 PM

Case Caption:  **PIERSON LAKES HOMEOWNERS ASSOCIATION INC - v. - EONS PROPERTIES LLC**

Judge Name:  **Rolf Thorsen**

| Doc# | Document Type/Information | Status | Date Received | Filed By |
|---|---|---|---|---|
| 1 | SUMMONS + COMPLAINT<br>Summons and Verified Complaint | Processed | 10/16/2017 | Goldenberg, I. |
| 2 | NOTICE OF PENDENCY - *Corrected*<br>Notice of Pendency | Processed | 10/17/2017 | Goldenberg, I. |
| 3 | AFFIRMATION/AFFIDAVIT OF SERVICE<br>Affidavit of Service Eons Properties, LLC on Secretary of State | Processed | 10/26/2017 | Goldenberg, I. |
| 4 | AFFIRMATION/AFFIDAVIT OF SERVICE | Processed | 11/14/2017 | Goldenberg, I. |
| 5 | AFFIRMATION/AFFIDAVIT OF SERVICE<br>Affidavit of Service Ogen & Sedaghati | Processed | 12/01/2017 | Goldenberg, I. |
| 6 | AFFIRMATION/AFFIDAVIT OF SERVICE<br>Affidavit of Service EONS Properties | Processed | 12/01/2017 | Goldenberg, I. |
| 7 | AFFIRMATION/AFFIDAVIT OF SERVICE<br>Affidavit of Service John Doe | Processed | 12/01/2017 | Goldenberg, I. |
| 8 | | Deleted | | |
| 9 | | Deleted | | |
| 10 | NOTICE OF MOTION<br>Notice of Motion | Processed | 01/17/2018 | Goldenberg, I. |
| 11 | AFFIDAVIT OR AFFIRMATION IN SUPPORT OF MOTION<br>Affidavit in Support of Motion | Processed | 01/17/2018 | Goldenberg, I. |
| 12 | AFFIDAVIT OR AFFIRMATION IN SUPPORT OF MOTION<br>Affirmation in Support of Motion | Processed | 01/17/2018 | Goldenberg, I. |
| 13 | EXHIBIT(S)<br>Exhibit A Ledger | Processed | 01/17/2018 | Goldenberg, I. |
| 14 | EXHIBIT(S)<br>Exhibit B Declaration | Processed | 01/17/2018 | Goldenberg, I. |
| 15 | EXHIBIT(S)<br>Exhibit C Summons & Complaint | Processed | 01/17/2018 | Goldenberg, I. |
| 16 | EXHIBIT(S)<br>Exhibit D Notice of Pendency | Processed | 01/17/2018 | Goldenberg, I. |
| 17 | EXHIBIT(S)<br>Exhibit E Affidavit of Service EONS secretary of state | Processed | 01/17/2018 | Goldenberg, I. |
| 18 | EXHIBIT(S)<br>Exhibit F Affidavit of Service Eons Ogen | Processed | 01/17/2018 | Goldenberg, I. |
| 19 | EXHIBIT(S)<br>Exhibit G Affidavit of Service Property | Processed | 01/17/2018 | Goldenberg, I. |
| 20 | EXHIBIT(S)<br>Exhibit H Affidavit of Service Doe | Processed | 01/17/2018 | Goldenberg, I. |
| 21 | EXHIBIT(S)<br>Exhibit I 3215 Affidavit of Service | Processed | 01/17/2018 | Goldenberg, I. |

NYSCEF

**Document List**

Rockland County Supreme Court

**Index #   035039/2017**

Created on:07/30/2018 05:04 PM

| Doc# | Document Type/Information | Status | Date Received | Filed By |
|------|--------------------------|--------|---------------|----------|
| 22 | AFFIRMATION/AFFIDAVIT OF SERVICE<br>Affidavit of Service | Processed | 01/17/2018 | Goldenberg, I. |
| 23 | RJI -RE: NOTICE OF MOTION<br>RJI | Processed | 01/17/2018 | Goldenberg, I. |
| 24 | JUDGMENT -TO COURT (PROPOSED)<br>Proposed Order Granting Default Judgment and<br>Appointing Referee | Processed | 01/17/2018 | Goldenberg, I. |
| 25 | ANSWER WITH COUNTER-CLAIM(S) | Processed | 01/28/2018 | Ogen, E. |
| 26 | NOTICE OF CROSS-MOTION | Processed | 01/28/2018 | Ogen, E. |
| 27 | AFFIDAVIT OR AFFIRMATION IN OPPOSITION TO<br>MOTION AND IN SUPPORT OF CROSS-MOTION | Processed | 01/28/2018 | Ogen, E. |
| 28 | AFFIDAVIT OR AFFIRMATION IN OPPOSITION TO<br>MOTION AND IN SUPPORT OF CROSS-MOTION<br>Affidavit of Merit | Processed | 01/28/2018 | Ogen, E. |
| 29 | EXHIBIT(S)<br>emails | Processed | 01/28/2018 | Ogen, E. |
| 30 | EXHIBIT(S)<br>Answer with Counterclaims | Processed | 01/28/2018 | Ogen, E. |
| 31 | EXHIBIT(S)<br>Arbitrator Decision - Damages | Processed | 01/28/2018 | Ogen, E. |
| 32 | EXHIBIT(S)<br>Arbitrator Decision | Processed | 01/28/2018 | Ogen, E. |
| 33 | LETTER / CORRESPONDENCE TO JUDGE<br>Ltr to Hon. Thorsen re adjournment | Processed | 01/29/2018 | Goldenberg, I. |
| 34 | AFFIDAVIT OR AFFIRMATION IN OPPOSITION TO<br>MOTION<br>Affirmation in Opposition to Cross Motion | Processed | 01/29/2018 | Goldenberg, I. |
| 35 | LETTER / CORRESPONDENCE TO JUDGE<br>Ltr to Hon. Thorsen re withdraw request for adjournment | Processed | 01/29/2018 | Goldenberg, I. |
| 36 | AFFIRMATION/AFFIDAVIT OF SERVICE | Processed | 01/30/2018 | Goldenberg, I. |
| 37 | AFFIDAVIT OR AFFIRMATION IN REPLY | Processed | 01/31/2018 | Ogen, E. |
| 38 | LETTER / CORRESPONDENCE TO JUDGE<br>Ltr to Hon. Rolf M. Thorsen, AJSC | Processed | 03/29/2018 | Goldenberg, I. |

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF ROCKLAND
--------------------------------------------------------------------X
PIERSON LAKES HOMEOWNERS ASSOCIATION, INC.,

Index No. 2017- 035039
Filed: 10/16/17

Plaintiff,

-against-

**NOTICE OF
PENDENCY**

EONS Properties, LLC; "JOHN DOE" and
"JANE DOE," which names refer to fictitious parties who
are possible tenants or occupants of the premises or who may
be other presently unknown parties who claim or may claim
a lien against the premises,

Defendants.
--------------------------------------------------------------------X

**NOTICE IS HEREBY GIVEN**, that an action has been commenced and is now pending

in this Court upon the complaint of the above named Plaintiff, Pierson Lakes Homeowners

Association, Inc., in which the judgment demanded in the pleadings by Plaintiff against Defendant

EONS Properties, LLC would affect the title to and the possession, use and enjoyment of real

property referred to below by a demand for foreclosure of the Plaintiff's lien for unpaid

Assessments and other charges, and the sale of such real property for the benefit of Plaintiff.

**PLEASE TAKE FURTHER NOTICE**, that the real property affected by said action at

the commencement of this action, and at the time of filing of this notice is situated in the State of

New York, County of Rockland, Town of Ramapo, and consists of: a parcel which is described on

the tax maps of the Town of Ramapo as Section 46.7, Block 1, Lot 7; the parcel is also known as

12 Pierson Lake Dr., Sloatsburg, New York 10974; the parcel is further described in the attached

Schedule A.

**PLEASE TAKE FURTHER NOTICE**, that at present legal title to the real property

affected by this Notice of Pendency is with the Defendant EONS Properties, LLC, which title was

acquired by deed dated December 16, 2014 from Michael Pecoraro, and recorded December 16,

2014 in Instrument No. 2015-00000120.

**PLEASE TAKE FURTHER NOTICE**, that this Notice of Pendency has been filed by

the Plaintiff herein.

Dated: October 17, 2017
      White Plains, NY

Diane E. Selker, Esq.
GOLDENBERG & SELKER, LLP
*Attorneys for Plaintiff HOA*
399 Knollwood Road, Suite 112
White Plains, NY 10603
(914) 997-0999

**TO THE CLERK OF THE COUNTY OF ROCKLAND:**

You are hereby directed to index the foregoing Notice of Pendency of Action against the

following named Defendant: EONS Properties, LLC.

Dated: October 17, 2017
         White Plains, NY

Diane E. Selker, Esq.
GOLDENBERG & SELKER, LLP
*Attorneys for Plaintiff HOA*
399 Knollwood Road, Suite 112
White Plains, NY 10603
(914) 997-0999

**RECORD AND RETURN TO**:

Diane E. Selker, Esq.
GOLDENBERG & SELKER, LLP
399 Knollwood Road, Suite 112
White Plains, NY 10603

## NATIONAL REAL ESTATE SERVICES, INC.

### Title Number: 5999

### S C H E D U L E   A

ALL that certain plot, piece or parcel of land, situate, lying and being in the Town of Ramapo, in the County of Rockland, State of NY and shown and designated as Lot 46.07-1-7 on a map entitled "Subdivision Plat-Lot Line Change Pierson Lakes Phase No. 3" made by A.R. Sparaco, Jr., PLS dated January 30, 2002 and filed in the Office of the Rockland County Clerk on June 5, 2003, as Map No. 7585, and which said parcel is more particularly bounded and described as follows:

BEGINNING at a point marked by an iron pin distant 1,980.24 feet Westerly as measured on a course of South 57 27' 26" west from the Southwesterly terminus of Sterlington Road as shown on a map entitled, "Subdivision Plat Pierson Lakes Phase I Drawing H-3" which was filed in the Office of Rockland County Clerk as Map No. 6460; and

RUNNING THENCE North 31 degrees 05' 00" West 48.67 feet to an iron pin set;

THENCE North 52 degrees 44' 15" East 543.09 feet to an iron pin set in the Westerly side of Cranberry Lake;

THENCE along the Westerly side of Cranberry Lake the following courses and distances:

South 29 degrees 78' 00" East 28.04 feet;
South 4 degrees 58' 30" East 24.39 feet
South 16 degrees 29' 00" East 82.76 feet;
South 25 degrees 33' 00" East 50.45 feet;
South 58 degrees 07' 00" East 53.65 feet;
South 48 degrees 37' 00" East 790.26 feet;
South 41 degrees 58' 00" East 144.76 feet to an iron pin;

THENCE turning away from Cranberry Lake South 44 degrees 25' 00" West 500.63 feet to a point marked by an iron pin;

THENCE North 45 degrees 35' 00" West 289.37 feet;

NATIONAL REAL ESTATE SERVICES, INC.

Title Number: 5999

S C H E D U L E  A  (continued)

THENCE on a curve bearing to the right having a radius of 576 feet, an arc distance of 145.77 feet;

THENCE North 31 degrees 05' 00" West 31.01 feet to an iron pin which said pin is the point or place of BEGINNING.

TOGETHER with an easement of ingress and egress and for utilities over the private rights of way shown on the aforementioned map to the nearest public highway.

TOGETHER with the benefits of and subject to the burdens set forth in a declaration of covenants, restrictions, easements, charges and liens made by Ramapo Land Co., Inc. dated April 25, 1990 and recorded in the Rockland County Clerk's office on May 11, 1990 in Liber 408 at Page 1110.

FOR
CONVEYANCING
ONLY

The policy to be issued under this report will insure the title to such buildings and improvements erected on the premises which by law constitute real property.

TOGETHER with all the right, title and interest of the party in the first part, or, in and to the land lying in the street in front of and adjoining said premises.

AFFIDAVIT OF SERVICE THROUGH
THE SECRETARY OF STATE, NEW YORK

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF ROCKLAND

----------------------------------------------------------------X

PIERSON LAKES HOMEOWNERS ASSOCIATION, INC.,

                                    Plaintiff,

        -against-                                           Index #: 2017-035039
                                                            Filed: 10/16/17

EONS PROPERTIES, LLC; "JOHN DOE" and
"JANE DOE," which names refer to fictitious parties who
are possible tenants or occupants of the premises or who may
be other presently unknown parties who claim or may claim
a lien against the premises,

                                    Defendants.

----------------------------------------------------------------X

STATE OF NEW YORK]
COUNTY OF ALBANY          ] ss.:

       Kristie DeLong, being duly sworn, deposes and says that she is over eighteen years of age; that on 10/19/2017, at the Department of State in the City of Albany, New York, she served the annexed Summons and Complaint and Notice of Pendency with Notice of Commencement of Action Subject to Mandatory Electronic Filing upon **EONS PROPERTIES, LLC** by delivering to and leaving with Nancy Dougherty, a Data Entry Machine Operator, in the Office of the New York Department of State two (2) copies thereof and that at the time of making such service, deponent paid Secretary of State a fee of $40.00.  That said service was made pursuant to Section 303 of the Limited Liability Company Law.

       Deponent further says that she knew the person so served as aforesaid to be a Data Entry Machine Operator at the New York State Department of State, duly authorized to accept such service on behalf of said defendant.

Deponent further states that she describes the person actually served as follows:

| Sex | Skin Color | Hair Color | Approx Age | Approx Height | Approx Weight |
|------|-----------|-----------|-----------|--------------|--------------|
| Female | White | Brown | 60yrs. | 5'4" | 130lbs. |

                                              _____
                                                        Kristie DeLong

Sworn to before me this

20 day of October, 2017

_____
Notary Public

        GERTRUDE B. WINTER
    Notary Public, State of New York
        No. 01WI5050407
    Qualified in Saratoga County
Commission Expires October 10, 2021

State of New York - Department of State
Receipt for Service

Receipt #:  201710190394                    Cash #:  201710190240
Date of Service:  10/19/2017           Fee Paid: $40 - DRAWDOWN
Service Company:  39 BLUMBERG/EXCELSIOR CORPORATE SERVICES -

Service was directed to be made pursuant to:  SECTION 303 OF THE LIMITED
    LIABILITY COMPANY LAW

Party Served:  EONS PROPERTIES, LLC


Plaintiff/Petitioner:
        PIERSON LAKES HOMEOWNERS ASSOCIATION, INC.



Service of Process Address:
EONS PROPERTIES, LLC
2ND FLOOR
11 HANOVER SQUARE
NEW YORK,  NY 10005

                                        Secretary of State
                                        By  NANCY DOUGHERTY

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF ROCKLAND
-------------------------------------------------------------------------X
PIERSON LAKES HOMEOWNERS ASSOCIATION, INC.,

                                    Plaintiff,

                    -against-

EONS PROPERTIES, LLC; "JOHN DOE" and
"JANE DOE," which names refer to fictitious parties who
are possible tenants or occupants of the premises or who may
be other presently unknown parties who claim or may claim
a lien against the premises,

                                    Defendants.
-------------------------------------------------------------------------X

Index No. 035039/2017
Filed: October 16, 2017

**AFFIDAVIT OF SERVICE**
CPLR 3215(g)(3)

*Address of Property*:
**12 Pierson Lake Dr.**
**Sloatsburg, NY 10974**

STATE OF NEW YORK          )
                           ) S.S.:
COUNTY OF WESTCHESTER      )

    I, MARY RODRIGUEZ being duly sworn says: I am not a party to the action and I am over 18 years of age and reside in Yorktown, New York.

    On November 14, 2017, I served a true copy of the annexed **SUMMONS & VERIFIED COMPLAINT and NOTICE OF PENDENCY** in the above captioned action upon following:

EONS Properties, LLC
12 Pierson Lake Drive
Sloatsburg, NY 10974

EONS Properties, LLC
c/o Ogen & Sedaghati, P.C.
202 East 35th Street
New York, NY 10016

EONS Properties, LLC
c/o New York Dept. of State
One Commerce Plaza
99 Washington Avenue
Albany, NY 12231

by depositing the same in an envelope bearing the legend "personal and confidential" and not indicating on the outside of the envelope that the communication is from an attorney or concerns an alleged debt by first class mail in a post-office or official depository of the U.S. Postal Service within the State of New York. The address and delivery service are indicated above.

Mary Rodriguez

Sworn to before me, this
14th day of November, 2017

Notary Public

DENISE E. LUCAS
Notary Public, State of New York
Registration No. 01LU6343946
Qualified in Westchester County
Commission Expires 06/20/20

STATE OF NEW YORK
COUNTY OF ROCKLAND      SUPREME   COURT       _Index No._ 2017-035039
                                               **Date filed:** 10-16-17

PIERSON LAKES HOMEOWNERS ASSOCIATION,INC.,

EONS PROPERTIES,LLC,"JOHN   _against_   DOE" and "JANE DOE,"     _AFFIDAVIT_
et al,                                                  _OF_
                                       _Plaintiff(s)_ XXXXXXXXXXXX     _SERVICE_

                                     _Defendant(s)_ XXXXXXXXXXXX

STATE OF NEW YORK, COUNTY OF: <u>WESTCHESTER</u>     ss.:
     The undersigned, being sworn, says: Deponent is not a party herein, is over 18 years of age and **resides in the State of New York.**
On    Oct. 27, 2017    at 1:00 P.M., at 202 East 35th St.,1st Floor,New York, NY 10016
deponent served the within    verified
☒ summons and complaint    ☐ summons    ☐ with notice
☐ subpoena duces tecum    ☐ notice of petition and petition      ☒ WITH ANNEXED NOTICE OF COMMENCEMENT OF
☐ citation               ☐ subpoena                    ACTION SUBJECT TO MANDATORY ELECTRONIC
                                              FILING & NOTICE OF PENDENCY
on
EONS PROPERTIES,LLC c/o OGEN
& SEDAGHATI,P.C.            ☒ defendant    ☐ witness   } hereinafter called { therein
                                     ☐ respondent             the recipient    named

**INDIVIDUAL** ☐    by delivering a true copy _of each_ to said recipient personally; deponent knew the person so served to be the person described as
     said recipient therein.

**CORPORATION** ☒    a --------------- corporation, by delivering thereat a true copy _of each_ to Aniva Manguao
     personally, deponent knew said corporation so served to be the corporation, described in same as said recipient and knew said
     individual to be   authorized agent in the Law Office    thereof.
                   of Ogen & Sedaghati, P.C.

**SUITABLE AGE PERSON** ☐    by delivering thereat a true copy _of each_ to _____ a person of suitable age and
     discretion. Said premises is recipient's ☐ actual place of business ☐ dwelling place ☐ usual place of abode within the state.

**AFFIXING TO DOOR, ETC.** ☐    by affixing a true copy _of each_ to the door of said premises, which is recipient's ☐ actual place of business ☐ dwelling place
     ☐ subject property within the state. Deponent was unable, with due diligence to find recipient or a person of suitable age
     and discretion, thereat, having called there

**MAILING** ☐    On _____ deponent enclosed a copy of same in a postpaid envelope properly addressed to recipient at recipient's
     ☐ actual place of business ☐ dwelling place ☐ subject property and deposited : envelope in an official depository
     under exclusive care and custody of the U.S. Postal Service.The envelope bore the legend "Personal and Confidential"

**DESCRIPTION** ☒

| | | | |
|---|---|---|---|
| ☐ Male | ☐ White Skin | ■ Black Hair | ☐ White Hair | ☐ 14-20 Yrs. | ☐ Under 5' | ☐ Under 100 Lbs. |
| ■ Female | ☐ Black Skin | ☐ Brown Hair | ☐ Balding | ■ 21-35 Yrs. | ☐ 5'0"-5'3" | ☐ 100-130 Lbs. |
| | ☐ Yellow Skin | ☐ Blonde Hair | ☐ Mustache | ☐ 36-50 Yrs. | ■ 5'4"-5'8" | ■ 131-160 Lbs. |
| | ■ Brown Skin | ☐ Gray Hair | ☐ Beard | ☐ 51-65 Yrs. | ☐ 5'9"-6'0" | ☐ 161-200 Lbs. |
| | ☐ Red Skin | ☐ Red Hair | ☐ Glasses | ☐ Over 65 Yrs. | ☐ Over 6' | ☐ Over 200 Lbs. |

Other identifying features:

**WITNESS FEES**   $          was paid (tendered) to the recipient   ☒ **Index Number/Date of filing endorsed thereon.**

**MILITARY SERVICE**   Upon information and belief I aver that the recipient is not in military service of New York State or of the United States as that term is defined in either the State or in the Federal statutes.

Sworn to before me on   11/6/2017

_Clemens W. Pantaleo_

CLEMENS W. PANTALEO
Notary Public, State of New York
No. 60-4929179
Qualified in Westchester County
Commission Expires May 2, 2018

Process Server
Patrick J. Ruto

1 of 1

STATE OF NEW YORK
COUNTY OF ROCKLAND        SUPREME   COURT                    *Index No.* 2017-035039

PIERSON LAKES HOMEOWNERS ASSOCIATION, INC.,                *Date filed:* 10-16-17

                                              *Plaintiff(s)* XXXXXXXXXXXX

EONS PROPERTIES, LLC, "JOHN   *against*  DOE" and "JANE DOE,"      **AFFIDAVIT**
et al,                                                              **OF**
                                              *Defendant(s)s* XXXXXXXXXXXX   **SERVICE**

STATE OF NEW YORK, COUNTY OF: <u>WESTCHESTER</u>        ss.:
The undersigned, being sworn, says: Deponent is not a party herein, is over 18 years of age and **resides in the State of New York.**

On ___Nov. 3, 2017___ at 7:55 A.M., at _12 Pierson Lake Drive, Sloatsburg, NY 10974_
deponent served the within     Verified
- ☒ summons and complaint   ☐ summons   ☐ with notice
- ☐ subpoena duces tecum    ☐ notice of petition and petition
- ☐ citation                ☐ subpoena         ☒ WITH ANNEXED NOTICE OF COMMENCEMENT OF
                                                ACTION SUBJECT TO MANDATORY ELECTRONIC
                                                FILING & NOTICE OF PENDENCY

on     EONS PROPERTIES, LLC

                                              ☒ defendant  ☐ witness   { hereinafter called  } therein
                                              ☐ respondent            { the recipient      } named

**INDIVIDUAL** ☐   by delivering a true copy *of each* to said recipient personally; deponent knew the person so served to be the person described as
said recipient therein.

**CORPORATION** ☐   a --------------- corporation, by delivering thereat a true copy *of each* to _____
personally, deponent knew said corporation so served to be the corporation, described in same as said recipient and knew said
individual to be _____ thereof.

**SUITABLE**
**AGE PERSON** ☐   by delivering thereat a true copy *of each* to _____ a person of suitable age and
discretion. Said premises is recipient's ☐ actual place of business ☐ dwelling place ☐ usual place of abode within the state.

**AFFIXING TO**
**DOOR, ETC.** ☒   by affixing a true copy *of each* to the door of said premises, which is recipient's ☐ actual place of business ☐ dwelling place
☒subject propertywithin the state. Deponent was unable, with due diligence to find recipient or a person of suitable age
and discretion, thereat, having called there

        10/21/17 at 11:15 A.M.      11/3/17 at 7:55 A.M.
        10/27/17 at 8:00 P.M.
        11/1/17 at 2:40 P.M.

**MAILING**    On _Nov. 6, 2017_ deponent enclosed a copy of same in a postpaid envelope properly addressed to recipient at recipient's
☒X    ☐ actual place of business ☐ dwelling place ☒subject propertyand deposited ☐ envelope in an official depository
under exclusive care and custody of the U.S. Postal Service. The envelope bore the legend "Personal and Confidential"

**DESCRIPTION** ☐
| | | | | | | |
|---|---|---|---|---|---|---|
| ☐ Male | ☐ White Skin | ☐ Black Hair | ☐ White Hair | ☐ 14-20 Yrs. | ☐ Under 5′ | ☐ Under 100 Lbs. |
| ☐ Female | ☐ Black Skin | ☐ Brown Hair | ☐ Balding | ☐ 21-35 Yrs. | ☐ 5′0″-5′3″ | ☐ 100-130 Lbs. |
| | ☐ Yellow Skin | ☐ Blonde Hair | ☐ Mustache | ☐ 36-50 Yrs. | ☐ 5′4″-5′8″ | ☐ 131-160 Lbs. |
| | ☐ Brown Skin | ☐ Gray Hair | ☐ Beard | ☐ 51-65 Yrs. | ☐ 5′9″-6′0″ | ☐ 161-200 Lbs. |
| | ☐ Red Skin | ☐ Red Hair | ☐ Glasses | ☐ Over 65 Yrs. | ☐ Over 6′ | ☐ Over 200 Lbs. |

Other identifying features:

**WITNESS**
**FEES**     $ _____  was paid (tendered) to the recipient   ☒ Index Number/Date of filing
                                                              endorsed thereon.

**MILITARY**
**SERVICE**   Upon information and belief I aver that the recipient is not in military service of New York State or of the United States as that term
is defined in either the State or in the Federal statutes.

Sworn to before me on _11/6/2017_ _____        _Clemens W. Pantaleo_
                        LOUIS ROSTEN                         Process Server
                  Notary Public, State of New York        Clemens W. Pantaleo
                        No. 4834354
                  Qualified in Putnam County
                  Commission Expires ___5/3/19___

**FILED: ROCKLAND COUNTY CLERK 12/01/2017 09:39 AM**      INDEX NO. 035039/2017
NYSCEF DOC. NO. 7      RECEIVED NYSCEF: 12/01/2017

17 of 194

STATE OF NEW YORK
COUNTY OF ROCKLAND          SUPREME   COURT

Index No. 2017-035039
Date filed: 10-16-17

PIERSON LAKES HOMEOWNERS ASSOCIATION,INC.,

Plaintiff(s)

against

EONS PROPERTIES,LLC,"JOHN  DOE" and "JANE DOE,"
et al,

Defendant(s)

**AFFIDAVIT OF SERVICE**

STATE OF NEW YORK, COUNTY OF: <u>WESTCHESTER</u>      ss.:

The undersigned, being sworn, says: Deponent is not a party herein, is over 18 years of age and **resides in the State of New York.**

On ___Nov. 3, 2017___ at 7:55 A.M., at _12 Pierson Lake Drive,Sloatsburg,NY 10974_

deponent served the within

- [X] summons with Verified
- [ ] summons
- [ ] summons with notice
- [X] summons and complaint
- [ ] notice of petition and petition
- [ ] subpoena duces tecum
- [ ] subpoena
- [ ] citation

- [X] WITH ANNEXED NOTICE OF COMMENCEMENT OF ACTION SUBJECT TO MANDATORY ELECTRONIC FILING & NOTICE OF PENDENCY

on   "JOHN DOE" and "JANE DOE"

- [X] defendant
- [ ] respondent
- [ ] witness

{ hereinafter called   therein
the recipient     named

**INDIVIDUAL** [ ]  by delivering a true copy of each to said recipient personally; deponent knew the person so served to be the person described as said recipient therein.

**CORPORATION** [ ]  a — — — — — — — — — —  corporation, by delivering thereat a true copy of each to ___ personally, deponent knew said corporation so served to be the corporation, described in same as said recipient and knew said individual to be ___ thereof.

**SUITABLE AGE PERSON** [ ]  by delivering thereat a true copy of each to ___ a person of suitable age and discretion. Said premises is recipient's [ ] actual place of business [ ] dwelling place [ ] usual place of abode within the state.

**AFFIXING TO DOOR, ETC.** [X]  by affixing a true copy of each to the door of said premises, which is recipient's [ ] actual place of business [ ] dwelling place [X] subject property within the state. Deponent was unable, with due diligence to find recipient or a person of suitable age and discretion, thereat, having called there

10/21/17 at 11:15 A.M.          11/3/17 at 7:55 A.M.
10/27/17 at 8:00 P.M.
11/1/17 at 2:40 P.M.

**MAILING** [X]  On _Nov. 6,2017_ deponent enclosed a copy of same in a postpaid envelope properly addressed to recipient at recipient's [ ] actual place of business [ ] dwelling place [X] subject property and deposited envelope in an official depository under exclusive care and custody of the U.S. Postal Service.The envelope bore the legend "Personal and Confidential"

**DESCRIPTION** [ ]

- [ ] Male
- [ ] Female
- [ ] White Skin
- [ ] Black Skin
- [ ] Yellow Skin
- [ ] Brown Skin
- [ ] Red Skin
- [ ] Black Hair
- [ ] Brown Hair
- [ ] Blonde Hair
- [ ] Gray Hair
- [ ] Red Hair
- [ ] White Hair
- [ ] Balding
- [ ] Mustache
- [ ] Beard
- [ ] Glasses
- [ ] 14-20 Yrs.
- [ ] 21-35 Yrs.
- [ ] 36-50 Yrs.
- [ ] 51-65 Yrs.
- [ ] Over 65 Yrs.
- [ ] Under 5'
- [ ] 5'0"-5'3"
- [ ] 5'4"-5'8"
- [ ] 5'9"-6'0"
- [ ] Over 6'
- [ ] Under 100 Lbs.
- [ ] 100-130 Lbs.
- [ ] 131-160 Lbs.
- [ ] 161-200 Lbs.
- [ ] Over 200 Lbs.

Other identifying features:

**WITNESS FEES**  $ ___ was paid (tendered) to the recipient  [X] Index Number/Date of filing endorsed thereon.

**MILITARY SERVICE**  Upon information and belief I aver that the recipient is not in military service of New York State or of the United States as that term is defined in either the State or in the Federal statutes.

Sworn to before me on _11/6/2017_

LOUIS ROSTEN
Notary Public, State of New York
No. 4834354
Qualified in Putnam County
Commission Expires

Clemens W. Pantaleo
Process Server
Clemens W. Pantaleo

1 of 1

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF ROCKLAND
-------------------------------------------------------------------------X
PIERSON LAKES HOMEOWNERS ASSOCIATION, INC.,

                                      Plaintiff,          Index No. 35039-17

          -against-                             **AFFIDAVIT OF**
                                                          **SERVICE**

EONS Properties, LLC; "JOHN DOE" and
"JANE DOE," which names refer to fictitious parties who
are possible tenants or occupants of the premises or who may
be other presently unknown parties who claim or may claim
a lien against the premises,

                                   Defendants.
-------------------------------------------------------------------------X

STATE OF NEW YORK         )
                                ) S.S.:
COUNTY OF WESTCHESTER  )

      I, MARY RODRIGUEZ being duly sworn says: I am not a party to the action and I am over 18 years of age and reside in Yorktown, New York.

      On January 17, 2018, I served a true copy of the annexed Motion for Default Judgment, Request for Judicial Intervention and Proposed Order Granting Default Judgment and Appointing Referee in the above captioned action upon following:

EONS Properties, LLC             EONS PROPERTIES, LLC
12 Pierson Lake Drive           c/o Ogen & Sedaghati, P.C.
Sloatsburg, NY 10974            202 East 35th Street
                                  New York, NY 10016

by depositing the same by first class mail in a post-office or official depository of the U.S. Postal Service within the State of New York. The address and delivery service are indicated above.

                                            Mary Rodriguez

Sworn to before me, this
17th day of January, 2018

Notary Public

DIANE E. SELKER
Notary Public. State of New York
No. 02SE6259727
Qualified in Westchester County
Commission Expires 4/16/2020

1 of 1

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF ROCKLAND

---------------------------------------------------------------------------X

PIERSON LAKES HOMEOWNERS ASSOCIATION, INC.,

                                     Plaintiff,                 Index No. 35039-17

         -against-                                         **NOTICE OF MOTION**
                                                          **FOR DEFAULT**
EONS Properties, LLC; "JOHN DOE" and               **JUDGMENT**
"JANE DOE," which names refer to fictitious parties who
are possible tenants or occupants of the premises or who may
be other presently unknown parties who claim or may claim
a lien against the premises,

                                     Defendants.

---------------------------------------------------------------------------X

        PLEASE TAKE NOTICE that upon the annexed Affirmation of Diane E. Selker, Esq.,

dated January 16, 2018, and the Affidavit of Sean Rice of January 16, 2018, and all of the prior

pleadings, procedures and papers heretofore had herein, the defendant shall move this Court at an

IAS Part of the Supreme Court of the State of New York, held in and for the County of

Rockland, at the Courthouse located at 1 South Main St, New City, NY 10956 on the 31st day of

January, 2018 at 9:30 A.M., or as soon thereafter as counsel may be heard, seeking the following

relief:

        AN ORDER **1)** granting default judgment in Plaintiff's foreclosure action in favor of the

Plaintiff and against Defendant EONS Properties, LLC for unpaid Homeowner Association

(HOA) assessments, costs, disbursements, and attorney fees; **2)** awarding default judgment in

favor of the Plaintiff and against EONS foreclosing Plaintiff's lien for unpaid assessments, costs

disbursements and attorney fees; **3)** appointing a referee to compute the amount due to the

Plaintiff and to examine and report whether the premises can be sold in parcels and to report the

amount thereafter to become due; **4)** amending the caption of the action to strike "John Doe" and

"Jane Doe" therefrom without prejudice to any of the proceedings heretofore had or to be had herein; and **5)** for such other and further relief as this Court shall deem just and proper, together with the costs of this motion.

**The above entitled action is not for the foreclosure of a mortgage, but to foreclose unpaid assessments owed to a homeowners' association.**

**PLEASE TAKE FURTHER NOTICE** that answering affidavits, if any, must be served and personally received by the undersigned pursuant to CPLR 2214 (b) at least two (2) days prior to the return date of this motion.

Dated: January 16, 2018
      White Plains, NY

                           Diane E. Selker, Esq.
                           Goldenberg & Selker, LLP
                           *Attorneys for the Plaintiff*
                           399 Knollwood Road, Suite 112
                           White Plains, NY 10603
                           (914) 997-0999

To:    EONS Properties, LLC
       12 Pierson Lake Dr.
       Sloatsburg, NY 10974

       EONS Properties, LLC
       c/o Ogen & Sedaghati, P.C.
       202 East 35th Street
       New York, NY 10016

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF ROCKLAND
------------------------------------------------------------------X
PIERSON LAKES HOMEOWNERS ASSOCIATION, INC.,      Index No. 35039-17

           Plaintiff,

               **AFFIDAVIT IN SUPPORT**
 -against-           **OF MOTION FOR DEFAULT**
               **JUDGMENT**

EONS Properties, LLC; "JOHN DOE" and
"JANE DOE," which names refer to fictitious parties who
are possible tenants or occupants of the premises or who may
be other presently unknown parties who claim or may claim
a lien against the premises,

           Defendants.
------------------------------------------------------------------X
STATE OF NEW YORK  )
          }ss.:
COUNTY OF ROCKLAND)

   SEAN RICE, being duly sworn, deposes and says:

1. I am the President of plaintiff Pierson Lakes Homeowners Association, Inc. ("Pierson

  Lakes").

2. I submit this affidavit in support of Pierson Lakes' motion for default judgment in its

  favor and against Defendant EONS Properties, LLC ("EONS") for unpaid assessments

  and other fees, and to foreclose Pierson Lakes' lien for the unpaid amounts.

3. I have reviewed the original attached account (see **Exhibit A**) for EONS, which account

  is kept in the regular course of business by Pierson Lakes.  I find the same to be in proper

  form and the amounts recorded therein to be correct, the entries being made in the regular

  course of business of Pierson Lakes and contemporaneously with the transactions

  recorded.

4. The balance owed by EONS to Pierson Lakes as of December 2, 2017 is $33,508.99 not

  including attorney fees and costs for the instant action.

Case 7:18-cv-00900-KMK Document 1 Filed 08/08/18 Page 1 of 35 Interim Pg
22 of 194

5.  A review of EONS's account reveals that the last time it made any payment to Pierson Lakes was almost 10 months ago, on March 8, 2017 (see **Exhibit A**).

6.  In the regular course of business Pierson Lakes notified EONS in writing on a monthly basis as to the amounts it owed Pierson Lakes.

7.  The monthly maintenance, capital assessments and late fees owed by EONS (and all other unit owners) were duly and timely fixed by the Board of the Pierson Lakes Condominium (See **Exhibit B**, Declaration Article VI, §3).

8.  The Declaration requires that EONS, as well as all the other HOA members, pay assessments to Pierson Lakes and if such assessments are not paid when due then the member is liable for the costs of collection, interest, and the reasonable attorney fees incurred by Pierson Lakes in collecting same (See **Exhibit B**, Declaration, Art. VI, §6).

9.  After the date of this affidavit, assessments will continue to accrue for EONS at the present monthly rate of $1,755.00, plus a late fee of 1.012% per month on any unpaid balance carried over and unpaid 30 days after billing.

10. Deponent has been advised by its counsel that all parties who are necessary to this action have been served.

11. The Declaration additionally provides that the amounts due Pierson Lakes shall be the personal obligation of the owner of each lot at the time the assessment comes due, and that no residential lot at Pierson Lakes is exempt from the payment of the assessments (See **Exhibit B**, Art. VI, §1).

12. According to the Declaration, if the assessments are not paid when due, Pierson Lakes is authorized to commence and prosecute an action to foreclose its lien against the lot (See **Exhibit B**, Art. VI, §6).

2

13. Additionally, the Declaration also authorizes Pierson Lakes to commence and prosecute an action to recover a personal money judgment against an owner of a lot for the failure to pay the assessments, and such suit maybe maintained without foreclosing or waiving the lien securing the same, and may be prosecuted simultaneously therewith (See **Exhibit B**, Art. VI, §6).

14. Deponent has reviewed the legal description of the property as set forth in the complaint and has determined that the premises consist of a single parcel and should be sold as such.

WHEREFORE, for the reasons stated above and in the attached affirmation of Pierson Lakes' attorney, judgment should be granted in favor of the Plaintiff.

_____
Sean Rice

Sworn to before me this
16ᵗʰ day of January, 2018

_____
Notary Public

**MARY ANNE C. RODRIGUEZ**
Notary Public, State of New York
No. 01RO6182722
Qualified in Westchester County
Commission Expires 03/03/20

3

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF ROCKLAND
----------------------------------------------------------------------------X
PIERSON LAKES HOMEOWNERS ASSOCIATION, INC.,

                              Plaintiff,

               -against-

EONS Properties, LLC; "JOHN DOE" and
"JANE DOE," which names refer to fictitious parties who
are possible tenants or occupants of the premises or who may
be other presently unknown parties who claim or may claim
a lien against the premises,

                            Defendants.
----------------------------------------------------------------------------X

Index No. 35039-17

**AFFIRMATION IN SUPPORT
OF MOTION FOR DEFAULT
JUDGMENT**

     Diane E. Selker, an attorney duly admitted to practice before the Courts of the State of New

York, affirms the following under penalty of perjury:

1.    I am a partner in the law firm of Goldenberg & Selker, LLP, attorneys for Plaintiff in

     this matter, and am fully familiar with the facts and circumstances of these proceedings

     and the matters set forth herein. I am not a party to the action.

2.    I submit this affirmation in support of the relief requested by Plaintiff Pierson Lakes

     Homeowners Association, Inc. ("Pierson Lakes" or "the HOA") in its notice of motion.

3.    The instant action was brought for two purposes: first, to obtain a personal money

     judgment against Defendant EONS Properties, LLC ("EONS") for unpaid assessments

     and other charges owed to Pierson Lakes (totaling $33,508.99 as of December 2, 2017,

     not including attorney's fees); and second, to foreclose Pierson Lake's lien against

     EONS' property at 12 Pierson Lake Dr., Sloatsburg, NY 10974 for such unpaid

     amounts.

4. The property, an undeveloped lot, which is owned by EONS and which is the subject of foreclosure, is described in "Schedule A" attached to the complaint in this action. (See **Exhibit C.**)

5. Plaintiff HOA is a not-for-profit corporation organized under the laws of the State of New York, with a principal place of business in Sterlington, Town of Ramapo, County of Rockland, State of New York, which is a homeowners' association that controls and manages real property known as "Pierson Lakes."

6. Pierson Lakes is subject to a Declaration of Covenants, Restrictions, Easements, Charges and Liens made by the Ramapo Land Co., Inc., dated April 25, 1990, which was recorded with the Rockland County Clerk on May 11, 1990, in Liber 408, Page 1110, as subsequently amended ("the Declaration") (relevant portions of the Declaration & By-Laws are attached as **Exhibit B**).

7. The amounts presently due to Plaintiff Pierson Lakes by EONS are set forth in the attached account (See **Exhibit A**), and are owed pursuant to the Declaration.

8. The summons, verified complaint, and a notice of pendency in the action were filed with the Rockland County Clerk on October 16, 2017 in the form prescribed by statute and contains, as this affirmant believes, all the particulars required by law to be stated in such documents. (Annexed as **Exhibit C** is a copy of the summons and complaint with confirmation of their electronic filing. Annexed as **Exhibit D** is a copy of the Notice of Pendency with confirmation of its electronic filing.)

9. The summons and verified complaint were served on EONS on October 19, 2017 by delivery to the Secretary of State pursuant to LLC Law§303. (Annexed hereto as

2

**Exhibit E** are copies of the affidavit of service and the confirmation receipt for its electronic filing in the Office of the Rockland County Clerk on October 26, 2017.)

10. EONS was also served by delivery on October 27, 2017 of the summons and verified complaint to an authorized agent at Ogen & Sedagheti, P.C., the law office of EONS' principals. (Annexed hereto as **Exhibit F** are copies of the affidavit of service and the confirmation receipt for its electronic filing in the Office of the Rockland County Clerk on December 1, 2017.)

11. EONS, "John Doe," and "Jane Doe" were also served on November 3, 2017 by affixing copies of the summons and complaint to the subject property and mailing copies to the subject property marked "Personal and Confidential. (Annexed hereto as **Exhibit G and Exhibit H,** respectively, are copies of the affidavits of service and the confirmation receipts for their electronic filing in the Office of the Rockland County Clerk on December 1, 2017.)

12. Since the filing of the Notice of Pendency, the complaint has not been amended by adding new parties to the action, or so as to affect other property not described in the notice of pendency, or so as to extend the claims of Pierson Lakes to property beyond the subject premises.

13. In addition to personal service, EONS was served on November 14, 2017 pursuant to CPLR 3215(g) and Business Corporation Law §303 (b) with a copy of the summons and verified complaint by first class mail bearing the legend "personal and confidential" and not indicating on the envelope that the communication was from an attorney or concerned an alleged debt to the subject property, to Ogen & Sedaghati, P.C., and to the

Secretary of State.  (A copy of the affidavit of service and confirmation of its electronic filing with the Rockland County Clerk on November 14, 2017 are attached as **Exhibit I.**)

14. No defendant answered or appeared and their time to do so has expired and has not otherwise been extended.

15. It is respectfully submitted that Plaintiff's cause of action is established sufficiently to warrant the court, as a matter of law, to grant judgment in favor of the Plaintiff and against EONS.

16. A copy of this motion has been served upon EONS.

WHEREFORE, for the reasons set forth herein and in the annexed affidavit of Sean Rice and the Exhibits hereto it is respectfully requested that the relief sought in Plaintiff's notice of motion be granted in its entirety.

Dated: January 16, 2018
White Plains, NY

Diane E. Selker

# Exhibit "B"

DECLARATION OF COVENANTS, RESTRICTIONS,
EASEMENTS, CHARGES AND LIENS


DECLARANT - RAMAPO LAND CO., INC.


DATE OF DECLARATION                    , 1989

———————————————

Phillips, Lytle, Hitchcock, Blaine & Huber
Attorneys for the Developer
437 Madison Avenue
New York, New York  10022

EXHIBIT A

30

TABLE OF CONTENTS

Page

ARTICLE    I.       DEFINITIONS.................................    2

ARTICLE    II.      PROPERTY SUBJECT TO THIS DECLARATION......    4
   Section  1.      The Properties.............................    4
   Section  2.      Developer's Right to Develop the
                    Properties and Developer's Option
                    to Include Certain Additional Lands.......    4
   Section  3.      Mergers....................................    5
   Section  4.      Reciprocal Cross Easements over
                    Remaining Rockland County Lands...........    5
   Section  5.      Reciprocal Cross Easements
                    Over New Jersey Lands.....................    5

ARTICLE    III.     MEMBERSHIP AND VOTING RIGHTS IN THE
                    ASSOCIATION...............................    6

ARTICLE    IV.      PROPERTY RIGHTS IN THE PROPERTIES.........    7
   Section  1.      Members' Easement of Enjoyment............    7
   Section  2.      Title to Common Areas.....................    7
   Section  3.      Extent of Members' Easements..............    8
   Section  4.      Parking Rights............................    9
   Section  5.      Delegation of Use.........................    9
   Section  6.      Pool and Tennis Court Rights..............    9

ARTICLE    V.       DEVELOPMENT OF PIERSON LAKES..............    9
   Section  1.      Pierson Lakes.............................    9
   Section  2.      Easements.................................    9
   Section  3.      Reservation of Easements..................   10
   Section  4.      Encroachments on Lots.....................   11
   Section  5.      Easements to Members of the
                    General Public............................   11

ARTICLE    VI.      COVENANT FOR MAINTENANCE ASSESSMENT.......   11
   Section  1.      Creation of the Lien and Personal
                    Obligation................................   11
   Section  2.      Purpose of the Assessment.................   11
   Section  3.      Assessments...............................   12
   Section  4.      Due Dates; Duties of the Board of
                    Directors.................................   13
   Section  5.      Special Assessments for Capital
                    Improvements..............................   13
   Section  6.      Effect of Non-Payment of Assessments;
                    The Personal Obligation of the Member;
                    The Lien, Remedies of the Association.....   13
   Section  7.      Quorum for Any Actions Authorized Under
                    Section 5.................................   14

Case 7:18-cv-06900-KMK Document 1 Filed 08/03/18 Page 31 of 194

**Section 4. Encroachments on Lots.** In the event that any portion of any roadway, walkway, parking area, driveway, water line, sewer line, utility line, sprinkler system, building or any other structure as originally constructed by the Developer encroaches on any Lot or the Common Areas, it shall be deemed that the Owner of such Lot or the Association has granted a perpetual easement to the Owner of the adjoining Lot or the Association as the case may be for continuing maintenance and use of such encroaching roadway, walkway, driveway, parking area, water line, sewer line, utility line, sprinkler system, building or structure. The foregoing shall also apply to any replacements of any such roadway, walkway, driveway, parking area, water line, sewer line, utility line, sprinkler system, building or structure if same are constructed in substantial conformance to the original installation. The foregoing conditions shall be perpetual in duration and shall not be subject to amendment of these covenants and restrictions.

**Section 5. Easements to Members of the General Public.** The Developer hereby grants members of the general public an easement of ingress and egress over the hiking trail traversing the eastern portion of The Properties as shown on the Schedule B site plan and as said trail may be re-routed from time to time by the Developer or the Association. The Developer, at the request of the Town of Ramapo, also grants local school groups, organizations and clubs the right to visit designated historical sites within The Properties on a chaperoned appointment basis.

**ARTICLE VI. COVENANT FOR MAINTENANCE ASSESSMENTS**

**Section 1. Creation of the Lien and Personal Obligation.** The Developer, for each Lot owned by it within The Properties, hereby covenants and each Owner of any Lot by acceptance of a deed therefore, whether or not it shall be expressed in any such deed or other conveyance, shall be deemed to covenant and agree, to pay to the Association such assessments as are fixed by the Association's Board of Directors and assessed to the Members as hereinafter provided. All sums assessed by the Association but unpaid, together with such interest thereon as is hereinafter provided, shall also be a charge on the land and shall be a continuing lien upon the property owned by such Member against which each such assessment is made. Each such assessment, together with interest thereon and the cost of collection thereof, as hereinafter provided, shall also be a personal obligation of the person who was the Owner of such property at the time when the assessment fell due.

**Section 2. Purpose of the Assessment.** The assessment levied by the Association shall be used exclusively for the purpose of promoting the recreation, health, safety and

-11-

43

welfare of the residents in The Properties as a community and in particular for the improvement and maintenance of properties, services and facilities devoted to this purpose and related to the use and enjoyment of the Common Areas, and of the Lots and Homes situated upon The Properties, including as to the Common Areas without limiting the foregoing, the payment of taxes (if any), insurance thereon and repair, replacement and additions thereto, and the cost of labor, equipment, materials, services, management and supervision thereof.

Section 3. Assessments. The Association's Board of Directors shall, from time to time, but at least annually, fix and determine the budget representing the sum or sums necessary and adequate for the continued operation of the Association and shall send a copy of the budget and any supplement to the budget to each Member prior to assessing the Members thereon. The Board shall determine the total amount required, including the operational items such as insurance, repairs, reserves, maintenance and other operating expenses, as well as charges to cover any deficits from prior years and capital improvements and repairs. The total annual requirements and any supplemental requirements shall be allocated among, assessed to and paid by the Members as follows:

Each Member shall pay a fraction of said requirements for each Lot owned the numerator of which shall be one (1) and the denominator of which shall be equal to the sum of the number of Lots on The Properties subject to this Declaration (initially 74) as amended. The Developer's obligation for such assessments on unsold Lots subject to this Declaration shall be limited to the difference between the actual operating costs of the Association, including reserves on the Common Areas and on Lots to which title has been conveyed, and the assessments levied on Owners who have closed title on their Lots. In supplying services to the Lot Owners, the Developer may direct the Association not to supply maintenance or other services to any Lot to which title remains in the Developer. The Developer's right to so direct the Association not to provide maintenance or other services to a Lot owned by the Developer is expressly conditioned upon the Developer providing such services itself at its sole cost and expense to the extent the Lot requires such services. Express recognition is hereby given to the fact that the Developer may choose to have its construction and other crews render maintenance services for its unsold Lots. In no event, however, shall the Developer be required to make a deficiency contribution in an amount greater than it would otherwise be liable for if it were paying

-12-

44

assessments on unsold Lots. The sum due the Association from each individual Owner shall constitute an assessment of the Board of Directors and unpaid assessments shall constitute liens on the individual Lots, subject to foreclosure as hereinafter provided.

Section 4. Due Dates; Duties of the Board of Directors. All Assessments shall be payable monthly in advance as ordered by The Board of Directors. The Board of Directors of the Association shall fix the date of commencement and the amount of the assessment against each Lot and shall prepare a roster of the Lots and assessments applicable thereto which shall be kept in the office of the Association and shall be open to inspection by any Member. Upon the written request of a Member or his mortgagee, the Board shall promptly furnish such Member or his mortgagee with a written statement of the unpaid charges due from such Member.

Section 5. Special Assessments for Capital Improvements. In addition to the annual assessments authorized by Section 3 of this Article VI, the Association may levy, in any assessment year, a special assessment (which must be fixed at a uniform rate for all Lots) applicable to that year only, in an amount no higher than the maximum annual assessment then permitted to be levied hereunder for the purpose of defraying, in whole or in part, the cost of any construction, unexpected repair or replacement of a described capital improvement upon the Common Areas, including the necessary fixtures and personal property related thereto, provided that any such assessment shall have the assent of two-thirds (2/3) of the votes of the Members who are voting in person or by proxy at a meeting duly called for this purpose, written notice of which shall be sent to all Members not fewer than thirty (30) days nor more than sixty (60) days in advance of the meeting, setting forth the purpose of the meeting, as fixed in the resolution authorizing such assessment.

Section 6. Effect of Non-Payment of Assessments; The Personal Obligation of the Member; The Lien; Remedies of the Association. If an assessment is not paid on the date when due, as fixed by the Board of Directors, then such assessment shall become delinquent and shall, together with such interest thereon and cost of collection thereof as hereinafter provided, thereupon become a continuing lien on the Member's Lot which shall bind such property in the hands of the defaulting Members, his heirs, devisees, personal representatives and assigns. Such lien shall be prior to all other liens except: (a) tax or assessment liens on the Lot by the taxing subdivision of any governmental authority, including but not limited to State, County and School District taxing agencies; and (b) all sums unpaid on any first mortgage of record encumbering the Lot. The personal obligation of the Member who was the Owner of the Lot when the assessment

INDEX NO. 035039/2017

RECEIVED NYSCEF: 01/17/2018

45

fell due to pay such assessment, however, shall remain his personal obligation for the statutory period and shall not pass to his successors in title unless expressly assumed by them.

If the assessment is not paid within thirty (30) days after the delinquency date, the assessment shall bear interest from the date of delinquency at the maximum permissible rate in the State of New York and the Association may bring an action at law against the Member or former Member personally obligated to pay the same and may foreclose the lien against the property. There shall be added to the amount of such assessment the costs of preparing and filing the complaint in such action, and in the event a judgment is obtained, such judgment shall include interest on the assessment as above provided and reasonable attorney's fees to be fixed by the court together with the cost of the action.

Section 7.    Quorum for Any Action Authorized Under Section 5.    The quorum required for any action of the Members of the Association authorized by Section 5 of this Article VI shall be as follows:

At the first meeting called, as provided for in Section 5 of this Article VI, the presence at the meeting of Members in person or by proxy entitled to cast fifty-one (51%) percent of all the votes of the Association shall constitute a quorum.   If the required quorum is not forthcoming at any meeting, another meeting may be called, subject to the notice requirement set forth in Section 5 and the required quorum at each subsequent meeting shall be one-half (1/2) of the required quorum at the preceding meeting, provided that such subsequent meeting shall not be held more than sixty (60) days following the preceding meeting.

ARTICLE VII.   ARCHITECTURAL CONTROL

Section 1.    Design Guidelines.  All construction and changes in landscaping, vegetation and topography on any Lot in the Development shall comply with the Pierson Lakes Design Guidelines prepared by the Jack Johnson Company, as said Design Guidelines may be amended from time to time by the Board of Directors of the Association.   Copies of the Design Guidelines, and all amendments thereto, shall be delivered to each Member and shall also be available for examination and copying by the Members and their agents at the offices of the Association.

Section 2.    Architectural Review Committee.    The Board of Directors of the Association shall appoint a five (5) person Architectural Review Committee, at least one of whose members shall be a Director, to administer and enforce the Pierson Lakes Design Guidelines. No building, fence, wall or other structure, or any sewage system, or change in landscaping,

-14-

# Exhibit "A"

## Pierson Lakes Homeowners Association, Inc.

### Receivable Accounts

From 01/01/2016 to 12/20/2017

| Debit | Credit | Balance | Date | Trx | Invoice | Ch. # | Description |
|---|---|---|---|---|---|---|---|
| | | | | | | | |
| Account : 26.00 - EONS Properties, LLC - Unit 12PL - 12 Pierson Lake Drive | | | | | | | 40,407.09 |
| 1,323.92 | | 1,323.92 | 01/01/2016 | | | | Beginning Balance |
| 690.00 | | 2,013.92 | 01/01/2016 | 1801 | 889 | | Common charges - January 2016 |
| 650.00 | | 2,663.92 | 01/01/2016 | 1802 | 914 | | sponsor payment deficit Unit 12PL |
| 9.92 | | 2,673.84 | 01/31/2016 | 1922 | 981 | | Late payment fees |
| 690.00 | | 3,363.84 | 02/01/2016 | 1910 | 952 | | Common charges - February 2016 |
| 650.00 | | 4,013.84 | 02/01/2016 | 1911 | 977 | | sponsor payment deficit Unit 12PL |
| | | | | | | | |

# Pierson Lakes Homeowners Association, Inc.

### Receivable Accounts

From 01/01/2016 to 12/20/2017

| Debit | Credit | Balance | Date | Trx | Invoice | Ch. # | Description |
|---|---|---|---|---|---|---|---|
| | 2,689.92 | 1,323.92 | 02/26/2016 | 1998 | 762,826,852, 889,914,981, 952 | | Received ch. 7933169 LB from EONS Properties, LLC. Thank you |
| 9.92 | | 1,333.84 | 02/29/2016 | 2010 | 1046 | | Late Fee |
| 690.00 | | 2,023.84 | 03/01/2016 | 1992 | 1015 | | Common charges - March 2016 |
| 650.00 | | 2,673.84 | 03/01/2016 | 1993 | 1040 | | sponsor payment deficit Unit 12PL |
| | 2,673.84 | 0.00 | 03/10/2016 | 2044 | 952,977,1046 ,1015,1040 | | Received ch. 8028436 LB from EONS Properties, LLC. Thank you |
| 690.00 | | 690.00 | 04/01/2016 | 2065 | 1082 | | Common charges - April 2016 |
| 650.00 | | 1,340.00 | 04/01/2016 | 2066 | 1107 | | sponsor payment deficit Unit 12PL |
| 1,340.00 | | 0.00 | 04/01/2016 | 2095 | 1082,1107 | | Received ch. 8146879 LB from EONS Properties, LLC. Thank you |
| 1,340.00 | | (1,340.00) | 04/29/2016 | 2195 | 1183,1152,11 77 | | Received ch. 8285617 LB from EONS Properties, LLC. Thank you |
| 690.00 | | (650.00) | 05/01/2016 | 2184 | 1152 | | Common charges - May 2016 |
| 650.00 | | 0.00 | 05/01/2016 | 2185 | 1177 | | sponsor payment deficit Unit 12PL |
| 690.00 | | 690.00 | 06/01/2016 | 2273 | 1222 | | Common charges - June 2016 |
| 650.00 | | 1,340.00 | 06/01/2016 | 2274 | 1247 | | sponsor payment deficit Unit 12PL |
| 9.92 | | 1,349.92 | 06/30/2016 | 2399 | 1327 | | Late Fee |
| 690.00 | | 2,039.92 | 07/01/2016 | 2370 | 1293 | | Common charges - July 2016 |
| 650.00 | | 2,689.92 | 07/01/2016 | 2371 | 1318 | | sponsor payment deficit Unit 12PL |
| | 1,340.00 | 1,349.92 | 07/01/2016 | 2388 | 1222,1247 | | Received ch. 8618290 LB from EONS Properties, LLC. Thank you |
| 690.00 | | 2,039.92 | 08/01/2016 | 2460 | 1364 | | Common charges - August 2016 |
| 650.00 | | 2,689.92 | 08/01/2016 | 2461 | 1389 | | sponsor payment deficit Unit 12PL |
| | 1,340.00 | 1,349.92 | 08/01/2016 | 2469 | 1327,1293,13 18 | | Received ch. 8764855 LB from EONS Properties, LLC. Thank you |
| 690.00 | | 2,039.92 | 09/01/2016 | 2553 | 1435 | | Common charges - September 2016 |
| 650.00 | | 2,689.92 | 09/01/2016 | 2554 | 1460 | | sponsor payment deficit Unit 12PL |
| | 1,340.00 | 1,349.92 | 09/01/2016 | 2557 | 1318,1364,13 89 | | Received ch. 8919032 LB from EONS Properties, LLC. Thank you |
| | 1,340.00 | 9.92 | 09/30/2016 | 2646 | 1389,1435,14 60 | | Received ch. 8075154 LB from EONS Properties, LLC. Thank you |
| 690.00 | | 699.92 | 10/01/2016 | 2638 | 1495 | | Common charges - October 2016 |
| 650.00 | | 1,349.92 | 10/01/2016 | 2639 | 1520 | | sponsor payment deficit Unit 12PL |
| 9.92 | | 1,359.84 | 10/31/2016 | 2756 | 1595 | | Late payment fees |
| 690.00 | | 2,049.84 | 11/01/2016 | 2745 | 1566 | | Common charges - November 2016 |
| 650.00 | | 2,699.84 | 11/01/2016 | 2746 | 1591 | | sponsor payment deficit Unit 12PL |
| | 1,340.00 | 1,359.84 | 11/01/2016 | 2752 | 1460,1495,15 20 | | Received ch. 8245333 LB from EONS Properties, LLC. Thank you |
| 9.92 | | 1,369.76 | 11/30/2016 | 2845 | 1663 | | 2nd Late Fee |
| 690.00 | | 2,059.76 | 12/01/2016 | 2821 | 1630 | | Common charges - December 2016 |
| 650.00 | | 2,709.76 | 12/01/2016 | 2822 | 1655 | | sponsor payment deficit Unit 12PL |
| | 1,340.00 | 1,389.76 | 12/01/2016 | 2843 | 1520,1595,15 66,1591 | | Received ch. 8391229 LB from EONS Properties, LLC. Thank you |
| 690.00 | | 2,059.76 | 01/01/2017 | 2917 | 1701 | | Common charges - January 2017 |
| 650.00 | | 2,709.76 | 01/01/2017 | 2919 | 1702 | | sponsor payment deficit |
| 9.92 | | 2,719.68 | 01/01/2017 | 2945 | 1728 | | Late payment fees |
| 9.92 | | 2,729.60 | 01/31/2017 | 3041 | 1797 | | Late payment fees |
| 690.00 | | 3,419.60 | 02/01/2017 | 3025 | 1765 | | Common charges - February 2017 |
| 650.00 | | 4,069.60 | 02/01/2017 | 3026 | 1790 | | sponsor payment deficit Unit 12PL |
| 9.92 | | 4,079.52 | 02/28/2017 | 3126 | 1869 | | Late Payment fee |
| 690.00 | | 4,769.52 | 03/01/2017 | 3099 | 1832 | | Common charges - March 2017 |
| 650.00 | | 5,419.52 | 03/01/2017 | 3100 | 1857 | | sponsor payment deficit Unit 12PL |
| | 4,039.89 | 1,379.63 | 03/08/2017 | 3143 | 1591,1663,16 30,1655,1702 ,1728,1701, | | Received ch. 1399 LB from EONS Properties, LLC. Thank you |
| 9.92 | | 1,389.55 | 03/31/2017 | 3219 | 1936 | | Late payment fees |
| 690.00 | | 2,079.55 | 04/01/2017 | 3209 | 1906 | | Common charges - April 2017 |
| 650.00 | | 2,729.55 | 04/01/2017 | 3210 | 1931 | | sponsor payment deficit Unit 12PL |
| 9.92 | | 2,739.47 | 04/30/2017 | 3301 | 2004 | | Late payment fees |
| 690.00 | | 3,429.47 | 05/01/2017 | 3287 | 1973 | | Common charges - May 2017 |
| 650.00 | | 4,079.47 | 05/01/2017 | 3288 | 1974 | | sponsor payment deficit Unit 12PL |
| 9.92 | | 4,089.39 | 05/31/2017 | 3404 | 2073 | | Late payment fees |
| 690.00 | | 4,779.39 | 06/01/2017 | 3383 | 2039 | | Common charges - June 2017 |

## Pierson Lakes Homeowners Association, Inc.

### Receivable Accounts

From 01/01/2016 to 12/20/2017

| Debit | Credit | Balance | Date | Trx | Invoice | Ch. # | Description |
|-------|--------|---------|------|-----|---------|-------|-------------|
| 650.00 | | 5,429.39 | 06/01/2017 | 3384 | 2040 | | sponsor payment deficit Unit 12PL |
| 690.00 | | 6,119.39 | 07/01/2017 | 3481 | 2108 | | Common charges - July 2017 |
| 650.00 | | 6,769.39 | 07/01/2017 | 3482 | 2109 | | sponsor payment deficit Unit 12PL |
| 17,500.00 | | 24,269.39 | 07/01/2017 | 3509 | 2167 | | Special assessment |
| 415.00 | | 24,684.39 | 07/01/2017 | 3623 | 2279 | | Adjust July 2017 Common Charges per new budget |
| 150.00 | | 24,834.39 | 07/25/2017 | 3575 | 2187 | | Legal Set Up Fee |
| 9.92 | | 24,844.31 | 07/31/2017 | 3612 | 2248 | | Late payment fees |
| 690.00 | | 25,534.31 | 08/01/2017 | 3585 | 2217 | | Common charges - August 2017 |
| 650.00 | | 26,184.31 | 08/01/2017 | 3586 | 2218 | | sponsor payment deficit Unit 12PL |
| 415.00 | | 26,599.31 | 08/01/2017 | 3629 | 2284 | | Adjust August Common Charges per new budget |
| 1,755.00 | | 28,354.31 | 09/01/2017 | 3785 | 2416 | | Common charges - September 2017 |
| 195.00 | | 28,549.31 | 09/18/2017 | 3745 | 2373 | | Legal Charge #13068/9-12-17 |
| 21.06 | | 28,570.37 | 09/18/2017 | 3745 | 2374 | | Legal Charge #13068/9-12-17 |
| 204.17 | | 28,774.54 | 09/18/2017 | 3745 | 2372 | | Legal Charge #13068/9-12-17 |
| 9.92 | | 28,784.46 | 09/30/2017 | 3800 | 2451 | | Late Payment Fees |
| 1,755.00 | | 30,539.46 | 10/01/2017 | 3787 | 2443 | | Common charges - October 2017 |
| 9.92 | | 30,549.38 | 10/31/2017 | 3913 | 2511 | | Late payment fees |
| 1,755.00 | | 32,304.38 | 11/01/2017 | 3896 | 2501 | | Common charges - November 2017 |
| 6,327.87 | | 38,632.25 | 11/27/2017 | 3980 | 2532 | | Legal Fee Charges-multiple invoices |
| 9.92 | | 38,642.17 | 11/30/2017 | 3998 | 2571 | | Late payment fees |
| 1,755.00 | | 40,397.17 | 12/01/2017 | 3990 | 2584 | | Common charges - December 2017 |
| 9.92 | | 40,407.09 | 12/02/2017 | 3995 | 2568 | | Late payment fees |
| 60,530.74 | 20,123.65 | 40,407.09 | | | | | |

less legal fees (6,898.10)

$33,508.99

FILED: ROCKLAND COUNTY CLERK 01/17/2018 02:19 PM

INDEX NO. 035039/2017

NYSCEF DOC. NO. 21

RECEIVED NYSCEF: 01/17/2018

18-08278-rdd Doc 1-9 Filed 06/14/18 Entered 06/14/18 18:18:35 Interim Pg
39 of 194

Case 7:18-cv-08900-KMK Document 1-4 Filed 08/09/18 Page 21 of 90

# EXHIBIT "I"

EXHIBIT "I"




# NYSCEF - Rockland County Supreme Court
# Confirmation Notice

This is an automated response for Supreme Court / Court of Claims cases. The NYSCEF site has received your electronically filed document(s) for:

**PIERSON LAKES HOMEOWNERS ASSOCIATION INC - v. - EONS PROPERTIES LLC**

**035039/2017**

**Assigned Judge: None Recorded**

## Documents Received on  11/14/2017 03:10 PM

| Doc # | Document Type | Motion # |
|---|---|---|
| 4 | AFFIRMATION/AFFIDAVIT OF SERVICE | |
| | Does not contain an SSN or CPI as defined in 202.5(e) or 206.5(e) | |

## Filing User

Name: **IRA S GOLDENBERG**
Phone #: **914-997-0999**          E-mail Address:  **igoldenberg@goldenbergselkerlaw.com**
Fax #:                            Work Address:    **399 Knollwood Road**
                                                   **Suite 112**
                                                   **White Plains, NY 10603**

## E-mail Notifications

An e-mail notification regarding this filing has been sent to the following address(es) on 11/14/2017 03:10 PM :

**GOLDENBERG, IRA S - igoldenberg@goldenbergselkerlaw.com**

**NOTE: If submitting a working copy of this filing to the court, you must include as a notification page firmly affixed thereto a copy of this Confirmation Notice.**

Paul Piperato, Rockland County Clerk - Piperatp@co.rockland.ny.us
Phone: 845-638-5094      Fax: 845-638-5073      Website: http://www.rocklandcountyclerk.com

**NYSCEF Resource Center -  EFile@nycourts.gov**
**Phone:** (646) 386-3033      **Fax:** (212) 401-9146      **Website:** www.nycourts.gov/efile

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF ROCKLAND
------------------------------------------------------------------X
PIERSON LAKES HOMEOWNERS ASSOCIATION, INC.,

                                      Plaintiff,

-against-

EONS PROPERTIES, LLC; "JOHN DOE" and
"JANE DOE," which names refer to fictitious parties who
are possible tenants or occupants of the premises or who may
be other presently unknown parties who claim or may claim
a lien against the premises,

                                      Defendants.
------------------------------------------------------------------X

Index No. 035039/2017
Filed: October 16, 2017

**AFFIDAVIT OF SERVICE**
**CPLR 3215(g)(3)**

***Address of Property***:
**12 Pierson Lake Dr.**
**Sloatsburg, NY 10974**

STATE OF NEW YORK      )
                      ) S.S.:
COUNTY OF WESTCHESTER  )

      I, MARY RODRIGUEZ being duly sworn says: I am not a party to the action and I am
over 18 years of age and reside in Yorktown, New York.
      On November 14, 2017, I served a true copy of the annexed **SUMMONS & VERIFIED**
**COMPLAINT and NOTICE OF PENDENCY** in the above captioned action upon following:

| | | |
|---|---|---|
| EONS Properties, LLC | EONS Properties, LLC | EONS Properties, LLC |
| 12 Pierson Lake Drive | c/o Ogen & Sedaghati, P.C. | c/o New York Dept. of State |
| Sloatsburg, NY 10974 | 202 East 35th Street | One Commerce Plaza |
| | New York, NY 10016 | 99 Washington Avenue |
| | | Albany, NY 12231 |

by depositing the same in an envelope bearing the legend "personal and confidential" and not
indicating on the outside of the envelope that the communication is from an attorney or concerns
an alleged debt by first class mail in a post-office or official depository of the U.S. Postal Service
within the State of New York. The address and delivery service are indicated above.

                                     Mary Rodriguez

Sworn to before me, this
14th day of November, 2017

Notary Public

DENISE E. LUCAS
Notary Public, State of New York
Registration No. 01LU6343946
Qualified in Westchester County
Commission Expires 06/20/20

FILED: ROCKLAND COUNTY CLERK 01/17/2018 02:19 PM
INDEX NO. 035039/2017

NYSCEF DOC. NO. 26
RECEIVED NYSCEF: 01/17/2018

# Exhibit "H"

Exhibit "H"




# NYSCEF - Rockland County Supreme Court
# Confirmation Notice

This is an automated response for Supreme Court cases. The NYSCEF site has received your
electronically filed documents for the following case.

### 035039/2017

**PIERSON LAKES HOMEOWNERS ASSOCIATION INC - v. - EONS PROPERTIES LLC**

**Assigned Judge: None Recorded**

## Documents Received on   12/01/2017 09:39 AM

| Doc # | Document Type | Motion # |
|-------|---------------|----------|
| 5 | AFFIRMATION/AFFIDAVIT OF SERVICE | |
| | Does not contain an SSN or CPI as defined in 202.5(e) or 206.5(e) | |
| 6 | AFFIRMATION/AFFIDAVIT OF SERVICE | |
| | Does not contain an SSN or CPI as defined in 202.5(e) or 206.5(e) | |
| 7 | AFFIRMATION/AFFIDAVIT OF SERVICE | |
| | Does not contain an SSN or CPI as defined in 202.5(e) or 206.5(e) | |
| 8 | AFFIRMATION/AFFIDAVIT OF SERVICE | |
| | Does not contain an SSN or CPI as defined in 202.5(e) or 206.5(e) | |
| 9 | AFFIRMATION/AFFIDAVIT OF SERVICE | |
| | Does not contain an SSN or CPI as defined in 202.5(e) or 206.5(e) | |

## Filing User

Name:    **IRA S GOLDENBERG**

Phone #:    **914-997-0999**       E-mail Address:    **igoldenberg@goldenbergselkerlaw.com**

Fax #:                            Work Address:    **399 Knollwood Road**
                                               **Suite 112**
                                               **White Plains, NY 10603**

## E-mail Notifications

An e-mail notification regarding this filing has been sent to the following address(es) on
12/01/2017 09:39 AM :

**GOLDENBERG, IRA S - igoldenberg@goldenbergselkerlaw.com**



# NYSCEF - Rockland County Supreme Court
## Confirmation Notice



### 035039/2017

**PIERSON LAKES HOMEOWNERS ASSOCIATION INC - v. - EONS PROPERTIES LLC**

**Assigned Judge: None Recorded**

**NOTE: If submitting a working copy of this filing to the court, you must include as a notification page firmly affixed thereto a copy of this Confirmation Notice.**

STATE OF NEW YORK
COUNTY OF ROCKLAND        SUPREME   COURT

Index No. 2017-035039

PIERSON LAKES HOMEOWNERS ASSOCIATION, INC.,       Date filed: 10-16-17

*Plaintiff(s)*

EONS PROPERTIES, LLC, "JOHN    *against*   DOE" and "JANE DOE,"       **AFFIDAVIT
et al,                                                                  OF
                                            *Defendant(s)*              SERVICE**

STATE OF NEW YORK, COUNTY OF: <u>WESTCHESTER</u>     ss.:

The undersigned, being sworn, says: Deponent is not a party herein, is over 18 years of age and **resides in the State of New York.**
On  Nov. 3, 2017   at 7:55 A.M., at  12 Pierson Lake Drive, Sloatsburg, NY 10974
deponent served the within  ☐ summons  ☐ with notice
☒ summons and complaint  ☐ notice of petition and petition    ☒ WITH ANNEXED NOTICE OF COMMENCEMENT OF
☐ subpeona duces tecum    ☐ subpeona                              ACTION SUBJECT TO MANDATORY ELECTRONIC
☐ citation                                                       FILING & NOTICE OF PENDENCY

on   "JOHN DOE" and "JANE DOE"
                                        ☒ defendant   ☐ witness  { hereinafter called }  therein
                                        ☐ respondent              the recipient    named

**INDIVIDUAL**  by delivering a true copy *of each* to said recipient personally; deponent knew the person so served to be the person described as
☐  said recipient therein.

**CORPORATION**  a ————————— corporation, by delivering thereat a true copy *of each* to _____
☐  personally, deponent knew said corporation so served to be the corporation, described in same as said recipient and knew said
   individual to be _____  thereof.

**SUITABLE
AGE PERSON**  by delivering thereat a true copy *of each* to _____ a person of suitable age and
☐  discretion. Said premises is recipient's ☐ actual place of business ☐ dwelling place ☐ usual place of abode within the state.

**AFFIXING TO
DOOR, ETC.**  by affixing a true copy *of each* to the door of said premises, which is recipient's ☐ actual place of business ☐ dwelling place
☒  ☒ subject property within the state. Deponent was unable, with due diligence to find recipient or a person of suitable age
   and discretion, thereat, having called there
        10/21/17 at 11:15 A.M.     11/3/17 at 7:55 A.M.
        10/27/17 at 8:00 P.M.
        11/1/17 at 2:40 P.M.

**MAILING**  On  Nov. 6, 2017   deponent enclosed a copy of same in a postpaid envelope properly addressed to recipient  at recipient's
☒  ☐ actual place of business ☐ dwelling place ☒ subject property and deposited  envelope in an official depository
   under exclusive care and custody of the U.S. Postal Service. The envelope bore the legend "Personal and Confidential"

**DESCRIPTION**  ☐ Male    ☐ White Skin   ☐ Black Hair   ☐ White Hair   ☐ 14-20 Yrs.   ☐ Under 5'    ☐ Under 100 Lbs.
☐        ☐ Female  ☐ Black Skin   ☐ Brown Hair   ☐ Balding     ☐ 21-35 Yrs.   ☐ 5'0"-5'3"   ☐ 100-130 Lbs.
                   ☐ Yellow Skin  ☐ Blonde Hair  ☐ Mustache    ☐ 36-50 Yrs.   ☐ 5'4"-5'8"   ☐ 131-160 Lbs.
                   ☐ Brown Skin   ☐ Gray Hair    ☐ Beard       ☐ 51-65 Yrs.   ☐ 5'9"-6'0"   ☐ 161-200 Lbs.
                   ☐ Red Skin     ☐ Red Hair     ☐ Glasses     ☐ Over 65 Yrs. ☐ Over 6'     ☐ Over 200 Lbs.
Other identifying features:

**WITNESS
FEES**  $                    was paid (tendered) to the recipient  ☒ Index Number/Date of filing
                                                                      endorsed thereon.

**MILITARY
SERVICE**  Upon information and belief I aver that the recipient is not  in military service of New York State or of the United States as that term
is defined in either the State or in the Federal statutes.

Sworn to before me on  11/6/2017

LOUIS ROSTEN                                    Process Server
Notary Public, State of New York                Clemens W. Pantaleo
No. 4834354
Qualified in Putnam County
Commission Expires  5/31/19

18-08228-rdd Doc 1-6 Filed 06/14/18 Entered 06/14/18 18:35:28 Interim Pg
Case 7:18-cv-06900-KMK Document 1-4 Filed 08/09/18 Page 46 of 94
46 of 194

# EXHIBIT "G"



# NYSCEF - Rockland County Supreme Court
# Confirmation Notice



This is an automated response for Supreme Court cases.  The NYSCEF site has received your electronically filed documents for the following case.

**035039/2017**

**PIERSON LAKES HOMEOWNERS ASSOCIATION INC - v. - EONS PROPERTIES LLC**

**Assigned Judge: None Recorded**

## Documents Received on  12/01/2017 09:39 AM

| Doc # | Document Type | Motion # |
|-------|---------------|----------|
| 5 | AFFIRMATION/AFFIDAVIT OF SERVICE | |
| | Does not contain an SSN or CPI as defined in 202.5(e) or 206.5(e) | |
| 6 | AFFIRMATION/AFFIDAVIT OF SERVICE | |
| | Does not contain an SSN or CPI as defined in 202.5(e) or 206.5(e) | |
| 7 | AFFIRMATION/AFFIDAVIT OF SERVICE | |
| | Does not contain an SSN or CPI as defined in 202.5(e) or 206.5(e) | |
| 8 | AFFIRMATION/AFFIDAVIT OF SERVICE | |
| | Does not contain an SSN or CPI as defined in 202.5(e) or 206.5(e) | |
| 9 | AFFIRMATION/AFFIDAVIT OF SERVICE | |
| | Does not contain an SSN or CPI as defined in 202.5(e) or 206.5(e) | |

## Filing User

Name:     **IRA S GOLDENBERG**

Phone #:  **914-997-0999**          E-mail Address:     **igoldenberg@goldenbergselkerlaw.com**

Fax #:                              Work Address:       **399 Knollwood Road**
                                                        **Suite 112**
                                                        **White Plains, NY 10603**

## E-mail Notifications

An e-mail notification regarding this filing has been sent to the following address(es) on 12/01/2017 09:39 AM :

**GOLDENBERG, IRA S - igoldenberg@goldenbergselkerlaw.com**

Paul Piperato, Rockland County Clerk - Piperatp@co.rockland.ny.us
Phone: 845-638-5094     Fax: 845-638-5073     Website: http://www.rocklandcountyclerk.com

**NYSCEF Resource Center -  EFile@nycourts.gov**
**Phone: (646) 386-3033     Fax: (212) 401-9146     Website: www.nycourts.gov/efile**

Page 1 of 2



# NYSCEF - Rockland County Supreme Court
## Confirmation Notice



### 035039/2017

**PIERSON LAKES HOMEOWNERS ASSOCIATION INC - v. - EONS PROPERTIES LLC**

**Assigned Judge: None Recorded**

**NOTE: If submitting a working copy of this filing to the court, you must include
as a notification page firmly affixed thereto a copy of this Confirmation Notice.**

Paul Piperato, Rockland County Clerk - Piperatp@co.rockland.ny.us
Phone: 845-638-5094      Fax: 845-638-5073      Website: http://www.rocklandcountyclerk.com

**NYSCEF Resource Center -  EFile@nycourts.gov**
**Phone: (646) 386-3033      Fax: (212) 401-9146      Website: www.nycourts.gov/efile**

Page 2 of 2

STATE OF NEW YORK
COUNTY OF ROCKLAND     SUPREME   COURT

PIERSON LAKES HOMEOWNERS ASSOCIATION, INC.,

                  *Index No.* 2017-035039

                  *Plaintiff(s)* XXXXXXXXXXXX

EONS PROPERTIES, LLC, "JOHN   *against*   DOE" and "JANE DOE,"
et al,
                  *Defendant(s)* XXXXXXXXXXXX

           *Date filed:* 10-16-17

           *AFFIDAVIT*
           *OF*
           *SERVICE*

STATE OF NEW YORK, COUNTY OF: <u>WESTCHESTER</u>    ss.:

The undersigned, being sworn, says: Deponent is not a party herein, is over 18 years of age and **resides in the State of New York.**

On    Nov. 3, 2017    at 7:55 A.M., at   12 Pierson Lake Drive, Sloatsburg, NY 10974

deponent served the within   verified
   ☒ summons and complaint    ☐ summons   ☐ with notice
   ☐ subpoena duces tecum    ☐ notice of petition and petition
   ☐ citation           ☐ subpoena

☒ WITH ANNEXED NOTICE OF COMMENCEMENT OF ACTION SUBJECT TO MANDATORY ELECTRONIC FILING & NOTICE OF PENDENCY

on    EONS PROPERTIES, LLC

           ☒ defendant    ☐ witness   { hereinafter called }   therein
           ☐ respondent        the recipient   named

**INDIVIDUAL**
☐   by delivering a true copy *of each* to said recipient personally; deponent knew the person so served to be the person described as said recipient therein.

**CORPORATION**
☐   a ---------------- corporation, by delivering thereat a true copy *of each* to _____
personally, deponent knew said corporation so served to be the corporation, described in same as said recipient and knew said individual to be _____ thereof.

**SUITABLE AGE PERSON**
☐   by delivering thereat a true copy *of each* to _____ a person of suitable age and discretion. Said premises is recipient's ☐ actual place of business ☐ dwelling place ☐ usual place of abode within the state.

**AFFIXING TO DOOR, ETC.**
☒   by affixing a true copy *of each* to the door of said premises, which is recipient's ☐ actual place of business ☐ dwelling place ☒ subject property within the state. Deponent was unable, with due diligence to find recipient or a person of suitable age and discretion, thereat, having called there

     10/21/17 at 11:15 A.M.      11/3/17 at 7:55 A.M.
     10/27/17 at 8:00 P.M.
     11/1/17 at 2:40 P.M.

**MAILING**
☒X   On   Nov. 6, 2017   deponent enclosed a copy of same in a postpaid envelope properly addressed to recipient at recipient's ☐ actual place of business ☐ dwelling place ☒ subject property and deposited envelope in an official depository under exclusive care and custody of the U.S. Postal Service. The envelope bore the legend "Personal and Confidential"

**DESCRIPTION**
☐

| | | | | | | |
|---|---|---|---|---|---|---|
| ☐ Male | ☐ White Skin | ☐ Black Hair | ☐ White Hair | ☐ 14-20 Yrs. | ☐ Under 5' | ☐ Under 100 Lbs. |
| ☐ Female | ☐ Black Skin | ☐ Brown Hair | ☐ Balding | ☐ 21-35 Yrs. | ☐ 5'0"-5'3" | ☐ 100-130 Lbs. |
| | ☐ Yellow Skin | ☐ Blonde Hair | ☐ Mustache | ☐ 36-50 Yrs. | ☐ 5'4"-5'8" | ☐ 131-160 Lbs. |
| | ☐ Brown Skin | ☐ Gray Hair | ☐ Beard | ☐ 51-65 Yrs. | ☐ 5'9"-6'0" | ☐ 161-200 Lbs. |
| | ☐ Red Skin | ☐ Red Hair | ☐ Glasses | ☐ Over 65 Yrs. | ☐ Over 6' | ☐ Over 200 Lbs. |

Other identifying features:

**WITNESS FEES**
$          was paid (tendered) to the recipient    ☒ **Index Number/Date of filing endorsed thereon.**

**MILITARY SERVICE**
Upon information and belief I aver that the recipient is not in military service of New York State or of the United States as that term is defined in either the State or in the Federal statutes.

Sworn to before me on   11/6/2017

          LOUIS ROSTEN
          Notary Public, State of New York
          No. 4834354
          Qualified in Putnam County
          Commission Expires _____

          *Clemens W. Pantaleo*
          Process Server
          Clemens W. Pantaleo

# Exhibit "F"

EXHIBIT F

FILED: ROCKLAND COUNTY CLERK 01/17/2018 02:19 PM INDEX NO. 035039/2017
NYSCEF DOC. NO. 1 Case 7:18-cv-06900-KMK Document 1 Filed 08/01/18 Page 3 of 10 RECEIVED NYSCEF: 01/17/2018
18-08226-rdd Doc 1-8 Filed 08/09/18 Entered 08/09/18 18:35:38 Interim Pg 51 of 194




# NYSCEF - Rockland County Supreme Court
# Confirmation Notice

This is an automated response for Supreme Court cases. The NYSCEF site has received your electronically filed documents for the following case.

**035039/2017**

**PIERSON LAKES HOMEOWNERS ASSOCIATION INC - v. - EONS PROPERTIES LLC**

**Assigned Judge: None Recorded**

## Documents Received on 12/01/2017 09:39 AM

| Doc # | Document Type | Motion # |
|-------|---------------|----------|
| 5 | AFFIRMATION/AFFIDAVIT OF SERVICE | |
| | Does not contain an SSN or CPI as defined in 202.5(e) or 206.5(e) | |
| 6 | AFFIRMATION/AFFIDAVIT OF SERVICE | |
| | Does not contain an SSN or CPI as defined in 202.5(e) or 206.5(e) | |
| 7 | AFFIRMATION/AFFIDAVIT OF SERVICE | |
| | Does not contain an SSN or CPI as defined in 202.5(e) or 206.5(e) | |
| 8 | AFFIRMATION/AFFIDAVIT OF SERVICE | |
| | Does not contain an SSN or CPI as defined in 202.5(e) or 206.5(e) | |
| 9 | AFFIRMATION/AFFIDAVIT OF SERVICE | |
| | Does not contain an SSN or CPI as defined in 202.5(e) or 206.5(e) | |

## Filing User

Name: **IRA S GOLDENBERG**

Phone #: **914-997-0999**

Fax #:

E-mail Address: **igoldenberg@goldenbergselkerlaw.com**

Work Address: **399 Knollwood Road**
**Suite 112**
**White Plains, NY 10603**

## E-mail Notifications

An e-mail notification regarding this filing has been sent to the following address(es) on 12/01/2017 09:39 AM:

**GOLDENBERG, IRA S - igoldenberg@goldenbergselkerlaw.com**

Paul Piperato, Rockland County Clerk - Piperatp@co.rockland.ny.us
Phone: 845-638-5094    Fax: 845-638-5073    Website: http://www.rocklandcountyclerk.com

**NYSCEF Resource Center - EFile@nycourts.gov**
**Phone: (646) 386-3033    Fax: (212) 401-9146    Website: www.nycourts.gov/efile**

FILED: ROCKLAND COUNTY CLERK 01/17/2018 02:19 PM
INDEX NO. 035039/2017
NYSCEF DOC. NO.: Case 7:18-cv-06900-KMK Document 1 Entered 08/09/18:18:35 interim Pg
RECEIVED NYSCEF: 01/17/2018
52 of 194



# NYSCEF – Rockland County Supreme Court
## Confirmation Notice



### 035039/2017

**PIERSON LAKES HOMEOWNERS ASSOCIATION INC - v. - EONS PROPERTIES LLC**

**Assigned Judge: None Recorded**

**NOTE: If submitting a working copy of this filing to the court, you must include
as a notification page firmly affixed thereto a copy of this Confirmation Notice.**

Paul Piperato, Rockland County Clerk - Piperatp@co.rockland.ny.us
Phone: 845-638-5094      Fax: 845-638-5073      Website: http://www.rocklandcountyclerk.com

**NYSCEF Resource Center - EFile@nycourts.gov**
**Phone:** (646) 386-3033      **Fax:** (212) 401-9146      **Website:** www.nycourts.gov/efile

STATE OF NEW YORK
COUNTY OF ROCKLAND        SUPREME    COURT                    _Index No._ 2017-035039
                                                             Date filed: 10-16-17

PIERSON LAKES HOMEOWNERS ASSOCIATION,INC.,

                                            _Plaintiff(s)_ XXXXXXXXXX

EONS PROPERTIES,LLC,"JOHN     _against_   DOE" and "JANE DOE,"           **AFFIDAVIT**
et al,                                                                   **OF**
                                            _Defendant(s)_ XXXXXXXXXXXX   **SERVICE**

STATE OF NEW YORK, COUNTY OF: **WESTCHESTER**           ss.:

The undersigned, being sworn, says: Deponent is not a party herein, is over 18 years of age and **resides in the State of New York.**

On ___Oct. 27, 2017___ at ___1:00 P.___M., at ___202 East 35th St.,1st Floor,New York,NY 10016___
deponent served the within ___verified___
☒ summons and complaint   ☐ summons   ☐ with notice
☐ subpeona duces tecum    ☐ notice of petition and petition
☐ citation                ☐ subpoena

☒ WITH ANNEXED NOTICE OF COMMENCEMENT OF ACTION SUBJECT TO MANDATORY ELECTRONIC FILING & NOTICE OF PENDENCY

on  EONS PROPERTIES,LLC  c/o OGEN
    & SEDAGHATI,P.C.

☒ defendant   ☐ witness   } hereinafter called } therein
☐ respondent              } the recipient      } named

**INDIVIDUAL**
☐        by delivering a true copy _of each_ to said recipient personally; deponent knew the person so served to be the person described as said recipient therein.

**CORPORATION**
☒        a _____ corporation, by delivering thereat a true copy _of each_ to ___Aniva Manguao___
         personally, deponent knew said corporation so served to be the corporation, described in same as said recipient and knew said
         individual to be ___authorized agent in the Law Office___ thereof.
                          of Ogen & Sedaghati, P.C.

**SUITABLE AGE PERSON**
☐        by delivering thereat a true copy _of each_ to _____ a person of suitable age and
         discretion. Said premises is recipient's ☐ actual place of business ☐ dwelling place ☐ usual place of abode within the state.

**AFFIXING TO DOOR, ETC.**
☐        by affixing a true copy _of each_ to the door of said premises, which is recipient's ☐ actual place of business ☐ dwelling place
         ☐subject property within the state. Deponent was unable, with due diligence to find recipient or a person of suitable age
         and discretion, thereat, having called there

**MAILING**
☐        On _____ deponent enclosed a copy of same in a postpaid envelope properly addressed to recipient at recipient's
         ☐ actual place of business ☐ dwelling place ☐subject property and deposited ı envelope in an official depository
         under exclusive care and custody of the U.S. Postal Service.The envelope bore the legend "Personal and Confidential"

**DESCRIPTION**
☒
| ☐ Male | ☐ White Skin | ☒ Black Hair | ☐ White Hair | ☐ 14-20 Yrs. | ☐ Under 5' | ☐ Under 100 Lbs. |
| ☒ Female | ☒ Black Skin | ☐ Brown Hair | ☐ Balding | ☒ 21-35 Yrs. | ☐ 5'0"-5'3" | ☐ 100-130 Lbs. |
| | ☐ Yellow Skin | ☐ Blonde Hair | ☐ Mustache | ☐ 36-50 Yrs. | ☒ 5'4"-5'8" | ☒ 131-160 Lbs. |
| | ☒ Brown Skin | ☐ Gray Hair | ☐ Beard | ☐ 51-65 Yrs. | ☐ 5'9"-6'0" | ☐ 161-200 Lbs. |
| | ☐ Red Skin | ☐ Red Hair | ☐ Glasses | ☐ Over 65 Yrs. | ☐ Over 6' | ☐ Over 200 Lbs. |

Other identifying features:

**WITNESS FEES**
$ _____ was paid (tendered) to the recipient   ☒ Index Number/Date of filing endorsed thereon.

**MILITARY SERVICE**
Upon information and belief I aver that the recipient is not in military service of New York State or of the United States as that term
is defined in either the State or in the Federal statutes.

Sworn to before me on ___11/6/2017___

_Clemens W. Pantaleo_

CLEMENS W. PANTALEO
Notary Public, State of New York
No. 60-4929179
Qualified in Westchester County
Commission Expires May 2, _2018_

Process Server
Patrick J. Ruto

# Exhibit "E"

FILED: ROCKLAND COUNTY CLERK 01/17/2018 02:19 PM

NYSCEF DOC. NO.: 3

INDEX NO. 035039/2017

RECEIVED NYSCEF: 01/17/2018

18-08... Case 7:18-cv-06... RMR Document 1... filed 08/09/18 18:35... intram Pg
55 of 194



# NYSCEF - Rockland County Supreme Court
# Confirmation Notice



This is an automated response for Supreme Court / Court of Claims cases. The NYSCEF site has received your electronically filed document(s) for:

**PIERSON LAKES HOMEOWNERS ASSOCIATION INC - v. - EONS PROPERTIES LLC**

**035039/2017**

**Assigned Judge: None Recorded**

## Documents Received on 10/26/2017 09:40 AM

| Doc # | Document Type | Motion # |
|-------|---------------|----------|
| 3 | AFFIRMATION/AFFIDAVIT OF SERVICE<br>Does not contain an SSN or CPI as defined in 202.5(e) or 206.5(e) | |

## Filing User

Name: **IRA S GOLDENBERG**

Phone #: **914-997-0999**

Fax #:

E-mail Address: **igoldenberg@goldenbergselkerlaw.com**

Work Address: **399 Knollwood Road**
**Suite 112**
**White Plains, NY 10603**

## E-mail Notifications

An e-mail notification regarding this filing has been sent to the following address(es) on 10/26/2017 09:40 AM :

**GOLDENBERG, IRA S - igoldenberg@goldenbergselkerlaw.com**

**NOTE: If submitting a working copy of this filing to the court, you must include as a notification page firmly affixed thereto a copy of this Confirmation Notice.**

Paul Piperato, Rockland County Clerk - Piperatp@co.rockland.ny.us
Phone: 845-638-5094    Fax: 845-638-5073    Website: http://www.rocklandcountyclerk.com

**NYSCEF Resource Center - EFile@nycourts.gov**
**Phone: (646) 386-3033    Fax: (212) 401-9146    Website: www.nycourts.gov/efile**

AFFIDAVIT OF SERVICE THROUGH
THE SECRETARY OF STATE, NEW YORK

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF ROCKLAND
_____X

PIERSON LAKES HOMEOWNERS ASSOCIATION, INC.,

Plaintiff,

-against-                                          Index #: 2017-035039
                                                   Filed: 10/16/17

EONS PROPERTIES, LLC; "JOHN DOE" and
"JANE DOE," which names refer to fictitious parties who
are possible tenants or occupants of the premises or who may
be other presently unknown parties who claim or may claim
a lien against the premises,

                              Defendants.

_____X

STATE OF NEW YORK ]
COUNTY OF ALBANY          ] ss.:

        Kristie DeLong, being duly sworn, deposes and says that she is over eighteen years of age; that on
10/19/2017, at the Department of State in the City of Albany, New York, she served the annexed Summons and
Complaint and Notice of Pendency with Notice of Commencement of Action Subject to Mandatory Electronic Filing
upon **EONS PROPERTIES, LLC** by delivering to and leaving with Nancy Dougherty, a Data Entry Machine
Operator, in the Office of the New York Department of State two (2) copies thereof and that at the time of making
such service, deponent paid Secretary of State a fee of $40.00.  That said service was made pursuant to Section
303 of the Limited Liability Company Law.

        Deponent further says that she knew the person so served as aforesaid to be a Data Entry Machine
Operator at the New York State Department of State, duly authorized to accept such service on behalf of said
defendant.

Deponent further states that she describes the person actually served as follows:

| Sex | Skin Color | Hair Color | Approx Age | Approx Height | Approx Weight |
|------|------------|------------|------------|---------------|---------------|
| Female | White | Brown | 60yrs. | 5'4" | 130lbs. |

                                        _____
                                                Kristie DeLong

Sworn to before me this

20th day of October , 2017

_____
Notary Public

        GERTRUDE B. WINTER
    Notary Public, State of New York
            No. 01WI5050407
      Qualified in Saratoga County
Commission Expires October 10, 20 ?1

State of New York - Department of State
Receipt for Service

Receipt #:  201710190394                    Cash #: 201710190240
Date of Service:  10/19/2017                Fee Paid: $40 - DRAWDOWN
Service Company:  39 BLUMBERG/EXCELSIOR CORPORATE SERVICES -

Service was directed to be made pursuant to:  SECTION 303 OF THE LIMITED
    LIABILITY COMPANY LAW

Party Served:  EONS PROPERTIES, LLC


Plaintiff/Petitioner:
          PIERSON LAKES HOMEOWNERS ASSOCIATION, INC.


Service of Process Address:
EONS PROPERTIES, LLC
2ND FLOOR
11 HANOVER SQUARE
NEW YORK,  NY 10005

                                        Secretary of State
                                    By  NANCY DOUGHERTY

# Exhibit "D"





# NYSCEF - Rockland County Supreme Court
# Confirmation Notice

This is an automated response for Supreme Court / Court of Claims cases. The NYSCEF site has received your electronically filed document(s) for:

**PIERSON LAKES HOMEOWNERS ASSOCIATION, INC. - v. - EONS PROPERTIES, LLC et al**

**Index Number NOT assigned**

**Assigned Judge: None Recorded**

## Documents Received on   10/16/2017 02:54 PM

| Doc # | Document Type | Motion # |
|-------|---------------|----------|
| 1 | SUMMONS + COMPLAINT | |
| | Does not contain an SSN or CPI as defined in 202.5(e) or 206.5(e) | |
| 2 | NOTICE OF PENDENCY | |
| | Does not contain an SSN or CPI as defined in 202.5(e) or 206.5(e) | |

## Filing User

|  |  |  |  |
|------|------|------|------|
| Name: | **IRA S GOLDENBERG** | | |
| Phone #: | **914-997-0999** | E-mail Address: | **igoldenberg@goldenbergselkerlaw.com** |
| Fax #: | | Work Address: | **399 Knollwood Road** |
| | | | **Suite 112** |
| | | | **White Plains, NY 10603** |

## E-mail Notifications

An e-mail notification regarding this filing has been sent to the following address(es) on 10/16/2017 02:54 PM :

**GOLDENBERG, IRA S - igoldenberg@goldenbergselkerlaw.com**

**NOTE: If submitting a working copy of this filing to the court, you must include as a notification page firmly affixed thereto a copy of this Confirmation Notice.**

Paul Piperato, Rockland County Clerk - Piperatp@co.rockland.ny.us
Phone: 845-638-5094     Fax: 845-638-5073     Website: http://www.rocklandcountyclerk.com

NYSCEF Resource Center - EFile@nycourts.gov
Phone: (646) 386-3033     Fax: (212) 401-9146     Website: www.nycourts.gov/efile

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF ROCKLAND
------------------------------------------------------------------------X
PIERSON LAKES HOMEOWNERS ASSOCIATION, INC.,

Index No. 2017- 035039
Filed:  10/16/17

                        Plaintiff,

**NOTICE OF
PENDENCY**

        -against-

EONS Properties, LLC; "JOHN DOE" and
"JANE DOE," which names refer to fictitious parties who
are possible tenants or occupants of the premises or who may
be other presently unknown parties who claim or may claim
a lien against the premises,

                        Defendants.
------------------------------------------------------------------------X

    **NOTICE IS HEREBY GIVEN**, that an action has been commenced and is now pending

in this Court upon the complaint of the above named Plaintiff, Pierson Lakes Homeowners

Association, Inc., in which the judgment demanded in the pleadings by Plaintiff against Defendant

EONS Properties, LLC would affect the title to and the possession, use and enjoyment of real

property referred to below by a demand for foreclosure of the Plaintiff's lien for unpaid

Assessments and other charges, and the sale of such real property for the benefit of Plaintiff.

    **PLEASE TAKE FURTHER NOTICE**, that the real property affected by said action at

the commencement of this action, and at the time of filing of this notice is situated in the State of

New York, County of Rockland, Town of Ramapo, and consists of: a parcel which is described on

the tax maps of the Town of Ramapo as Section 46.7, Block 1, Lot 7; the parcel is also known as

12 Pierson Lake Dr., Sloatsburg, New York 10974; the parcel is further described in the attached

Schedule A.

    **PLEASE TAKE FURTHER NOTICE**, that at present legal title to the real property

affected by this Notice of Pendency is with the Defendant EONS Properties, LLC, which title was

acquired by deed dated December 16, 2014 from Michael Pecoraro, and recorded December 16,

FILED: ROCKLAND COUNTY CLERK 01/17/2018 02:19 PM INDEX NO. 035039/2017
NYSCEF DOC. NO. Case 7:18-cv-06900-KMK Document 14 Filed 08/09/18 Page 41 of 90 RECEIVED NYSCEF: 01/17/2018

61 of 194

2014 in Instrument No. 2015-00000120.

**PLEASE TAKE FURTHER NOTICE,** that this Notice of Pendency has been filed by

the Plaintiff herein.

Dated: October 17, 2017
White Plains, NY

Diane E. Selker, Esq.
GOLDENBERG & SELKER, LLP
*Attorneys for Plaintiff HOA*
399 Knollwood Road, Suite 112
White Plains, NY 10603
(914) 997-0999

**TO THE CLERK OF THE COUNTY OF ROCKLAND:**

You are hereby directed to index the foregoing Notice of Pendency of Action against the following named Defendant: EONS Properties, LLC.

Dated: October 17, 2017
      White Plains, NY

                                      Diane E. Selker, Esq.
                                      GOLDENBERG & SELKER, LLP
                                      *Attorneys for Plaintiff HOA*
                                      399 Knollwood Road, Suite 112
                                      White Plains, NY 10603
                                      (914) 997-0999

**RECORD AND RETURN TO:**

Diane E. Selker, Esq.
GOLDENBERG & SELKER, LLP
399 Knollwood Road, Suite 112
White Plains, NY 10603

INDEX NO. 035039/2017
RECEIVED NYSCEF: 01/17/2018

**NATIONAL REAL ESTATE SERVICES, INC.**

Title Number: 5999

S C H E D U L E  A

ALL that certain plot, piece or parcel of land, situate, lying and being in the Town of Ramapo, in the County of Rockland, State of NY and shown and designated as Lot 46.07-1-7 on a map entitled "Subdivision Plat-Lot Line Change Pierson Lakes Phase No. 3" made by A.R. Sparaco, Jr., PLS dated January 30, 2002 and filed in the Office of the Rockland County Clerk on June 5, 2003, as Map No. 7585, and which said parcel is more particularly bounded and described as follows:

BEGINNING at a point marked by an iron pin distant 1,980.24 feet Westerly as measured on a course of South 57 27' 26" west from the Southwesterly terminus of Sterlington Road as shown on a map entitled, "Subdivision Plat Pierson Lakes Phase I Drawing H-3" which was filed in the Office of Rockland County Clerk as Map No. 6460; and

RUNNING THENCE North 31 degrees 05' 00" West 48.67 feet to an iron pin set;

THENCE North 52 degrees 44' 15" East 543.09 feet to an iron pin set in the Westerly side of Cranberry Lake;

THENCE along the Westerly side of Cranberry Lake the following courses and distances:

South 29 degrees 78' 00" East 28.04 feet;
South 4 degrees 58' 30" East 24.39 feet
South 16 degrees 29' 00" East 82.76 feet;
South 25 degrees 33' 00" East 50.45 feet;
South 58 degrees 07' 00" East 53.65 feet;
South 48 degrees 37' 00" East 790.26 feet;
South 41 degrees 58' 00" East 144.76 feet to an iron pin;

THENCE turning away from Cranberry Lake South 44 degrees 25' 00" West 500.63 feet to a point marked by an iron pin;

THENCE North 45 degrees 35' 00" West 289.37 feet;

## NATIONAL REAL ESTATE SERVICES, INC.

### Title Number: 5999

### S C H E D U L E  A  (continued)

THENCE on a curve bearing to the right having a radius of 576 feet, an arc distance of 145.77 feet;

THENCE North 31 degrees 05' 00" West 31.01 feet to an iron pin which said pin is the point or place of BEGINNING.

TOGETHER with an easement of ingress and egress and for utilities over the private rights of way shown on the aforementioned map to the nearest public highway.

TOGETHER with the benefits of and subject to the burdens set forth in a declaration of covenants, restrictions, easements, charges and liens made by Ramapo Land Co., Inc. dated April 25, 1990 and recorded in the Rockland County Clerk's office on May 11, 1990 in Liber 408 at Page 1110.

**FOR
CONVEYANCING
ONLY**

The policy to be issued under this report will insure the title to such buildings and improvements erected on the premises which by law constitute real property.

TOGETHER with all the right, title and interest of the party in the first part, or, in and to the land lying in the street in front of and adjoining said premises.

18-08298-rdd Doc 12000 Filed 08/14/18 Entered 08/14/18 18:18:35 Interim Pg
Case 7:18-cv-06900-KMK Document 14 Filed 08/09/18 Page 47 of 50
65 of 194

# Exhibit "C"



# NYSCEF - Rockland County Supreme Court
# Confirmation Notice



This is an automated response for Supreme Court / Court of Claims cases. The NYSCEF site has received your electronically filed document(s) for:

**PIERSON LAKES HOMEOWNERS ASSOCIATION, INC. - v. - EONS PROPERTIES, LLC et al**

**Index Number NOT assigned**

**Assigned Judge: None Recorded**

## Documents Received on   10/16/2017 02:54 PM

| Doc # | Document Type | Motion # |
|-------|---------------|----------|
| 1 | SUMMONS + COMPLAINT | |
| | Does not contain an SSN or CPI as defined in 202.5(e) or 206.5(e) | |
| 2 | NOTICE OF PENDENCY | |
| | Does not contain an SSN or CPI as defined in 202.5(e) or 206.5(e) | |

## Filing User

| | | | |
|---|---|---|---|
| Name: | **IRA S GOLDENBERG** | | |
| Phone #: | **914-997-0999** | E-mail Address: | **igoldenberg@goldenbergselkerlaw.com** |
| Fax #: | | Work Address: | **399 Knollwood Road** |
| | | | **Suite 112** |
| | | | **White Plains, NY 10603** |

## E-mail Notifications

An e-mail notification regarding this filing has been sent to the following address(es) on 10/16/2017 02:54 PM :

**GOLDENBERG, IRA S - igoldenberg@goldenbergselkerlaw.com**

**NOTE: If submitting a working copy of this filing to the court, you must include as a notification page firmly affixed thereto a copy of this Confirmation Notice.**

**Paul Piperato, Rockland County Clerk - Piperatp@co.rockland.ny.us**
Phone: 845-638-5094     Fax: 845-638-5073     Website: http://www.rocklandcountyclerk.com

**NYSCEF Resource Center – EFile@nycourts.gov**
**Phone: (646) 386-3033     Fax: (212) 401-9146     Website: www.nycourts.gov/efile**

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF ROCKLAND
-----------------------------------------------------------------------X
PIERSON LAKES HOMEOWNERS ASSOCIATION, INC.,

**SUMMONS**

Plaintiff,

Index No. 2017-
Filed:

-against-

EONS PROPERTIES, LLC; "JOHN DOE" and
"JANE DOE," which names refer to fictitious parties who
are possible tenants or occupants of the premises or who may
be other presently unknown parties who claim or may claim
a lien against the premises,

*Address of Property*:
**12 Pierson Lake Dr.
Sloatsburg, NY 10974**

Defendants.
-----------------------------------------------------------------------X

**TO THE ABOVE-NAMED DEFENDANTS:**

YOU ARE HEREBY SUMMONED to answer the Verified Complaint in this action and
to serve a copy of your Verified Answer on the Plaintiff's attorneys within 20 days after service
of the summons (or within 30 days after service is complete if the summons is not personally
delivered to you within the State of New York), and, in case of your failure to appear or answer,
Judgment will be taken against you by default for the relief demanded in the complaint.

Plaintiff designates Rockland County as the place of trial. The County in which the real
property is located that is the subject of the foreclosure is the basis for venue.

**This action seeks the collection of unpaid assessments and other charges and fees
owed to a homeowners' association.**

Dated: October 16, 2017
White Plains, NY

Diane E. Selker, Esq.
Goldenberg & Selker, LLP
*Attorneys for Plaintiff*
399 Knollwood Road, Suite 112
White Plains, New York 10603
(914) 997-0999

**This advice pertains to your dealings with me as a debt collector. It does not affect your
dealings with the court, and in particular it does not change the time at which you must
answer the complaint or other legal pleadings. The summons is a command from the
court, not from me, and you must follow its instructions even if you dispute the validity or
amount of the debt. The advice in this notice also does not affect my relationship with the
court. As a lawyer, I may file papers in the suit according to the court's rules and the
judge's instructions.**

Case 7:18-cv-06900-KMK Document 1 Filed 08/09/18 18:35 Entered Pg 68 of 194

To:    EONS Properties, LLC
       12 Pierson Lake Dr.
       Sloatsburg, NY 10974

       EONS Properties, LLC
       c/o Ogen & Sedaghati, P.C.
       202 East 35th Street
       New York, NY 10016

       EONS Properties, LLC
       c/o New York Secretary of State

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF ROCKLAND
------------------------------------------------------------------------X
PIERSON LAKES HOMEOWNERS ASSOCIATION, INC.,                    Index No. 2017-
                                                              Filed:
                                         Plaintiff,

                                                              **VERIFIED**
            -against-                                         **COMPLAINT**

EONS Properties, LLC; "JOHN DOE" and
"JANE DOE," which names refer to fictitious parties who
are possible tenants or occupants of the premises or who may
be other presently unknown parties who claim or may claim
a lien against the premises,
                                         Defendants
------------------------------------------------------------------------X

        Plaintiff, PIERSON LAKES HOMEOWNERS ASSOCIATION, INC., ("HOA" or
"Plaintiff" or "Pierson Lakes") by its attorneys, Goldenberg & Selker, LLP, as and for its
complaint against the above-referenced defendants, alleges as follows:

1. Plaintiff HOA is a not-for-profit corporation organized under the laws of the State of
   New York, with a principal place of business in Sterlington, Town of Ramapo,
   County of Rockland, State of New York, which is a homeowners' association that
   controls and manages real property known as "Pierson Lakes."

2. Upon information and belief, defendant EONS Properties, LLC ("EONS"), a New
   York Limited Liability Company, is the owner in fee of improved residential real
   property located at Pierson Lakes ("the Lot") which real property is also described as
   Section 46.7, Block 1, Lot 7 on the Tax maps of the Town of Ramapo, County of
   Rockland, State of New York which real property has a post office mailing address of
   12 Pierson Lakes Drive, Sloatsburg, NY 10974 as further described in the attached
   "Schedule A."

3. Upon information and belief, EONS acquired fee simple absolute title to the Lot
   pursuant to a deed dated May 25, 2006, from Michael Pecoraro, which deed was
   recorded with the Rockland County Clerk on July 3, 2006, as Instrument ID Number
   2015-00000120, and EONS continues to own the Lot.

4. Ownership of the Lot, and all other residential lots at Pierson Lakes, are subject to a
   Declaration of Covenants, Restrictions, Easements, Charges and Liens made by the
   Ramapo Land Co., Inc., dated April 25, 1990, which was recorded with the Rockland
   County Clerk on May 11, 1990, in Liber 408, Page 1110, as subsequently amended
   ("the Declaration").

5. The owner of each Lot at Pierson Lakes covenants and agrees to pay to the HOA
   maintenance assessments and other charges (collectively referred to herein as
   "Assessments") and, if such Assessments are not paid when due, then they shall bear

interest at the maximum New York statutory rate together with the costs of collection and the reasonable attorney fees incurred by the HOA in collecting same.

6. The Assessments are the personal obligation of the owner of each Lot.

7. No Lot is exempt from the payment of the Assessments.

8. The HOA is authorized to commence and prosecute an action to recover a personal money judgment against an owner of a Lot for the failure to pay the Assessments and such suit may be maintained without foreclosing or waiving the lien securing the same.

## FIRST CAUSE OF ACTION

9. EONS was invoiced for Assessments and other amounts owed to the HOA in connection with the Lot.

10. EONS failed and continues to fail and refuse to pay its Assessments to the HOA.

11. Since March 8, 2017, EONS has made no payments to the HOA. As of October 1, 2017, EONS owes the HOA $30,539.46 in Assessments, which amount continues to increase at the present rate of $1,755.00 per month, late fees of $9.92 each month payment is not received by the end of the month, plus additional fees, and attorney fees.

12. EONS is delinquent in its obligations pursuant to the Declaration and owes the HOA Assessments, interest, costs, disbursements, and the HOA's reasonable attorney fees.

13. The HOA is entitled to a personal money judgment in its favor and against EONS for unpaid Assessments and interest at the maximum New York statutory rate, together with the HOA's reasonable attorney fees, costs, and disbursements.

## SECOND CAUSE OF ACTION

14. The allegations set forth above are repeated and incorporated by reference.

15. Pursuant to the Declaration, if an Assessment is not paid when due, then such Assessment becomes delinquent and, together with such interest thereon and cost of collection thereof, becomes a continuing lien on the Lot, and the HOA may bring an action at law to foreclose the lien against the property.

16. The HOA's lien has not been paid, cancelled or discharged of record, and there are no other proceedings in law or in equity to recover the amounts claimed herein.

17. Plaintiff is entitled to a judgment of foreclosure of its lien and, upon the foreclosure sale of the Unit, the proceeds of such foreclosure sale.

FILED: ROCKLAND COUNTY CLERK 01/17/2018 02:19 PM
NYSCEF DOC. NO.: Case 7:18-cv-06900-KMK Document 1 Filed 08/09/18 18:25
INDEX NO. 035039/2017
RECEIVED NYSCEF: 01/17/2018

WHEREFORE, Plaintiff, PIERSON LAKES HOMEOWNERS ASSOCIATION, INC., prays for judgment granting the following relief:

a)      As to the First cause of action, a personal money judgment in favor of the Plaintiff and against EONS in the amount of $30,539.46, for unpaid Assessments through October 1, 2017, together with additional charges and fees as they continue to accrue and remain unpaid, and interest at the maximum statutory rate, together with costs, disbursements and reasonable attorney fees;

b)      As to the Second cause of action, that the Court adjust and determine the equities of all parties to this action and determine the respective priorities of the various liens, if any, and the interests of all the parties herein; that it adjudge that the Plaintiff has a valid lien upon the Unit in an amount as set forth in the complaint, with interest at the statutory rate, costs, disbursements, and reasonable attorney fees, plus accrued Assessments; that all other parties claiming under the Plaintiff and/or under the defendant EONS Properties, LLC be forever foreclosed of all right and equity of redemption or other interest in the Unit; that the Unit be sold as provided by law, and the proceeds of such sale be brought into Court and thence paid to the Plaintiff in the amounts due it including interest at the statutory rate, the costs and disbursements of the action, and reasonable attorney fees; that either or any of the parties to this action may become a purchaser upon such sale; that this court, if requested, forthwith appoint a receiver of the rents and profits of said premises with the usual power and duties; and, that defendant EONS Properties, LLC be adjudged to pay any deficiencies that may remain after applying all such moneys so applicable thereto; and,

d)      That the Plaintiff have such other and further relief as this Court deems just and proper.

Dated: October 11, 2017
         White Plains, NY

                                    _____
                                    Diane E. Selker, Esq.
                                    GOLDENBERG & SELKER, LLP
                                    *Attorneys for Plaintiff*
                                    Pierson Lakes Homeowners HOA
                                    399 Knollwood Rd., Suite 112
                                    White Plains, NY 10603
                                    (914) 997-0999

3

<u>VERIFICATION</u>

STATE OF NEW YORK    )
                     }ss.:
COUNTY OF ROCKLAND)

     Sean Rice, being duly sworn, deposes and says: I am the President of Pierson Lakes Homeowners Association, Inc., Plaintiff in the within action.

     I have read the foregoing Verified Complaint and know the contents thereof; the same are true to my own knowledge, except as to matters stated therein to be alleged upon information and belief, and as to those matters I believe them to be true. The basis of my knowledge as to the truth of the matters stated in the Verified Complaint are the books and records maintained by the Plaintiff and its bookkeepers, and a foreclosure search conducted by a title insurance company.

                                       Sean Rice

Sworn to before me the
12th day of October , 2017

Notary Public

**DENISE E. LUCAS**
Notary Public, State of New York
Registration No. 01LU6343948
Qualified in Westchester County
Commission Expires 06/20/20

4

**NATIONAL REAL ESTATE SERVICES, INC.**

Title Number: 5999

S C H E D U L E  A

ALL that certain plot, piece or parcel of land, situate, lying and being in the Town of Ramapo, in the County of Rockland, State of NY and shown and designated as Lot 46.07-1-7 on a map entitled "Subdivision Plat-Lot Line Change Pierson Lakes Phase No. 3" made by A.R. Sparaco, Jr., PLS dated January 30, 2002 and filed in the Office of the Rockland County Clerk on June 5, 2003, as Map No. 7585, and which said parcel is more particularly bounded and described as follows:

BEGINNING at a point marked by an iron pin distant 1,980.24 feet Westerly as measured on a course of South 57 27' 26" west from the Southwesterly terminus of Sterlington Road as shown on a map entitled, "Subdivision Plat Pierson Lakes Phase I Drawing H-3" which was filed in the Office of Rockland County Clerk as Map No. 6460; and

RUNNING THENCE North 31 degrees 05' 00" West 48.67 feet to an iron pin set;

THENCE North 52 degrees 44' 15" East 543.09 feet to an iron pin set in the Westerly side of Cranberry Lake;

THENCE along the Westerly side of Cranberry Lake the following courses and distances:

South 29 degrees 78' 00" East 28.04 feet;
South 4 degrees 58' 30" East 24.39 feet
South 16 degrees 29' 00" East 82.76 feet;
South 25 degrees 33' 00" East 50.45 feet;
South 58 degrees 07' 00" East 53.65 feet;
South 48 degrees 37' 00" East 790.26 feet;
South 41 degrees 58' 00" East 144.76 feet to an iron pin;

THENCE turning away from Cranberry Lake South 44 degrees 25' 00" West 500.63 feet to a point marked by an iron pin;

THENCE North 45 degrees 35' 00" West 289.37 feet;

FILED: ROCKLAND COUNTY CLERK 01/17/2018 02:19 PM INDEX NO. 035039/2017
NYSEF DOC. NO. Case 7:18-cv-06900-KMK Document 1-4 Filed 08/09/18 18:35 interim Pg RECEIVED NYSCEF: 01/17/2018

## NATIONAL REAL ESTATE SERVICES, INC.

### Title Number: 5999

### S C H E D U L E  A  (continued)

THENCE on a curve bearing to the right having a radius of 576 feet, an arc distance of 145.77 feet;

THENCE North 31 degrees 05' 00" West 31.01 feet to an iron pin which said pin is the point or place of BEGINNING.

TOGETHER with an easement of ingress and egress and for utilities over the private rights of way shown on the aforementioned map to the nearest public highway.

TOGETHER with the benefits of and subject to the burdens set forth in a declaration of covenants, restrictions, easements, charges and liens made by Ramapo Land Co., Inc. dated April 25, 1990 and recorded in the Rockland County Clerk's office on May 11, 1990 in Liber 408 at Page 1110.

**FOR CONVEYANCING ONLY**

The policy to be issued under this report will insure the title to such buildings and improvements erected on the premises which by law constitute real property.

TOGETHER with all the right, title and interest of the party in the first part, or, in and to the land lying in the street in front of and adjoining said premises.

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF ROCKLAND

-----------------------------------------------------------------------X

PIERSON LAKES HOMEOWNERS ASSOCIATION, INC.,

                                  Plaintiff,

             -against-

EONS Properties, LLC; "JOHN DOE" and "JANE DOE,"
which names refer to fictitious parties who are possible
tenants or occupants of the premises or who may be other
presently unknown parties who claim or may claim a lien
against the premises,

                                 Defendants.

-----------------------------------------------------------------------X

**VERIFIED ANSWER
AND COUNTERCLAIMS**

Index No.: 35039/17

      **PLEASE TAKE NOTICE** that the Defendant EONS Properties, LLC, by its attorneys,

OGEN & SEDAGHATI, P.C., upon information and belief, answers the Complaint as follows:

      1.     As to paragraph 1 of the Complaint: Deny having knowledge or information

sufficient to form a belief as to the truth of the allegations contained therein.

      2.     As to paragraph 2 of the Complaint: Denied.

      3.     As to paragraph 3 of the Complaint: Denied.

      4.     As to paragraph 4 of the Complaint: Deny having knowledge or information

sufficient to form a belief as to the truth of the allegations contained therein.

      5.     As to paragraph 5 of the Complaint: Deny having knowledge or information

sufficient to form a belief as to the truth of the allegations contained therein.

      6.     As to paragraph 6 of the Complaint: Deny having knowledge or information

sufficient to form a belief as to the truth of the allegations contained therein.

FILED: ROCKLAND COUNTY CLERK 01/28/2018 10:56 PM
NYSCEF DOC. NO. 25

INDEX NO. 035039/2017

RECEIVED NYSCEF: 01/28/2018

Case 7:18-cv-06900-KMK Document 5 Filed 08/03/18 Page
76 of 194

7.     As to paragraph 7 of the Complaint: Deny having knowledge or information sufficient to form a belief as to the truth of the allegations contained therein.

8.     As to paragraph 8 of the Complaint: Deny having knowledge or information sufficient to form a belief as to the truth of the allegations contained therein.

9.     As to paragraph 9 of the Complaint: Denied.

10.     As to paragraph 10 of the Complaint: Denied.

11.     As to paragraph 11 of the Complaint: Denied.

12.     As to paragraph 12 of the Complaint: Denied.

13.     As to paragraph 13 of the Complaint: Denied.

14.     As to paragraph 14 of the Complaint: Defendant repeats, reiterates and realleges each and every response set forth above, together with the same force and effect as though fully set forth herein at length.

15.     As to paragraph 15 of the Complaint: Denied, and refers all questions of law to the Court.

16.     As to paragraph 16 of the Complaint: Denied.

17.     As to paragraph 17 of the Complaint: Denied.

**AS AND FOR A FIRST AFFIRMATIVE DEFENSE**

18.     The Complaint, and each count thereof, fails to state a claim upon which relief may be granted.

FILED: ROCKLAND COUNTY CLERK 01/28/2018 10:56 PM          INDEX NO. 035039/2017
NYSCEF DOC. NO: 25    Case 7:18-cv-06900-KMK    Document 5    Filed 08/03/18    RECEIVED NYSCEF: 01/28/2018

77 of 194

### AS AND FOR A SECOND AFFIRMATIVE DEFENSE

19.     Plaintiff has failed to obtain personal jurisdiction over Defendant; this Answer is filed subject to, and without waiving, full preservation of Defendant's objection to said lack of personal jurisdiction.

### AS AND FOR A THIRD AFFIRMATIVE DEFENSE

20.     To any extent that Plaintiff was damaged, Plaintiff failed to mitigate the damages claimed.

### AS AND FOR A FOURTH AFFIRMATIVE DEFENSE

21.     To any extent that Plaintiff was damaged, the damages alleged to have been suffered by Plaintiff were caused or contributed to by the culpable conduct of persons over whom Defendant had no authority or control.

### AS AND FOR DEFENDANT'S COUNTERCLAIMS

22.     EONS Properties, LLC, as and for its Counterclaims against PIERSON LAKES HOMEOWNERS ASSOCIATION, INC., alleges the following, on information and belief, and demands that PIERSON LAKES HOMEOWNERS ASSOCIATION, INC. provide an answer thereto:

### AS AND FOR A FIRST COUNTERCLAIM
#### (Breach of Fiduciary Duty)

23.     EONS Properties, LLC repeats, reiterates and realleges each and every one of the foregoing paragraphs, with the same force and effect as though fully set forth herein at length.

24.     EONS Properties, LLC is a domestic limited liability company qualified to do business in the State of New York.

25.     Counterclaim Defendant PIERSON LAKES HOMEOWNERS ASSOCIATION, INC. is a not-for-profit corporation organized under the laws of the State of New York, with a principal place of business in Sterlington, Town of Ramapo, County of Rockland, State of New York, which is a homeowners' association that controls and manages real property known as "Pierson Lakes."

26.     Counterclaim Defendant PIERSON LAKES HOMEOWNERS ASSOCIATION, INC. had a duty to act on behalf of, to the benefit of, and in the best interest of its homeowner members, including Counterclaim Plaintiff EONS Properties, LLC, and to act in a reasonable manner and in the best financial interests of its homeowner members, including Counterclaim Plaintiff EONS Properties, LLC.

27.     Counterclaim Plaintiff EONS Properties, LLC put its trust and confidence in Counterclaim Defendant PIERSON LAKES HOMEOWNERS ASSOCIATION, INC. to properly manage, control, and operate its affairs in a reasonable manner and in the best financial interests of its homeowner members, including Counterclaim Plaintiff EONS Properties, LLC.

28.     As a result of the foregoing, Counterclaim Plaintiff EONS Properties, LLC had and has a fiduciary relationship with Counterclaim Defendant PIERSON LAKES HOMEOWNERS ASSOCIATION, INC.

28.     As a result of the foregoing, Counterclaim Defendant PIERSON LAKES HOMEOWNERS ASSOCIATION, INC. have and had a fiduciary duty to Counterclaim Plaintiff EONS Properties, LLC.

29.     Counterclaim Defendant PIERSON LAKES HOMEOWNERS ASSOCIATION, INC., through its Board, members, employees, agents, associates, contractors, subcontractors, consultants, and/or attorneys, breached that fiduciary duty by: failing to perform its obligations to the sponsors of the development and others; failing to timely and properly pay its tax obligations; improperly delaying payment of its obligations, causing the payments to increase; improper conduct relating to the attorney general's office and others; causing forfeiture of funds belonging to the homeowners, including Counterclaim Plaintiff EONS Properties, LLC, and otherwise causing damages to accrue to Pierson Lakes homeowners and others.

30.     Counterclaim Defendant PIERSON LAKES HOMEOWNERS ASSOCIATION, INC., through its Board, members, employees, agents, associates, contractors, subcontractors, consultants, and/or attorneys, breached that fiduciary duty by failing to put forth its best efforts regarding the foregoing.

31.     Counterclaim Defendant PIERSON LAKES HOMEOWNERS ASSOCIATION, INC., through its Board, members, employees, agents, associates, contractors, subcontractors, consultants, and/or attorneys, breached that fiduciary duty by acting in bad faith in its conduct with the sponsor and others.

32.     Counterclaim Defendant PIERSON LAKES HOMEOWNERS ASSOCIATION, INC., through its Board, members, employees, agents, associates, contractors, subcontractors, consultants, and/or attorneys, breached that fiduciary duty by improperly expending the money it had collected from homeowners.

33. Counterclaim Defendant PIERSON LAKES HOMEOWNERS ASSOCIATION, INC., through its Board, members, employees, agents, associates, contractors, subcontractors, consultants, and/or attorneys, breached that fiduciary duty by retaining and keeping incompetent counsel for its dealings and proceedings with the sponsors.

34. As a direct and proximate result of the forgoing, Counterclaim Plaintiff EONS Properties, LLC has been injured and damaged in an amount not less than Nine Hundred Thousand Dollars ($900,000.00), plus interest.

### AS AND FOR A SECOND COUNTERCLAIM
#### (Action for Waste)

35. EONS Properties, LLC repeats, reiterates and realleges each and every one of the foregoing paragraphs, with the same force and effect as though fully set forth herein at length.

36. The conduct of Counterclaim Defendant PIERSON LAKES HOMEOWNERS ASSOCIATION, INC., as set forth in the preceding paragraphs, constituted a waste of its member and homeowner assets.

37. As a direct and proximate result of the forgoing, Counterclaim Plaintiff EONS Properties, LLC has been injured and damaged in an amount not less than Nine Hundred Thousand Dollars ($900,000.00), plus interest.

WHEREFORE, Defendant/Counterclaim Plaintiff EONS Properties, LLC demands judgment as follows:

A. Dismissing the Complaint and denying all relief demanded therein.

    B.      Awarding Counterclaim Plaintiff EONS Properties, LLC damages as set forth in the First and Second Causes of Action, in an amount to be determined at trial, but no less than $900,000.00;

    C.      Awarding Defendant the costs, disbursements and attorneys' fees of the instant action.

    D.      Such other and further relief in favor of Defendant as the Court deems just and proper.

Dated:    New York, New York
         January 26, 2018

                Yours, etc.

                _____
                **EITAN ALEXANDER OGEN**
                **OGEN & SEDAGHATI, P.C.**
                **Attorneys for Defendant/Counterclaim Plaintiff**
                **EONS Properties, LLC**
                **202 East 35th Street**
                **New York, New York 10016**
                **(212) 344-3440**

TO:    **GOLDENBERG & SELKER**
       **399 Knollwood Road, Suite 112**
       **White Plains, NY 10603**
       **(914)997-0999**

# VERIFICATION

Natalie Sedaghati, being duly sworn, deposes and says:

I am a member of EONS Properties, LLC, Defendant/Counterclaim Plaintiff in the action within. I have read the annexed **ANSWER AND COUNTERCLAIMS** and know the contents thereof, and the same are true to my knowledge, except those matters therein which are stated to be alleged upon information and belief, and as to those matters I believe them to be true.  My belief, as to those matters therein not stated upon knowledge, is based upon facts, records, and other pertinent information contained in my files.

ED:          New York, New York
             January 26, 2018

_____
Natalie Sedaghati

Sworn to before me this
26th day of January 2017

_____
Eitan Alexander Ogen
Notary Public State of New York
No.: 02OG5081205
Qualified in New York County
Commission Expires 6/30/19

FILED: ROCKLAND COUNTY CLERK 01/28/2018 11:18 PM
INDEX NO. 035039/2017
NYSCEF DOC. NO.
RECEIVED NYSCEF: 01/28/2018

18:08248 document 1200530 RKM Document Entered 08/09/18 18:35 1 picrem Pg
Case 7:18-cv-06900-KMK Document 1 Filed 08/09/18 Page 1 of 4

83 of 194

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF ROCKLAND

--------------------------------------------------------------------X

PIERSON LAKES HOMEOWNERS ASSOCIATION, INC.,

                         Plaintiff,

        -against-

EONS Properties, LLC; "JOHN DOE" and "JANE DOE," which names refer to fictitious parties who are possible tenants or occupants of the premises or who may be other presently unknown parties who claim or may claim a lien against the premises,

                      Defendants.

--------------------------------------------------------------------X

Refer to the Hon.
Rolf Thorsen

Ret. Date: 2/2/18

**NOTICE OF
CROSS MOTION**

Index No.: 35039/2017

 

PLEASE TAKE NOTICE, that upon the annexed affirmation of **EITAN ALEXANDER OGEN**, duly affirmed on January 26, 2018, together with the exhibits annexed thereto, and the annexed affidavit of Natalie Sedaghati, duly sworn to on January 26, 2018, and upon all the pleadings and proceedings heretofore had herein, the undersigned will cross move this Court at an IAS Motion Part thereof, at the Rockland Courthouse located at Courthouse, 1 South Main Street, New City, NY 10956, on February 2, 2018, at 9:30 AM, or as soon thereafter as counsel can be heard for an Order, pursuant to CPLR § 3012(d), extending the time for Defendant to interpose the Answer herein and compelling Plaintiff to accept same; and for such other and further relief as to this Court seems just and proper.

1

FILED: ROCKLAND COUNTY CLERK 01/28/2018 11:18 PM    INDEX NO. 035039/2017
NYSCEF DOC. NO. Case 7:18-cv-06900-KMK Document 1 Filed 08/09/18 18:35 2 picrem  Pg
84 of 194

RECEIVED NYSCEF: 01/28/2018

PLEASE TAKE FURTHER NOTICE, that answering affidavits, if any, are to be served

upon the undersigned within two (2) days prior to the return date of the within application.

Dated:      New York, New York
            January 26, 2018

                              Yours, etc.

                              _____
                              EITAN ALEXANDER OGEN
                              OGEN & SEDAGHATI, P.C.
                              **Attorneys for Defendant/Counterclaim Plaintiff**
                              **EONS Properties, LLC**
                              202 East 35th Street
                              New York, New York 10016
                              (212) 344-3440

TO:    GOLDENBERG & SELKER
       399 Knollwood Road, Suite 112
       White Plains, NY 10603
       (914)997-0999

2

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF ROCKLAND
----------------------------------------------------------------------X
PIERSON LAKES HOMEOWNERS ASSOCIATION, INC.,

                            Plaintiff,

           -against-

EONS Properties, LLC; "JOHN DOE" and "JANE DOE,"
which names refer to fictitious parties who are possible
tenants or occupants of the premises or who may be other
presently unknown parties who claim or may claim a lien
against the premises,

                         Defendants.
----------------------------------------------------------------------X

**AFFIRMATION IN
SUPPORT OF
DEFENDANT'S MOTION
AND IN OPPOSITION TO
PLAINTIFF'S MOTION**

Index No.: 35039/2017

      Eitan Alexander Ogen, an attorney duly admitted to practice law before the Courts of the

State of New York, and a member of **OGEN & SEDAGHATI, P.C.**, attorneys for Plaintiff herein,

affirms the following to be true under the penalties for perjury.

      1.      Your affirmant, fully familiar with the facts and circumstances surrounding the within

issues, submits this affirmation in support of the within application for an Order, pursuant to CPLR §

3012(d), extending the time for Defendant to interpose the Answer herein and compelling Plaintiff to

accept same, and in opposition to Defendant's motion for a default judgment; and for such other and

further relief as to this Court seems just and proper.

      2.      Defendant EONS Properties LLC is the owner of a vacant lot located in the Pierson

Lakes development in Sloatsburg, Rockland County, NY.

      3.      Plaintiff PIERSON LAKES HOMEOWNERS ASSOCIATION, INC. is the

homeowners' association for the development.

3

4.      Plaintiff herein has sued Defendant for unpaid assessments and charges and to foreclose on the Plaintiff's property, located at 12 Pierson Lakes Drive (a/k/a) 7 Lodge Road, Sloatsburg, NY.

5.      Defendant herein submits an Affidavit of Merit by Natalie Sedaghati, which explains the facts and circumstances herein.

6.      According to the affidavits of service, it appears that service of the Summons and Complaint was made upon the vacant property on November 3, 2017, with a mailing to said vacant lot on November 6, 2017 (Ex. "G" and "H" to Plaintiff's motion.)  It was thus never received by EONS Properties, LLC.

7.      It appears that another service was made upon the undersigned's law office on October 27, 2017 to a secretary in the law office. (Ex. "F" to Plaintiff's motion.) However, the law office was never designated as the agent of EONS Properties, LLC until it made an appearance herein.  Moreover, what was dropped off at the time of service was only the Notice of Pendency, not the Summons and Complaint.

8.      It also appears that Plaintiff served Defendant via the Secretary of State on or about October 19, 2017.  (Ex. "E" to Plaintiff's motion.  However, it appear that the additional mailing was not made until November 14, 2017, again, to the undersigned's law office. (Ex. "I")

9.      In any case, the summons and complaint was not actually received until on or about January 22, 2018, upon the receipt of the instant motion by Plaintiff.

10.      Upon receipt of the motion, the undersigned contacted Plaintiff's counsel to request an extension of time to interpose an Answer.  (Ex. "A")  The request was declined.  (Ex. "A")

4

11.     Accordingly, the undersigned served and filed the instant Answer (Ex. "B") and now moves to compel Plaintiff to accept same and opposes Plaintiff's motion for a default.

12.     Although Defendant is not moving to dismiss the case based upon personal jurisdiction, the above explains the reason for Defendant not answering earlier and it is submitted that it represents a reasonable excuse for the delay.

13.     The defense is also meritorious as set forth in the Verified Answer.

14.     As set forth in Ms. Sedaghati's affidavit, PIERSON LAKES HOMEOWNERS ASSOCIATION, INC. has caused significant harm to the members of the association, including Defendant.

15.     Ex. "A" to Defendant's motion, the "account" submitted, shows that about half the charges are "sponsor payment deficits." These deficits have been caused, in large part, by improper conduct of PIERSON LAKES HOMEOWNERS ASSOCIATION, INC.

16.     In fact, in binding Arbitration, the Hon. Ira B. Warshawsky found considerable misconduct by PIERSON LAKES HOMEOWNERS ASSOCIATION, INC., its board members, and agents. As a result, a huge judgment of over $1.4 Million PIERSON LAKES HOMEOWNERS ASSOCIATION, INC. was directed. (See Exs. "C" and "D")

17.     Thus, there is certainly a meritorious defense, as much of the money being charged is due to the Plaintiff's own errors, misconduct and miscalculations.

18.     It is well established that "[w]hether there is a reasonable excuse for a default is a discretionary, sui generis determination to be made by the court based on all relevant factors, including the extent of the delay, whether there has been prejudice to the opposing party,

5

whether there has been willfulness, and the strong public policy in favor of resolving cases on the merits." <u>Harcztark v. Drive Variety, Inc.</u>, 21 A.D.3d 876. 800 N.Y.S.2d 613 (2d Dep't 2005).

19.     Here, there was a reasonable excuse for the delay, it was brief, there has been no prejudice to any party, no showing of any willfulness, and the courts strongly favor a resolution on the merits.

20.     In fact, in a case that seeks foreclosure, as this one does, the courts are even less likely to grant a default in a situation such as this.

21.     A "foreclosure action is equitable in nature and triggers the equitable powers of the court. . . . 'Once equity is invoked, the court's power is as broad as equity and justice require' . . . Thus, a court may rely on 'its inherent authority to vacate [a judgment] in the interest of substantial justice, rather than its statutory authority under CPLR 5015 (a),' as the 'statutory grounds are subsumed by the court's broader inherent authority.'" <u>U.S. Bank N.A. v. Losner</u>, 145 A.D.3d 935, 44 N.Y.S. 3d 467 (2d Dep't 2016) (citations omitted).

22.     The <u>Losner</u> case, <u>supra</u>, was a case where the judgment had already been entered. Yet, the Court invoked its broader inherent authority to vacate the default judgment as it was a foreclosure action. <u>A fortirori</u> in this case the Court's authority in the interests of justice may be invoked as no judgment has been entered and Defendant acted quickly to seek to extend its time to answer.

23.     Even in cases with as much as a <u>5 month delay</u> in answering, the Second Department has recently held that where there is a reasonable excuse and a showing of a meritorious defense, Defendant should be permitted to interpose an answer. <u>Gomez v. Gomez-Trimarchi</u>, 137 A.D.3d 972, 27 N.Y.S.3d 229 (2d Dep't 2016).

6

24.     In <u>Gomez, supra,</u> the Second Department held that "defendant's excuse for the delay in answering was reasonable, especially since there was no prejudice or willfulness, and in light of the public policy in favor of resolving cases on the merits." <u>Id</u>. (citations omitted).

25.     In the instant case, it is all the more so the case that Defendant's answer should be permitted to be interposed as the delay is much briefer, and there has been absolutely no prejudice to Defendant.

26.     Accordingly, it is respectfully requested that the instant cross motion be granted and Plaintiff's motion be denied.

**WHEREFORE,** Defendant respectfully request that the within cross motion be granted in all respects, the default motion by Plaintiff be denied, together with such other and further relief as this Court deems just and proper.

Dated:      New York, New York
            January 26, 2018

_____
Eitan Alexander Ogen

7

**From:** Diane Selker [mailto:dselker@goldenbergselkerlaw.com]
**Sent:** Wednesday, January 24, 2018 1:51 PM
**To:** Eitan Ogen <eitan@osfirm.com>
**Cc:** Ira Goldenberg <igoldenberg@goldenbergselkerlaw.com>; Mary Rodriguez <mrodriguez@goldenbergselkerlaw.com>; rices@plhoa.org
**Subject:** RE: Pierson Lakes Homeowners v. EONS Properties, LLC, Index # 35039-2017

Dear Mr. Ogen –

Because it is so late, and the motion for default judgment is already in, it was necessary that I check with the board before answering your request regarding the adjournment. The board does not want us to permit an adjournment on consent. Therefore, you will need to file a motion. Best, Diane

**Diane E. Selker, Esq.**
Goldenberg & Selker, LLP
Attorneys at Law
399 Knollwood, Suite 112
White Plains, NY 10603
Phone: (914) 997-0999 x 102 or (914) 682-4015 x 102
Fax & eFax: (914) 682-1512
dselker@goldenbergselkerlaw.com

The information contained in this transmission is attorney privileged and/or confidential information intended for the use of the individual or entity named above. If the reader of this message is not the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited.

18-08228-rdd    Doc 96-2    Filed 08/14/18    Entered 08/14/18 18:18:35    Exhibit 2    Pg
91 of 194

**From:** Eitan Ogen [mailto:eitan@osfirm.com]
**Sent:** Wednesday, January 24, 2018 1:22 PM
**To:** Diane Selker <dselker@goldenbergselkerlaw.com>
**Subject:** Pierson Lakes Homeowners v. EONS Properties, LLC, Index # 35039-2017
**Importance:** High

Dear Ms. Selker,

I will be representing EONS Properties, LLC in the above matter.

I am asking for a 30 day extension to interpose an Answer or otherwise move for relief, and for us to adjourn the default motion for 30 days so that our Answer may be submitted.

Kindly advise if you will agree to same and I will forward the Stipulation for your signature.

Thank you in advance for your courtesy.

Eitan Alexander Ogen, Esq.
Ogen & Sedaghati, P.C.
202 East 35th Street
New York, NY 10016
Tel: (212)344-3440
Fax: (718)412-3268

NATIONAL ARBITRATION AND MEDIATION, INC.

-------------------------------------------------------------------X

PIERSON PROJECT, L.L.C., POTAKE LAKE, L.L.C.,
and ROCK HILL, L.L.C. d/b/a ROCK HILL PROJECT,

Claimants

File No. 188736

-against-

PIERSON LAKES HOMEOWNERS ASSOCIATION, INC.,    **Decision of**
**Arbitrator**
Respondent.

-------------------------------------------------------------------X

## INTRODUCTION

This Arbitration was held for 12 days, over 3 months (September-November, 2015). It covered numerous issues that arose between the Pierson Lake Homeowners Association (PLHA) and the sponsors of the project (Pierson Project, LLC, Potake Lake, LLC, and Rock Hall, LLC d/b/a Rock Hall Project (actually successors to original sponsors) after prior issues and lawsuits (2007) were settled in April, 2011 (The Stipulation of Settlement/Settlement Agreement/S.A.) (Cx10).

At the Arbitrator's request, the two sides agreed on what was essentially an outline of issues which would form the skeleton of their post-arbitration memos. Each side was allowed to submit an initial memo of no more than 35 pages and a reply memo of no more than 25 pages.

Based upon those memos, the lengthy records and hundreds of exhibits, the Arbitrator renders this decision. Each section of the decision is meant to stand alone unless of course it is part of any one or more sections that are intertwined with another section.

1

1111250

It was also agreed that actual proof of damages would be reserved subject to whether the Arbitrator found liability on the part of the PLHA related to Delay and any other damage claim that the Arbitrator may reserve on. Other claims may be clearly connected to a specific amount of damages if the Arbitrator finds the Sponsor or the PLHA is liable on those claims or counterclaims.

Also, the issue of who is the "Prevailing Party", and the appropriate Attorneys' fee will also be kept in reserve for additional finding and/or submissions.

For the most part, claimants' exhibits will be listed as Cx and respondent's exhibits will be listed as Rx… Transcript references would be indicated as (TR or Tr).

## MAY THE PLHA BE EXCUSED FROM PERFORMANCE OF THE SETTLEMENT AGREEMENT?

The Settlement Agreement is a complex multi-faceted agreement intended to be all encompassing in solving many years of problems between the PLHA and Sponsors leading up to the signing of the Settlement Agreement (S.A.) in April, 2011 (Cx10).

Sponsor notes that a violation of a covenant of the agreement, an independent covenant, may be compensated in damages. (Independent from any other covenant).

Sponsor argues that while there are many parts of the S.A. that are independent from the other, two sections are tied together: the release of the escrow amount of $470,000 and PLHA compliance with the non-opposition provision (Cx10, p. 13). Sponsor argues they performed their part but the PLHA breached its part (Cx37A, 38, R 94, 101-104).

The PLHA has denied it breached its part of the agreement by its action with the Attorney General's Office or in any other way but also argued that the Sponsor breached first and said breach was a material breach which excused their performance of the S.A., citing to AM Cosmetics, Inc. v. Solomon, 67 F. Supp.2d 312, 317 (S.D.N.Y. 1999), "Under New York law, if

2

one party commits a material breach of contract, the other party to the contract is relieved of further performance.   (Also citing to <u>Alesayi Beverage Corp. v. Canada Dry Corp.</u> 947 F. Supp.658, 667 (S.D.N.Y. 1996)).

The Sponsor cites to the same case and quotes "if the injured party chooses not to terminate the contract, he surrenders his right to terminate later based on that breach." (See <u>AM Cosmetics</u> at 317).

It is quite clear the PLHA did not choose to terminate the contract (the S.A.) and continued to receive benefits thereunder.

The PLHA has claimed two material breaches which obviate their need to follow the S.A.

Sponsors' failure to make payments in October 2013 and for many months thereafter: the PLHA contended that Final Subdivision Approval had been obtained by the end of August 2013 but no later than September and, therefore, those payments should have started in October (Amato Tr 2295).

<u>New Security Improvements</u>:  Sponsors' filing for Final Subdivision Approval without filing for site plan approval for the Guard House area.

PLHA argues that each of these were "substantial [in] that [they] defeated the PLHA's object in making the contract."   In the alternative, they argue that even if the Arbitrator concludes that these breaches do not preclude the delay claim of sponsors, it should still be rejected.  They point out that Sponsors have done "nothing physically on the land since" they received Final Subdivision Approval in August 2013 (Sarkissian, Tr 1102).

The issue of the failure to make payments as of October 2013 and through May of 2014 is an important one.

3

However, it amounts to a small amount of money compared to other parts of the agreement. The Arbitrator finds: (a) these issues were not material breaches, and (b) assuming they were, the Respondents' failure to act upon them by terminating the agreement in any way whatsoever, or even going to arbitration as the S.A. provided for as relief from a breach, precluded the PLHA from later terminating the agreement or choosing to no longer abide by one or more of its terms. The issues of the disagreement on what constitutes Final Approval and the delay claim related thereto as well as payment failures will be discussed forthwith.

## SEPARATION OF SUBMISSION OF FINAL SUBDIVISION APPROVAL FROM SITE PLAN APPROVAL OF GUARD HOUSE AND RELATED ISSUES

### Bifurcation Argument

The Sponsors' decision not to bring the site plan application (Guard House/Gate House) until after Final Subdivision Approval was finalized is relevant to the counterclaim issue of material breach, which would relieve the PLHA of abiding by the S.A. which included not communicating with the Attorney General's office.

Respondents have argued that Bifurcation:

Was hidden from PLHA for many months and

The S.A. cannot be amended orally (Referencing Sponsor decision to bifurcate).

The Claimant has argued:

Nothing was hidden from the PLHA.

The Sponsor does not claim oral amendment, but rather that Gueyikian informed Ms. Amato of his plans and she accepted this in a signed writing (Rx48A)

Claimant expands upon the above:

Ms. Amato was aware of the fact Sponsors were not going to bring site plan application "until after completing the subdivision" as far back as February, 2012 (Tr 2374). Further PLHA

4

knew that the applications for the Guard House had not been submitted at the same time as the Subdivision Application. Claimant posits that even if the "Gueyikian – Amato" email exchange does not constitute a written change to the S.A., it was beneficial to both parties since bringing them together or bringing site approval before Final Subdivision Approval (they argue) would have caused longer delays. Of course this is the Sponsor's opinion.

The arbitrator finds the decision by Sponsor to bring site plan approval separate from Final Approval was known to PLHA – Ms. Amato and the Board prior to October, 2013, most likely in February, 2012. Ms. Amato agreed that the sponsors had sent her copies of their applications before they were sent to the town (TR. 2381). She was also sent the separate applications for the guardhouse when the Sponsor submitted them. PLHA also knew why the "Kurtzman type" of objection to the Guard house and its location, if attached to the Final Subdivision Approval, would most likely have delayed it.

The argument over what constituted Final Approval was active in the fall of 2013. Subdivision Approval was obtained by September, 2013 but no payments ensued due to Sponsors' interpretation of Final Approval. There was no action taken pursuant to the S.A. to arbitrate these issues at that time nor complain of it as a breach of the S.A.

Instead, a series of affirmative steps were taken to change the responsibilities of Sponsors over a period of nearly one year, starting in the late fall of 2013 and into and through January 2015 with the filing of the lien.

These included:

The Harrison email exchange with sponsor's counsel, Sarajian, claiming fraud by the sponsors in marketing the property (Rx83), and questioning the solvency of    the sponsor

5

Making Sponsor responsible for approximately 2/3 of the Road Loan of $650,000 (or the interest thereon). Adding the Litigation reserve of $200,000 to the Budget (2/3 responsibility of sponsors). January 22, 2014 Board resolution and other board action vis-à-vis the budget.

  c.  Harrison's communications with AG.

  d.  Notifying Sponsor's lender that PLHA had asserted a lien against Sponsor's property which they claimed had priority to Lender's mortgage. Lien did not yet exist and would not have had priority, pursuant to Declaration, VI Section 6 (Cx2 p. 15), referencing First Mortgage of Lender.

  e.  Filing of lien in January 2015.

There was an apparent "threat/communication" with Sponsor's title company if it helped Sponsor bond the lien. (Sponsor eventually determined that it would not bond the lien.) The propriety of the lien is discussed elsewhere.

Arbitrator finds that email exchange between Ms. Amato and Gueyikian did not constitute a written amendment to the S.A. The language of the email exchange is not sufficiently clear to reach that conclusion. However, arbitrator also finds that this was not a material breach nor did PLHA argue or maintain that it was a breach, material or otherwise, until after this proceeding was filed.

Said failure precludes the PLHA from now claiming a prior breach by Sponsor and then using said breach as a basis of a counterclaim or defense to their own actions which would otherwise violate the S.A. (AM Cosmetics, Inc., v. Solomon, 67 F.Supp.2d at 317-18 (party with actual knowledge of a breach who does not give timely notice of the breach to the breaching party waives the right to later sue upon the breach).

6

1111250

There was no evidence that said "bifurcation" by itself damaged the PLHA.  The PLHA has the burden to show causation and damages.

It has not.

The only apparent damages-related claim would be that the bifurcation resulted in a delay of Final Approval (as the Sponsor defines it), and, thus, the payments that should have been due PLHA upon Final Approval, in their view, were delayed because of Sponsor's action in violation of the S.A.  This depends upon how the Arbitrator will rule on the Final Approval argument.

Final Subdivision Approval occurred in August 2013 or no later than September 2013. Sponsors could have commenced construction at that time.   Under their, the Sponsors', interpretation of the definition of Final Approval, construction would have to wait for approval of the site plan for Guard House which would be included as part of section IV of the S. A.

Respondent claims they were due monthly payments from August 2013 (plat filed September 2013) when Final Subdivision approval was obtained until, what Sponsor called Final Approval, was obtained eight months later. Approval was actually obtained on March 11, 2014. Non-appealable approval would then have been in effect 30 days thereafter. Due to the fact that the town did not file a resolution with the clerk's office with the necessary documents at that time, which would have started the clock on the appeals process, the actual non-appealable final approval was not achieved until late May or early June 2014.

The respondents also claim they were discharged of their obligation under the S.A. when the Sponsor only submitted for Final Subdivision Approval in May 2012 without site approval for the Security issues (Guard House).

The Arbitrator rejects that argument.  If it was a breach it was not complained of, and if it was a breach it was not material.

7

1111250

The fact, however, that the PLHA did not formally object to this bifurcation process nor file for arbitration does not mean that the sponsors acted within the parameters of the Settlement Agreement when they bifurcated the submission, nor that such action, if in violation of the Settlement Agreement, did not result in damages to the PLHA.

This, thus, brings us to the definition of Final Approval found in S.A. Article II(1).

"1.    <u>Final Approval</u>.  For the purpose of this Agreement, 'Final Approval' is defined as follows:

A final non-appealable subdivision approval, signed by the Chairman of the Town of Ramapo Planning Board, and final non-appealable approvals from all other agencies or entities necessary to commence construction of roads and infrastructure on Phases 2 and 3 of the Pierson Lakes Development, consistent with the Preliminary Subdivision Approval (as defined below) with the changes set forth in Article IV of this Agreement.  Sponsors reserve the right to make non-Material Changes to the preliminary subdivision layout to better accomplish the agreed upon changes in this Agreement or other concerns raised by the Planning Board or other agencies."

One cannot read the definition of Final Approval without including the reference to Article IV and then to Article IV D. NEW GUARD HOUSE ENTRANCE AND NEW GUARD HOUSE GATES, and most specifically subparagraph 3.[1]

"3.    Sponsors 2 and 3 shall add the New Security Improvements to the subdivision plat submitted to the Town of Ramapo for Final approval.  The New Improvements shall be added to the final plat as depicted on the sketch attached hereto as exhibit P-5."

Thus, the Arbitrator finds the Sponsors are correct; Final Approval has not been obtained if any Article IV issues remain unapproved.  Clearly, the site plan for the New Security

---

[1] Despite the disagreement over what the reference to article IV was to mean in the Settlement Agreement, Article II (1), neither side attempted to show what the intent of the draftsman may have been when this section of the settlement agreement was authored.

8

Improvements had not yet been approved by the end of August 2013. Thus, Final Approval had

not been obtained until June 2014.

However, did the sponsors breach the settlement agreement more specifically paragraph

IV (D) (3) as noted above and/or IV (D) (7)?

Was the site plan for the New Security Improvements added to the subdivision plat

submitted for final approval? Did the sponsors have the right to omit this? If not, is it a breach?

The Settlement Agreement further provides IV (D)(7):

> "If this approval is required and if requested by Sponsors 2 and 3,
> the PLHA and the Individual Plaintiffs shall support, in writing,
> any application for site plan or other approval that is consistent
> with the terms of this Agreement. If site plan or other approval is
> required by the Town, Sponsors 2 and 3 shall apply for this
> approval at the same time that they apply for Final Approval.
> Sponsors 2 and 3 agree to expeditiously pursue any site plan or
> other approval that may be required by the Town for the New
> Security Improvements, but they shall not be required to
> commence any litigation to challenge the denial of such approval."
> (Cx10 p. 20).

Thus, the failure to comply with (D)(7) is a breach of the agreement. The fact that the

PLHA knew/were aware that there had not been a simultaneous submission does not make it any

less of a breach. The fact that there was a reasonable tactical reason for putting off the

submission of the site plan for the New Security Improvements does not mean it was not a

breach. Article IV(A)(4), the right of Sponsors to use "sole discretion" in pursuit of "Final

Approval," does not trump duty of Sponsors to follow (D)(7).

The Sponsors argue that both the PLHA and the Sponsors gained by this delay in

submission of the site plan for the New Security Improvements. This may be true.

It could be said that if both plans were submitted together, there would not have been

"final non-appealable subdivision approval" by September, 2013 but by a far later date.

9

As noted earlier, the Arbitrator has found that the PLHA was aware of the bifurcated submission long before October, 2013. They also did not act to declare a breach or proceed to arbitration. Rather, they proceeded to act to take the steps outlined earlier to obtain funds from the Sponsors or put leverage on the Sponsors.

The Arbitrator thus finds that Final Approval was not obtained until there was site plan approval including approval for parts of IV that required approval. Thus, non-appealable final approval was not obtained until early June 2014. However, the Arbitrator also finds that the failure to submit for both the Final Approval and the site plan approval at the same time was a breach of IV(D)(7).[2] (only a written waiver of IV (D) (7) could have avoided such a finding and it did not occur).

However, though it is a breach, the arbitrator finds that it was not material, and it was not declared a breach by the PLHA.  It is also noted that an attempt to settle this issue, amongst others, was proffered by Mr. Gueyikian in an email dated May 9, 2014 while looking for a face-to-face sit down with the board. If both sides had taken a more conciliatory view of the process, what is now 2 years ago, thousands and thousands of dollars could have been saved and the vituperative exchanges amongst the Sponsors and the board avoided.

The arbitrator concludes the appropriate damage award for Sponsors' breach is the eight months' payments ($14,400 per month) between October 1, 2013 and June 1, 2014 with 9% interests from June 1, 2014, on the sum of said payments.[3]

---

[2] There is some internal inconsistency in language between the definition of Final Approval in II(1), which includes the reference to Article IV of the agreement, and separate reference to the words "Final Approval" in Article IV(D)(7) in referencing the time for submission of the plans.

[3] The monthly payments will not include the road assessment added by the January 2014 resolution nor the litigation reserve fund added by the 2014 budget.]

10

## SLAPP RULING

Claimant's action against the PLHA is not just a mere breach of contract action but also a breach of the settlement agreement: a very detailed and complex settlement agreement that settled a four-year-old lawsuit.

It is not a SLAPP suit.  It is a lawsuit for the breach of the S.A. which was entered into by two sophisticated parties with experienced lawyers.

PLHA's actions through Harrison violated the S.A.   Harrison is not merely a homeowner and a member of the H.O.A., but a lawyer.  He became involved with these activities after the PLHA and Sponsor entered into the S.A. (April, 2011).  That is the only excuse one can imagine for his not understanding, or should we say misunderstanding, the impact of his actions under the S.A.

It is clear he was representing the board in his interactions with the AG's office.  To claim now that this is a SLAPP suit and raise the Anti-SLAPP suit legislation of the Civil Rights Law is unbelievable.

Claimant has no increased burden of proof due to the Anti SLAPP suit legislation.

The truth or falsity of Harrison's continued communications to the A.G. are not material to the Sponsor's claim against the PLHA.

This PLHA is not some poor group of people whose First Amendment rights have been trampled upon by the Claimant.

The SLAPP suit argument/claim defense is, as Claimant stated, a red herring.  In fact it wasted a great deal of time during the arbitration process. [See my prior decision].

The S.A. provided a forum for a disgruntled party – Arbitration.

11

Arbitration is a respected forum for settling disputes outside of the court system; a forum the PLHA chose not to use and fought ferociously to avoid when invoked by the Sponsors.

Expanded commentary on the SLAPP suit issue is included in my ruling on the Delay Claims to follow.

### THE NUMBER OF LOTS TO BE USED IN THE DENOMINATOR IN CALCULATING ASSESSMENTS

Pursuant to the S.A. (Art. V(A) (at 21-22) there is a formula for determining the denominator of a fraction that would be used for determining responsibility for a share of common charges.

The agreement stated that "prior to the approval, the denominator shall be the existing 25 Lots in Phase 1 and not 74 Lots [obviously referring to 25 lots in Phase 1 and expected 49 lots in Phase 2 and 3].  Until Final Approval, the operating budgets for the PLHA will be prepared based on assessments to the existing Lots in phase 1 with appropriate reserves in accordance with the Declaration and Offering Plan. Potake and Rock Hill shall not be assessed. Two lots outside the property that were added by the PLHA should contribute the same amount of assessments of those levied on the 25 lots in Phase 1. " (Cx10) (para (a) on p. 22).

These two lots were not added to the 25, but, rather, they were paying whatever each of the 25 Lots would pay. It is these 2 lots that cause us the problem. Though I could be mistaken, I do not believe that there was any testimony that differentiated the 2 lots that were added by the PLHA to the Phase 1 count of lots from the 2 lots that were spoken of at the end of part (a) to V (A) (1). Those 2 lots received special treatment for assessment and voting purposes but were not counted into the actual number of lots.

12

In V(A)(1)(c) a new denominator is set forth:

"Once a final subdivision plat is filed for Phases 2 and 3, the denominator used for Art. VI, Sec. 3 of the Declaration shall be increased by the total number of Lots on the final subdivision plat and every Lot, including all of those owned by the Sponsors shall monthly pay common charges as set forth herein."

Thus, we would have to count the total of the number of lots shown on the final subdivision plat. In the opinion of the arbitrator, it is not the total number of lots on phases 1, 2 and 3 that we are counting, but we are adding the number of lots on the filed plat for phase 2 and 3 to the lots on phase 1.

At this point, the number 76 is not mentioned, nor is the number 74. One would think the total would be 74; 25 Lots in Phase One and 49 Lots in Phase Two and Three. Why would we need V (A) (1) (c) to give us a way of calculating a new denominator if 74 was not subject to change? There has not been an explanation proffered.

When Ms. Amato counted the lots during her testimony, she counted 27 Lots in Phase 1. She did not count them from the Phase 2 and 3 plat but from a map. This included two lots that were "outside the property that were added by the PLHA" (See Rx4) (Phase 1 map.) If there were 2 additional lots outside of the 25 lots (and the two lots added by the PLHA) that were referred to above, we would then have 29 lots in phase 1. No one has contended that.

Does this make any sense? Does it matter? In April, 2011, Marc Kissel, former PLHA counsel, also counted 27 Lots in a letter sent to Sponsors (Rx27). However we must look to his letter which is quite edifying. Mr. Kissel's letter was written on April 6, 2011, prior to the finalization of the settlement agreement. He noted there were 27 lots in Phase 1. He also commented that only 25 of these were entitled to vote because 2 of the lot owners also owned

13

additional lots (one each). Our "extra lot" owners were notably not given additional voting privileges, and they were assessed the same exact amount as lot owners of the other 23 lots.

Mr. Pecoraro testified if you trace Plan Amendments over a period of time, they showed 76 Lots (Tr 2492-99).   He is correct on the count.  Sponsors, of course, disagree.  They point to the same clause of the S.A.  They note that the "denominator shall be increased by the total number of lots shown on the filed final subdivision plat . . ." They argue that since the earlier number was 25 from V(A)(1)(a) then that number is then increased "by the total number of Lots shown on the filed final subdivision plat . . . " which they take to mean Phases 2 and 3.

No one called as a witness a drafter of this less-than-precise document.  Drafted as is, it did not lock the Sponsors into a specific number of Lots but allowed for a final count when the dust had settled. In other words, the 49 lots in phases 2 and 3 could have increased but it is less likely, in fact impossible, that the number of lots in Phase 1 would increase.

If we read the document literally, we must take the prior number (25) and add to it ("shall be increased") "by the total number of all the lots shown on the final subdivision plat..."   Thus, if the final subdivision plat was to be defined as Phases 1, 2, and 3, it would include phase 1 we would add 76 to 25 and get 101.

Now all parties and their lawyers know that is an incorrect interpretation of the language of this Agreement.  However, the reader cannot disregard words "shall be increased by."  The common meaning is you take a prior number and increase it.  You increase it by the lots in Phase Two and Three of the filed final subdivision plat (which would not include the lots in phase 1).

Without other testimony or evidence indicating otherwise, the Arbitrator's interpretation of Art. V(A)(1)(a) & (c) is that the denominator for use in Art. VI Sec. 3 of the Declaration is 74,

14

the 25 lots as previously set forth in V (A) (1) (a) increased by the 49 lots as reflected in the final filed subdivision plat for phases 2 and 3. We do not recount the lots in phase 1.

### OPT OUT ISSUES

Article VI Sec. 3 of the "Declaration of Covenants, Restrictions, Easements, Charges and Liens" (Declaration) (Cx2 p.13) states in sum and substance a formula for lot owners' responsibility for assessments to cover "operational items such as insurance, repairs, reserves, maintenance and other operating expenses as well as charges to cover any defects from prior years and capital improvements and repairs."

The developer may direct the association (PLHA) "not to supply maintenance or other services to any Lot to which title remains in the developer." However, they can only do that if they provide such services themselves to "the extent the lot requires such services." (Cx2, p. 14).

In March, 2015, the Sponsor (via Counsel) sent the PLHA a notice that they were opting out of garbage pickup, snow removal, utilities expenses, general landscaping, cleaning engineering fees, insurance and security for their Phase 2 & 3 lots (Cx33) (Tr 1342:22 – 1343:5). They did not opt out of services for Lot 12, the lot they own in Phase 1. On the face of the Declaration, it appears they can do that, however that only starts the argument.

The PLHA argues that the settlement of the 2007 action in April, 2011 (S.A. Cx10) vitiated the opt out provision. They base this on the argument that the fact that the Sponsor had counterclaims in the 2007 action that were based on the opt out provision and these counterclaims were withdrawn with prejudice as part of the S.A. (April, 2011).

Let's address this argument which appears to be one of res judicata, first, before moving to others.

15

Article V Sec. (A) (3) of the S.A. says that "All other provisions of Art VI Sec. 3 of the Declaration concerning assessments shall remain in full force and effect."

Thus, the Arbitrator finds that the section of the Declaration related to Opt Outs is still in full force and effect.

But what about the res judicata argument? PLHA contends that Sponsors cannot assert an opt out claim. Under their theory, such a claim could not be asserted until the end of time.

Res judicata "prevents a party from litigating any issue or defense that could have been raised or decided in a previous suit." (Waldman v. Village of Kiryas Joel, 39 F.Supp.2d, 370, 377 (S.D.N.Y. 1999). The PHLA further argues this includes settlements which result in "dismissal with prejudice" and this is equivalent to "a final judgment on the merits for res judicata purposes on all claims asserted or which could have been asserted in the suit." Nemaizer v. Baker, 793 F.2d 58, 60-61 (2d Cir 1986).

Claimants respond. They contend that res judicata is not the controlling legal theory but that of collateral estoppel or often called "issue preclusion" which "prevents parties or their privies from re-litigating in a subsequent action an issue of fact or law that was fully and fairly litigated in a prior proceeding." See Marvel Characters, Inc v. Simon, 310 F.3d 280 (2d Cir. 2002).

In 2007, as part of their counterclaim to an action brought by the PLHA, in paragraph 214, the Sponsors sought "a declaration that any attempt by the Association [PLHA] to levy future 'Assessments' against them is ultra vires and beyond the authority granted to the Association under the By-Laws."

The claims under our current matter are not the same as the counterclaim in 2007. The issues are, however, similar. Our claims do not arise out of the same occurrence of events.

16

1111250

Sponsor contends that future opt-out requests were not precluded by the S.A. They note that the S.A. Article V Sec. (A) amended certain terms of Article VI Sec. 3 of the Declaration. They point out that other sections remained the same, including the opt out provisions Article V sec. A (3) (See Cx10 p. 24).

In Marvel Characters, Inc. v. Simon supra, a case cited by both sides, the court noted in its ruling that collateral estoppel (issue preclusion) was the appropriate doctrine — not res judicata (claim preclusion) - since the causes of action were not identical but the issues were. More importantly, the court found that "where a stipulation of settlement is 'unaccompanied by findings' it does not bind the parties on any issue . . . which might arise in connection with another cause of action."

The Arbitrator concludes the 2011 Settlement Agreement does not preclude the opt out claims of Sponsor in this action.

The Arbitrator further finds that the fact the S.A. specifically states that "upon final approval, Sponsor shall not object to provisions of twenty-four hour security at reasonable cost" (S.A. Article V (A) (1)(b) (Cx10, p. 22) does not preclude the Sponsors from opting out of other services. It further finds that the Sponsor may opt out of the services set forth in their letter of March 31, 2015, with a caveat. They may not opt out of the "24 hour security at reasonable cost." This leads to a separate argument on what is the cost for what security is doing. Is the guard only at the gate? Does the guard roam the entire area? Apparently, the guard at the gate is also the guard who gets in his car and drives around the area (Tr 1354-1355). The Sponsor cannot opt out of security, but it must be provided at a reasonable cost for what is provided. I am not in a position to rule on that issue nor do I believe I've ever been asked to rule on that issue.

17

The S.A. does not provide any exclusions to the security paragraph.  The responsibility of the Sponsor stands as noted in the S.A.

PLHA must provide insurance policy information to Sponsor as to what this insurance is covering and its cost.  Sponsors, on the other hand, must provide to the PLHA proof of the insurance they intend to obtain to replace whatever the current insurance policy is covering.

Article VI Sec. 3 of the Declaration (Cx2 at 14) speaks to the developers right to opt out of "maintenance or other services to any Lot to which title remains in the developer . . ."  The Arbitrator concludes that the Sponsor may only opt out of services that would be provided directly or indirectly relating to a "Lot," not services that would otherwise be for the good of the whole community. This is a very fine line. Thus, the Sponsor may opt out of:  (1) garbage pickup, clearly a direct service to the individual lots, (no homes in Phase 2 & 3); (2) snow removal which would be a direct service to the lot owner otherwise they would not be able to get out of their driveway; (there are no roads from which snow is removed in Phase 2 or 3; (3) utility expense – only if it is covering utilities for individual lots rather than common areas; (4) General Landscaping – only if it is provided for the beautification of the areas abutting the individual lots and since none is being done at this time in phase 2 and 3 then sponsor would be able to opt out of this expense (5) Landscaping Improvements-this would appear to be an expense directly related to the common areas, not to the individual lots and therefore the sponsor would not be able to opt out of this expense; (6) Cleaning Services – there are apparently none provided to each lot, thus the sponsor cannot opt out of cleaning expenses (no one described what these were);  (7) Engineering Fee – if engineering services are provided for an individual lot then sponsor can opt out of said fees,  however, there has been no explanation of what this is for or how it impacts on an individual lot; (8) Insurance – previously mentioned, but no explanation of

18

what the insurance is for.  If in some way the insurance provides coverage to individual lots, then Sponsor may opt out.  Otherwise, Sponsor cannot opt out.

## CRANBERRY LAKE – TAXES

In a letter dated July 18, 2014 from Mr. Gueyikian to Ms. Amato, he informs her that the PLHA is responsible for Real Estate Taxes on Cranberry Lake going back to 2004.  He notes they were unable to provide the PLHA with an estimate of said taxes until this time, the reason being that the Town Assessor could not provide such an estimate until Final Non-appealable approval of Phase 2 and 3 was finalized (June 16, 2014).

The Sponsor then estimates the tax based on prior year valuation at $2,333.00.

The Sponsor bases this on the April 6, 2004 agreement, the applicable portion of which reads:

> "Upon Potake LLC's delivery of the initial form of the Cranberry Lake Dam and Spillway Deed in the form attached hereto as Exhibit A to Rothschild & Pearl LLP to be held in escrow as aforesaid, the PLHA shall assume, shall be deemed to have assumed, and shall be solely responsible for all rights and obligations, including maintenance and repair obligations for Cranberry Lake, the Cranberry Lake dam, the spillway, and all appurtenant facilities without execution of any further documents."

This resulted in a deed being executed on that same date.  Both the cover letter, deed and agreement are found in Cx65.

The 16th Amendment to the Offering Plan also referenced this situation.

> "VI.    **TRANSFER OF CRANBERRY LAKE, DAM AND SPILLWAY TO PLHA**
>
> The PLHA is solely responsible for all rights and obligations, including maintenance and repair obligations for Cranberry Lake, Dam and Spillway and all appurtenant facilities.   The New Sponsors shall not have any obligations with respect to Cranberry Lake, Dam and Spillway other than as Lot Owners.

19

Title to Cranberry Lake will be transferred to PLHA upon subdivision of Phase III and not upon sale of first Lot in Phase III, as stated in the Declaration."

What is not in black and white in any of our documents is whether the PLHA was responsible for Real Estate Taxes on the Lake, going back to 2004.

The PLHA thus denies any responsibility for taxes because they are not mentioned. What is said is that once the deed was in the hands of the escrow agent, the PLHA shall be "solely responsible for all the rights and obligations for Cranberry Lake Dam, the Spillway and all appurtenant facilities . . ." (Agreement April 6, 2004) (Cx65).

PLHA argues that since they were not billed for taxes until July 11, 2014, the Sponsor should be precluded from collecting any back taxes.

However, it was not until July, 2014 that there was a tax assessment for the area. The separate lots in Phases 2 & 3 did not exist (officially) until that time.

The PLHA has also raised the Statute of Limitations defense but Sponsor claims they could not invoice PLHA until July, 2014 (11 years).

The Arbitrator assumes the Sponsor was paying Real Estate Taxes on the Lake and connected properties since 2004. Though it may not have been able to separate out the Lake from the balance of the properties until July 2014, they were not precluded from invoicing on a pure ratio of lake size over total acreage. However, tax liability of a lake may not be the same as taxing land. If the Arbitrator is wrong, and the Sponsors were not paying taxes on the Lake during this period then they are not entitled to receive repayment of taxes for any of those years.

In the opinion of the Arbitrator without further elaborative language, the real estate taxes on Cranberry Lake would not be the responsibility of the PLHA until said Lake was titled to them.

20

1111250

Case 7:18-cv-00950-KMK Document 1 Filed 03/03/18 Page 30 of 97

However, the 2004 agreement would infer that once the initial form of the Deed was in the hands of the escrow agent, the PLHA became responsible for the "rights and obligations" related thereto. The only logical interpretation of that language would include taxes. It is inconceivable that the Sponsor would remain responsible for the taxes if all "rights and obligations, including maintenance and repair obligations . . ." have passed to the PLHA.

The Arbitrator thus finds the burden of paying the real estate taxes is properly imposed upon the PLHA, but will only impose said taxes back to 2008 (six years from July, 2014); at $2,333.00 per year for a total of $13,998.00. The PLHA is, of course, responsible for all Cranberry Lake taxes since July, 2014. Again, the Sponsors must show they did pay real estate taxes on the Lake and its appurtenances during the period in question in order to receive payment for a portion of those taxes from the PLHA.

## COUNTER CLAIMS

Pursuant to Article III(C)(3)(c)(Cx10), the Sponsors were to pay $2,600.00 to the PLHA upon the sale of Lot 12 and then upon the sale of each of the 49 lots after Final Approval, $2,600.00 per lot. If four years after the execution of the agreement all 50 lots had not yet been sold, the full balance of the payments would be immediately due and owing the PLHA.

The Arbitrator finds the Sponsor is responsible for paying $130,000 to the PLHA as of April 11, 2015 with statutory interest of 9% from said date to the date of this decision.

Pursuant to Article III(C)(3)(b), the Sponsors were to give $50,000.00 to the PLHA after Final Approval and the earlier of the completion of the roads in Phases 2 and 3 or two years from the Final Approval date.

The issue of Final Approval date was a significant part of our arbitration.

21

In that the Arbitrator has found that the correct Non-Appealable Final Approval date was

June 14, 2014, then said $50,000.00 is not due the PLHA until June 14, 2016.

## THE GUARD HOUSE ISSUES

Pursuant to the S.A., the Sponsors are required to pay for the new Guard House as it is set

forth (Cx10 p. 18-19) in Article IV(D) of the S.A.

Specifically,

2. "a new guard house, new entrance gates and related roadway modifications

(collectively the "New Security Improvements") shall be constructed within the PLHA's existing

access easement over Sterlington Road. The New Security Improvements shall be constructed

by Sponsors 2 and 3, at their expense."

"3. . . . The new Improvements shall be added to the final plat as depicted on the sketch

attached as Exhibit P-5."

Sponsor stated, in January 27, 2012, the PLHA requested additional elements for the

Guard House area. Sponsor agreed to do this but now wants the PLHA to pay for additional

items.

In actuality Ms. Amato, after reviewing the final plat, wrote:

> "1. We note that the plans don't reflect details of the new security
> gatehouse and wondered if these details will be included at this
> time or will follow later.
> 2. There is no mention of bathroom facilities and mail room
> facilities to be included at the new security entrance. These
> services would be required for the guard's use and to accommodate
> mail delivery for residents in Phases II & III. Would this require
> town approval and will these details follow in a separate plan
> submission?
> 3. The three additional security gates are not reflected on this
> plan, do they require town approval?

Mr. Gueyikian responded:

22

"I am glad that you have reviewed them and find these open space lots in agreement with the Settlement Agreement.

2. As to the Gates, these also need to be shown before we submit.

3. We have shown the location for the proposed gate house.

4. After we receive Final Approvals we need to design the building, utilities etc. and obtain a building permit."

This does not appear to be a demand by the PLHA for anything that was not otherwise needed by the Sponsors pursuant to the S.A. Nor is the response of Gueyikian a rejection of the comments of Ms. Amato. Rather it was "we'll get to it" (see point 4, above).

From the testimony, the Sponsor needs to have a Guard House that will be reached by any vehicle entering the complex prior to it going toward the road to what will be Phase 2 and 3 homes. They needed it moved; therefore, they will pay for it. (As per the S.A.)

That facility will need a bathroom, either in it or nearby, as in the Gatehouse or in the Guardhouse. As far as a new Gatehouse, a building which would contain the mailboxes for Phase 2 and 3 homes, there is no reason why the PLHA should be responsible for or share the costs of such a structure.

### The Sponsors' Delay Claims
### Hiking Trails – Communication with AG – The Lien

The Sponsor claims the PLHA has committed acts which have delayed the Sponsors from obtaining Final Approval and they have suffered financially from such delays.

The first of their three claims of delay relates to the Hiking Trails, and though much time has been spent on this issue, I will not delve too deeply into this matter at this time.

**Hiking Trails**- Pursuant to the S.A., the hiking trails were to be reconfigured, but only if all lot owners agreed to it. Over the next seven months, the PLHA board appears to have tried its

23

best to obtain 100% approval on the planned movement of the trails. They eventually fell three votes short.

The PLHA argues this trail movement was for the advantage of the Sponsors to move trails so they would not cut through their lots. To put it bluntly – it doesn't matter.

The PLHA points to attempts by the Sponsor to get the AG's office to mediate the issue with the lot owners. Again, that was not a bad thing. Maybe it would have worked. But it was not the Sponsors that suggested it but the Board's own counsel.

The PLHA also claims that the Sponsor wanted the PLHA to sue the recalcitrant lot owners. Now this may have been a bit heavy-handed, but it does not impact on this issue, and perhaps just as importantly, no PLHA witness has any recollection of such a claim.

It was the job of the PLHA to get unanimous approval. They were unable to do this. They finally gave up and so informed the Sponsors as of November 26, 2011.

The Sponsors argue that by June 1, 2011, the PLHA should have told them they could not get unanimous approval. The Sponsors had no authority to make a unilateral decision on the trails. Furthermore, there was little they could do on the property until a decision was made on the trails.

In somewhat obtuse language, the PLHA argues that "the Agreement did not require the PLHA to obtain unanimous consent – it merely provided the parties with the opportunity to obtain such approval." The logic is convoluted. The PLHA must be reading a different agreement.

Article IV(C) Hiking Trails (b) directs the moving of trails so that they run along the edges of the lots (45, 46, 47 and 48 (Phase 2)) and away from any building clearing limits. However, "Sponsors 2 & 3 shall only be required to reconfigure these trails if the PLHA obtains

24

unanimous approval of all the members of the PLHA." The Sponsors were not required to reconfigure the trails unless unanimous approval had been obtained.

The Agreement does not set a deadline to obtain approval. However, the PLHA had a duty to notify the Sponsors that it could not obtain the needed unanimous approval. The fact that Sponsors were aware of the problem by June 1, 2011 does not serve as the waiving of the white flag on the issue.

Ms. Amato testified she told Greg (Sarkissian) at the board meeting in June, 2011, there was "no way" they would ever get unanimous votes when they all knew Mrs. Kurtzman would never agree or get on board. (Tr 2230).

The agreement does not set a form of response the PLHA was to use to communicate the failure to obtain unanimity.

However, without some formality of the final decision of the inability of the PLHA to obtain unanimity, the arbitrator concludes that the November 26, 2011 notice will serve as the time the PLHA concluded it could not obtain unanimity.

That date will stand for calculating delay by the PLHA. Said calculation will run from July 28, 2011 to November 26, 2011, a total of four months.

### The Actions of the PLHA with the AG's Office (through Mr. Harrison)

The Arbitrator previously ruled that any violations by the Sponsors of the S.A. were either not "a material breach" or even if they were, the fact that the PLHA did not act in any way with regard to said alleged breach precludes them now from relying on said alleged material breaches as a defense for their not complying with the S.A. Thus, the Arbitrator must now determine whether:

25

1111250

The actions of Mr. Harrison (which were clearly on behalf of the PLHA) violated the S.A.

If they did, what damages were caused to the Sponsors? More specifically, did Harrison's actions delay the Approval process? and

If they did delay the process what damages have Sponsors suffered due to said delay?

It is also noted that Sponsor argues that actions of Harrison/PLHA also violate the 2001 Agreement (Cx4).

The S.A., as previously noted, had many parts and subparts. Each side considered one or more parts important or very important for their own reasons.

The Sponsors considered Article IV (A)(2) (Cx10, p. 14-15) of high importance.

"At the request of Sponsors 2 and 3, the PLHA and the individual Plaintiff shall affirmatively state, in writing, their approval and support for all applications submitted for Final Approval consistent with this agreement. **In the event that any of the individual members of the PLHA or other persons residing in the Pierson Lakes Development act on their own, or through others, and take a position to oppose, delay or obstruct any aspect of the applications for Final Approval to the Town of Ramapo Planning Board or any other permitting agency, including, but not limited to, the Attorney General's Office,** or if any other third party opposes, delays or obstructs any aspect of the applications for Final Approval, at the request of the Sponsors 2 and 3 the PLHA shall inform, in writing, the Planning Board and any agencies involved, including the Attorney General's Office, of its support for the application for Final Approval." (Cx10, p. 14-15). [Emphasis supplied]

Clearly Mr. Harrison's actions that began as of January 29, 2014, by his communication with the AG's Office, and continued through February of 2015, fit within the parameters of

26

Article IV (A)(2) of the S.A. (Cx37A, 38, 68; Rx99, 101-104). Any argument by the PLHA that they were doing it for altruistic purposes is (a) irrelevant, it is still a breach, and (b) not accepted by the Arbitrator.

Mr. Sarkissian testified to the importance of this clause in that the PLHA had used the AG's office as "leverage in ways and means of interfering or delaying our approval process during the past 14 years '. . . so' I did not want them to continue using the AG's office as a leverage going forward." (Tr 2459-60). Such interference (communication) then requires them to issue an amendment.[4]

Upon a careful review of Mr. Harrison's communications with Lisa Wallace (Deputy Attorney General), whom he addressed as Lisa in most of his communications with her, Mr. Harrison became more than a concerned citizen.

He is literally an assistant to the AG's office. In Cx68 at Numbers 032-34 (Bates numbers), a document obtained via FOIL, Mr. Harrison, though his name has been redacted, lays out a point by point, section by section, commentary to the Sponsor is pending Amendment to the Offering Plan. The "Subject" of the email reads "Misstatements and Omissions in HOA Offering Plan for Pierson Lakes."

Mr. Harrison's state of mind is not at issue here. The truth or falsity of his statements is not at issue. What he may or may not have said to Ms. Wallace (though it could be interesting) is not at issue. The PLHA was absolutely precluded from taking the actions it took in violation of the S.A.

---

[4] Tr p 2460 L. 14 – 2461 L.3 – "A. When there is interference with the AG's office with information, whether it's true or not true, that triggers to issuing an amendment. We have to disclose to the public as to what the PLHA or AG's office has received as a new form on information. So every time when we submit that kind of an amendment, they interfere. So AG's office has, in order to accept our disclosure, they have to verify, so it goes back and forth to many, many reiterations delaying the process of the approval. Therefore, the impact for us would be in, during that period, we will not be able to continue marketing our project."

27

The action taken by the Sponsors is not a SLAPP suit. The Respondents' Anti-SLAPP suit defense is rejected by the Arbitrator, as noted earlier in this Decision.

Initially, the PLHA relied upon <u>Waterways at Bay Pointe HOA, Inc. v. Waterways Development Corp.</u>, 38 Misc.3d 1225(A). (Sup Ct Suffolk 2013) <u>aff'd</u> 132 A.D.3d 975 (2d Dept. 2015) to support their claim that this was a SLAPP suit and, thus, subject to a different level of proof than a regular breach of contract case. They argued that the Sponsor would have to establish by clear and convincing evidence that any communication (by Respondent) which gives rise to the action (the instant complaint) was made with knowledge of its falsity or with reckless disregard of whether it was false, where the truth or falsity of such communication is material to the cause of action at issue; thus creating an additional element of proof for claimant to prove along with a higher standard of proof than fair preponderance of the credible evidence as would be required in a normal breach of contract action.

They argued that Civil Rights Law §76-a(2) should be applied to our facts. In an earlier decision, specifically on this issue, dated November 6, 2015, I outlined the prevailing law on this issue and I now incorporate by reference that decision in this ruling.

I found that though this is a breach of contract action, it could also be a SLAPP suit.

The Appellate decision in <u>Waterways</u> was handed down in the middle of our SLAPP suit controversy and caught the Respondents by surprise. It confirmed that Respondents' counterclaim (in <u>Waterways</u>) was a SLAPP suit (as our Respondent argues about the Sponsor's claim in the instant case). However, it went further and found that the language of their 1997 agreement which stated "The [Plaintiff] recognizes that the SPONSOR has the right to complete construction of the PROJECT . . . and (HOA) shall . . . not interfere or otherwise impede and/or disrupt the Sponsor's activities with respect to the same," was a waiver. <u>Id</u>. at 980.

28

1111250

Most importantly, and specifically, the Appellate Division continued that "this clause of the agreement constitutes a specific waiver [Civil Rights Law §70-a] of the Plaintiff's right to oppose the sponsor's application for a building permit, notwithstanding the fact that it does not specifically mention Civil Rights Law §76-a." (citations omitted.) Id. *at 780.*

Thus the only issue I found that remained in my prior decision was whether the Settlement Agreement constituted a "waiver" under Civil Rights Law §70-a (2).

I now find, based upon all the evidence submitted this case, that the Settlement Agreement was a waiver pursuant to Civil Rights Law §70-a(2), and that the communication(s) by Harrison to the AG's office breached the Settlement Agreement.

The PLHA was represented by competent, experienced counsel. They were not some group of innocent protestors unaware of their rights who were tricked into signing the S.A. Furthermore, there is no limitation or exception to S.A. Article IV (A)(2). The Sponsors have no burden to prove anything about Harrison's communications to the AG, whether they were true or false, or whether Harrison made them with knowledge of their falsity or with reckless disregard of whether they were false.

The Sponsors do argue, though they do not have to, that Harrison's actions were "at a minimum a reckless disregard for the truth." They point to a portion of Harrison's letter of January 29, 2014 where he states "We are concerned that the Sponsor of the Pierson Lakes HOA is marketing lots through a misleading offering plan." (Cx37A). This was false and Harrison knew it. He had sent in his wife as a prospective buyer (an undercover buyer) and she was not given an offering plan because they had none to give her.

Mr. Harrison — over a period of months — made certain financial claims against the Sponsors, which Sponsor claims were fictitious or at least inflated. These included:

29

The Road Work Claim of $500,000, which had not existed until one week before he wrote to Wallace on 1/29/14. (He had written a resolution which placed responsibility on the Sponsors).

The Best Efforts Claim of $300,000 which has no basis in fact nor any relationship to the $300,000 amount. This later (10/2014) became $326,000 plus interest. This is based (Rx102) on fees that would have been due, depending on when Final Approval was obtained if the Sponsors had used their best efforts to obtain Final Approval. It appears to even calculate these damages as if Final Approval would have had to have been obtained by March, 2012. There was no evidence/testimony that any respondent witness believed that.

Litigation Reserve. Harrison opined the Legal Reserve Fund (commented on separately) was being spent. He also calls it "a legal expense reserve," not a special fund.

There was no proof that it was being spent on anything, much less the "lien filings" which he claims it was being spent on and which had yet to be created as of that date in October 2014.

He then refers to a $1 million dollar lien which was not filed until February 2015, of which he notified Ms. Wallace.

Without going into further detail, Mr. Harrison knew that many of the "facts" of which he so informed Ms. Wallace were "a reckless disregard for the truth."

The PLHA's application to use the Anti-SLAPP Suit law (Civil Rights Law §70-a(2)) is denied and the Arbitrator finds the Settlement Agreement (Article IV(A)(2) (Cx10 p. 14-15) was a waiver of such a statute.

The next issue becomes whether the action of the PLHA, though a breach of the S.A., actually delayed the Sponsor's ability to obtain Final Approval and if so, what are their damages.

30

1111250

There are two damage aspects related to the breach of the S.A. by the PLHA. One is the claim by Sponsor that said breach delayed the Sponsor from moving toward Final Approval (Delay Claim). The second is that said breach entitled the Sponsor to recover escrow funds. We will address the Delay Claim first.

The PLHA argues that the Sponsors have failed to prove that Harrison's communication with the AG delayed or interfered with the development of Phase 2 or 3. They point out that prior to Harrison's communications with the AG, issues between the Sponsors and the PLHA had "come to a head" which would have required the Sponsors to report/amend their Offering Plan to disclose details of their disputes with the PLHA to the AG.

The PLHA points/argues that the Sponsor would have had to report the financial issues they had with the PLHA to the AG whether Harrison had acted or not.

They note that Sarkissian stated he would have to notify the AG's office of a material change. (Tr 1180). They argue this "cuts against" their delay claim. They also point to Adler's testimony that they must make financial disclosure of whether they are current (Tr 1959).

It is clear that a proposed Amendment 26 had been submitted to the AG but was withdrawn at or about the time of the January 22, 2014 Resolution which Sarkissian objected to, but he did not indicate it would result in the Sponsors' withdrawing Amendment 26.

Amendment 26 was resubmitted on August 6, 2014.

PLHA argues that there has been no proof submitted that Harrison caused a seven month delay in resubmission of the 26th Amendment or any delay whatsoever.

The next period would be from August 8, 2014 to December 29, 2014, when the AG accepted Amendment 26. They note that though Mr. Harrison reached out to the Assistant AG in September, it was Ms. Wallace who affirmatively requested that the "PLHA verify [the

31

Sponsors] disclosure in the newly filed proposed Amendment 26." Mr. Harrison testified that Ms. Wallace reached out to him on various issues and asked him to verify the Sponsors' position as found in the proposed Amendment.

The PLHA thus declare they were not responsible for any delay caused by the four month review of the AG's office. They argue the AG did her own due diligence, and this "mandated regulatory inquiry" cannot be a basis of liability on the PLHA for any delay or interference.

The PLHA say the real issue was the new pre-sale requirement that allowed the Sponsor not to close on a lot in Phase 2 and 3 until it had 13 lots under contract. It was this new condition that caused an extended delay, so they argue.

It would appear this was an issue between Ms. Wallace and Mr. Adler for about two months.

Mr. Adler had testified that a matter such as this should have taken no more than sixty days "on the outside" to resolve.

He also noted in all the years he had been filing amendments to Offering Plans, he had never seen the AG get involved. He thought it was improper (Tr 2026). "It should have just been between the reviewer and myself."

The sending of drafts between the reviewer and the HOA was unprecedented.

The evidence is clear that Ms. Wallace was sending drafts to Mr. Harrison. She was using him as an advisor for what she was doing with Mr. Adler. No matter how hard or how frequent Respondents' counsel objected, it was, and is, clear to the Arbitrator that Ms. Wallace worked hand in glove with her HOA advisor, Mr. Harrison. She even relayed the HOA's red-lined provisions and communication to Mr. Adler (Tr 2031).

32

Ms. Wallace asked for items that she only knew of because of Mr. Harrison's communications with her, communications that violated the S.A.

Mr. Adler asked with whom she communicated at PLHA but she declined to give names and said she would just rather give him her deficiencies.

There is no doubt, absolutely no doubt, that Ms. Wallace was a conduit for Mr. Harrison's carefully laid-out objections and exceptions to the 26th Amendment. Mr. Adler's testimony, which the Arbitrator finds credible, clearly supports the Sponsors' position that the PLHA interfered, substantially, with the process of obtaining Amendment 26.

Amendment 26 was pending in mid-January, 2014. It was withdrawn. From January 29, 2014 until December 29, 2014, the actions of Mr. Harrison on behalf of the PLHA caused delays to the process. Relying on Mr. Adler, a man familiar with the process as to the normal time for such application, it would have taken 60 days to accomplish this. I would double it and make it 120 days or four months.

The Arbitrator finds that the interference by Mr. Harrison, who became an assistant to the Assistant AG Wallace, was the primary cause for such delay. Thus, an eight-month delay is placed upon the Respondent PLHA. The issue of damages related to the Hiking Trail Delay and delay related to Harrison's/PLHA's breach of the S.A. is reserved.

### 3. DELAY RELATED TO THE LIEN

The Sponsors claim that the filing of the lien caused further delay.

First and foremost, it should be clear that the filing of a lien, on its face, is not precluded by the S.A. or the Declaration. Whether this lien, in the manner in which it has been filed, is legal, is a different argument.

33

It is clear that the Sponsors had the right to bond the lien which would have allowed them to continue construction (or start), and mitigate all damages that might be related thereto.

The Sponsors chose not to pursue bonding the lien. Sponsors argue, however, that the PLHA interfered with their ability to bond the lien. There was insufficient evidence to support that the PLHA, or someone representing them, interfered with the Sponsors' ability to bond the lien and that was the reason it was not bonded. In Amendment 26, filed prior to the lien, the Sponsor stated that if "liens are filed, new sponsor will bond such lien with the title company." (Tr 1289; Tr 1997; Adler Ev 82). The Arbitrator finds that the Lien did not delay the Sponsors in that they could have bonded it. The validity of elements of the lien is discussed below.

### LEGALITY OF THE LIEN
### DAMAGES FROM THE LIEN UNRELATED TO THE DELAY CLAIM

The PLHA has asserted a Lien pursuant to the Declaration (VI Section 1 & 6) (Cx2 p. 12-14) and Sections 339-z and 339-aa, of the Condo Act.[5] However, RPL§339-z and aa do not apply to the PLHA. In fact, HOAs are not governed by the Condominium Act (Board of Directors of Hunt Club at Coram Homeowners Association, Inc. v. Hebb, 72 AD3d997 (2d Dept. 2010)). It could be covered by the Condo Act if the HOA chose to be covered by it. Our HOA never expressly stated that it intends or intended to be governed under the Act. Thus, the PLHA may only assert its lien under New York's Lien Law.

The Sponsor argues that they should be awarded the difference between the claimed lien and a valid lien amount that may be found by the Arbitrator.

---

[5] The Lien
1. $392,286 related to Road Loan and Litigation Reserve
2. $5,299 arrears on Lot 12
3. $240,000 Failure to use Best Efforts
4. $170,325 on all of the above at 18%

34

The PLHA does not now dispute the Condo Law argument. Rather it contends that the Lien Law section is not 39-i but 39-a and, in any event, these sections of the Lien Law refer to a "proceeding to enforce a mechanics lien upon a private or public improvement . . ." Thus, since we are not dealing with a mechanics lien, Lien Law §39-a is not applicable. The PLHA is correct. This lien is not a mechanics lien.

Thus, the PLHA may proceed to file a lien pursuant to the Declaration but neither RPL339-z nor 339-aa applies thereto. Further, Lien Law §39-a, is inapplicable to the damage claim raised by the Sponsors.

Therefore, unless the Sponsors wish to argue some other theory of damages, they will be limited to the damages they may have suffered pursuant to their Delay Claim that relate to the filing of the Lien.

The PLHA is confined to the Declaration and the S.A. in filing any lien.

### Filing of the Lien

Initially, the PLHA has filed the lien under the Declaration and the Condo Act (Sec. 339-z and 339-aa) which was inappropriate (see above). The enforcement of a lien is subject to Article V(B) of the S.A. (Cx10 p. 24-25) "Enforcement of Liens as set forth in Article XI, Sec. 7 of the Declaration (Cx2 p. 30-31) shall be limited to assessments on an individual lot. No lot shall be subject to a lien for assessments owed on other lots even if there is common ownership."

The PLHA has responded (FN 12 of Respondent's Memo) that the lien, filed against all of Phase 2 and 3 lots was valid. "That nothing in that Agreement . . . prohibited filing of a lien premised on the Sponsors' alleged arrearages to the PLHA for the totality of Phases 2 and 3 (as opposed to an individual lot arrearage)." Such arrearages are sometimes referred to as "Development-wide Arrearages."

35

Article VI Section 1 of the Declaration(Cx2 at 12-13), in referring to sums assessed to the Members by the Association but remaining "unpaid together with interest thereon as is hereinafter provided shall also be a charge on the land and shall be a continuing lien upon the property owned by such Member against which each assessment is made."

Unpaid assessments and the interest thereon shall also become liens on a Member's lot (VI Section 6) (Cx2 p. 5). In our case, the Sponsor owns 50 lots.

Thus, assuming the arrearages referred to by PLHA relate to individual lots, we have an illegal blanket lien. If the assessments comprising the lien were not related to a particular lot, then the lien is otherwise valid (assuming the amounts claimed are valid.) The Arbitrator finds the lien is not a blanket lien, it is, therefore, not an illegal lien and it will stand, subject to ruling on the specific parts of the lien.

## ELEMENTS OF THE LIEN
## ROAD WORK – THE ROAD LOAN – THE LIEN

Needed road work for Phase 1 and the payment of same are covered on p. 26 of the S.A., more specifically in Article V Section E(1) (Cx10).

The PLHA was required to "implement a road repair plan for Phase 1 pursuant to a plan developed by an independent engineer acceptable to both the PLHA and the Sponsors and begin the needed road repair."

The S.A. continued further and explained how the repairs were to be funded. The PLHA was to use funds from its reserves and "the Sponsors lot sales contributions of $107,900.00 already made to the PLHA pursuant to Section 3(b) to the December, 2001 agreement and future payments to be made pursuant thereto."

It was understood that there might not be sufficient funds initially to pay for all the work.

36

In the immediate prior section, Article V Section D, in referring to the reserves, and the replenishment thereof, "the difference will be raised through a Special Assessment against Phase 1 lot owners, excluding Sponsor 1 as of the date of this agreement."

The size of the project grew dramatically when the engineer's report came in: It included drainage repairs (before other work should be done and eventually the use of Belgian block on the edges of the roadways.) A 2007 analysis noted the need for drainage improvements, and Ms. Amato had alerted the HOA of this need (Cx16).

An assessment was imposed on the home owners, spread over a three-year period. It eventually came in at $291,500 (Cx14 p.2). This, of course, was not for the rest of the road work.

Financing options for the rest of the road work were explored by the PLHA. A resolution authorizing the borrowing was passed in August of 2013. It included a requested paragraph by Sarkissian that the Sponsor, most specifically Lot 12 owned by Sponsor, would not be responsible for that portion of the loan.

The total cost of the Road Repair project as per the Claimant was $1,043,662 (Cx14 p. 2). All work was completed in the latter part of 2013 (Tr 2346).

Beyond the monies referenced in the S.A. related to the road work, there would have been no further responsibility of the Sponsors for the road work.

However, on January 22, 2014, the PLHA passed a resolution (drafted by Mr. Harrison) which literally misstated the S.A. in reference to road repairs, and attempted to make the road repair a general expense versus a capital expense. It authorized the borrowing of funds as needed to complete Phase1 road repairs as required under the S.A. or so it stated.

37

The membership had previously voted (and approved) the capital improvement of the Belgian Block section of the work.

In the 2001 Declaration, the Sponsor is not responsible for capital improvements nor is the Sponsor responsible for Special Assessments. The S.A. did not vitiate the Declaration and it was and still is in effect unless specifically overridden by the S.A.

The January 22, 2014 Resolution makes it into a general expense so PLHA can bill Sponsor. Upon review of Ms. Amato's cross, the arbitrator realized how desperate the Respondents were to prevent Ms. Amato from giving a straight answer.

She did not know what additional road work meant in her own board's resolution of January 22nd.

When Respondent's counsel says "its two years ago," the witness immediately says "I don't remember" – as to what "additional road work meant" in the January 22nd Resolution.

The Resolution is revisionist history or "1984" using the words of Claimant's counsel.

While the S.A. says "create and implement a road repair plan," the Resolution[6] starts with:

---

[6] Loan Repayment (Principal and Interest)

WHEREAS, the Settlement Agreement required certain minimal repairs to Phase I roads ("Base Required Road Repair);

WHEREAS, in addition to the Base Required Road Repair, the PLHA has undertaken (i) drainage repairs that were not required by or done pursuant to the Settlement Agreement, (ii) Belgium Block installation that was not required by or done pursuant to the Settlement Agreement; (iii) additional road work (collectively, the "General Expense").

NOW, THEREFORE, BE IT RESOLVED, that the Loan taken out by the PLHA was required because of the General Expenses (not the Base Required Road Repair), would not have been required but for the General expenses, and would have not been taken out if only the Base Required Road Repair had been undertaken;

RESOLVED FURTHER, that, accordingly, and not withstanding any prior resolutions or other commentary regarding these matters, the repayment of the principal and interest on the loan shall be a general expense in the budget of the PLHA (and that any prior resolutions or commentary inconsistent herewith is hereby revoked and nullified) and

38

1111250

"The S/A required certain minimal repairs to Phase I roads (Base Required Road Repair).

(The S.A. doesn't say that, Mr. Harrison created these new terms for the PLHA's purposes. It actually says "implement a road repair plan for Phase I pursuant to a plan developed by an independent engineer . . .")

The second "Whereas" clause then refers to its self-created language "Base Required Road Repair" which it states were "in addition to the Base Required Road Repair" (but were actually part of the independent engineers report) and includes "(iii) additional road work" (for which no one has a definition) and he calls them ("collectively, the General Expenses.")

The PLHA then contends that the loan was taken out for these "General Expenses" not for the "Base Required Road Repair." Again these are terms created by Mr. Harrison.

PLHA has argued that there is an important difference in the language of the S.A. when referring to Road Improvements and Road Repairs. It is upon this difference that they base their argument that the Sponsors bear 2/3 responsibility for repaying the loan, that is also the foundation for part of the lien, and part of their "complaint" to the Attorney General or as they put it, their "expression of concern" to the AG.

As previously noted, the Settlement Agreement (S.A.) (April, 2011) required the following with regard to Road Work, more specifically "Phase 1 Roads": "the PLHA will create and implement a road repair plan for Phase 1 pursuant to a plan developed by an independent engineer acceptable to both the PLHA and the Sponsors and begin the needed road repairs using the funds in the PLHA's reserves as soon as possible."

---

**FURTHER RESOLVED,** that the PLHA reserves all rights, and that no prior or future action or inaction or characterization shall constitute a waiver of any rights of the PLHA under the Declaration, the Settlement Agreement, or otherwise.

39

1111250

The report of the "independent" engineer controls here. Said report included drainage repairs, milling, paving and Belgian Block installation. This Plan was then implemented.

The PLHA, by the passing of the January 22nd Resolution, attempted to make the Sponsors responsible for a part of the loan taken by the PLHA to fund the repairs.

In August 2013, PLHA released the Sponsors from liability with respect to roadwork and also stated that the roadwork constituted a "capital expenditure" for which Sponsors are exempt. (Article VI (5) of the Declaration).

Now comes the kicker – they also argue that that resolution – their resolution – does not stop them for charging the Sponsors for a share of the costs of <u>improvements</u> (as opposed to repairs). They argue only a portion of the roadwork undertaken by the PLHA was required by the Agreement; that the S.A. did not request the Belgian Block or the drainage work. However, they also noted that the drainage work was required and the Belgian Block provided needed structural support and for aesthetic purposes. They note "nothing in the Agreement prohibited the PLHA from seeking contribution from the Sponsors for principal and interest payments on a road loan taken out for improvements."

The August 2013 Resolution was rescinded by the Board in the aforementioned resolution of January 22, 2014. Apparently, or so Sponsor opined, this was in response to Sponsor's interpretation of Final Approval and Sponsor's refusal to pay $51,000 for a paving bill that was Sponsor's responsibility (which was eventually paid). A revenge resolution?

The PLHA has argued there was no consideration for the 2013 resolution.

The issue of consideration for the August 2013 Resolution is a non-issue. All it really did was essentially confirm the S.A. on the Road Work issue. Whatever reason given for rescinding it is not relevant, though there was a showing of consideration.

40

Further, there was nothing to overcome the fact that in order for the PLHA to take action which adversely affects the Sponsors ability to market or sell, it cannot take place without the Sponsor's written consent. Therefore, PLHA could not have added $650,000 in debt to the budget for which future homeowners would bear responsibility (See Tr 224-225)

Finally, there is PLHA's difference of opinion with the Sponsors on capital improvements.

Article VI (5) of the Declaration exempts the Sponsors from any financial responsibility for "special assessments," including special assessments for "capital expenditures," which is also a "special assessment."

PLHA argues that this is not how the Declaration reads. They argue it "merely prohibits assessing Sponsors for capital expenditures that are funded through the use of a "Special Assessment." The Respondent then quotes Ms. Amato's testimony (or pieces of it). "A special assessment can be a capital expenditure and a capital expenditure can be a special assessment" but they are not always the same." (Amato Tr at 2447). A truly interesting turn of a phrase. The PLHA then argues that as long as they do not fund a capital improvement with a Special Assessment, the Sponsor must pay for it.

The Arbitrator rejects PLHA's view on capital improvements and special assessments. It also rejects the semantic gamesmanship of the PLHA in their attempt to separate repair from improvement.

The evidence reflects that a loan was taken out by the PLHA in the fall of 2013. The road work was then completed (Tr 2364). There was a release of Escrow in 2014. It was used to pay down the loan (saving considerable interest) but not enough to pay it off.

41

It was then up to PLHA to figure out how to pay the balance. What could they have done? The Claimant argues an assessment of Phase 1 non-sponsor lot owners would have been appropriate. See V (D) for replacement of Reserves (when they were not sufficient to pay off the loan).

The Arbitrator thus rejects the PLHA's imposition of any additional charges upon the Sponsors related to the Road Work or the principal or interest related to the loan taken out for the Road Work.

The Arbitrator finds that this Resolution modified the Settlement Agreement (S.A.) that had been entered into in April, 2011. That the PLHA had no authority to unilaterally amend the S.A. and that said Resolution shall have no binding effect on the sponsor or its obligations to pay for the Road Work set forth in the S.A. §V(E).

Any part of the Lien related to Road Work is stricken.

## ELEMENTS OF THE LIEN
## LITIGATION RESERVE FUND

Another amount that became at issue as part of the Lien is the Litigation Reserve Fund.

This "fund" was added to the 2014 budget as a $200,000 line item. There is no doubt in the arbitrator's mind this was added to fund a litigation against the Sponsor. Thus, not even indirectly, requiring the Sponsor to fund PLHA's litigation against itself. This was done on the same day as the Resolution which redefined the terminology and definitions of Road Work.

The Litigation Reserve Fund showed up in the 2014 budget. It was not in the 2015 budget, and, in fact, was removed from the 2014 budget later in the year. There was no explanation of where it went or why. It apparently did not appear in an independent audit performed later in the year (2014).

42

Sponsors say the PLHA cannot add Reserve funds. PLHA disagrees (Tr. 2512, 2532-33). Mr. Pecoraro notes that PLHA may fund amounts for reserve funds annually and its power to add funds is unlimited. This power comes from the Declaration from 2001 (Cx2, p. 13). "The board shall determine the total amount required, including the operational items such as insurance, repairs, reserves, maintenance and other operating expenses – as well as changes to cover the deficits from prior years and capital improvements and repairs." (Declaration, Article VI, Sec. 3 (Cx2)).

Sponsor, on the other hand, has argued that actual expected expenses must be used for "each budgetary category pursuant to Schedule A of the Offering Plan" with four specific exceptions (Cx10 p. 23) (The Settlement Agreement).

Mr. Pecoraro, when examined on the Legal Reserve Fund and its relationship to Supplementary Information (Audit) (Cx64 at p.8) stated that this is really a book entry, the $200,000 is not there but it is a receivable due from the Sponsor.

He also testified that all other funds that are shown there actually do have the amounts shown or even more than those amounts may exist. As to the Deficiency calculation, Note 9 on p. 10, it included the Legal Reserve Fund.

The lien amount is the difference between what the Sponsor was invoiced and what was paid (Pecoraro, Tr 2543).

Incorporated into the Declaration as Schedule A is the projected 1989 budget. Sponsors call this a chart of accounts (Sarkissian Tr. 106) and any deviation from this schedule must be approved by the Sponsors (Tr. 92) and if such a charge is outside of Schedule A (the 1989 Budget) it is then a "special assessment for which the Sponsors are exempt" (Tr. 95).

43

PLHA now argues not that the Sponsors are wrong, but that there is nothing in the Declaration that says it is locked into these categories in perpetuity. However, with nothing else to say otherwise, the language of the Declaration would stand.

In response to Sponsors' argument, the PLHA contends "if we cannot do it as a special assessment then it could be placed in the dedicated line item for legal fees that does exist."

Sponsors argue you cannot put a Legal Fee Assessment into a line item as a budget item. That such items are those that occur in the "ordinary course" not in reserve for a then undetermined future litigation. The Declaration uses the term "operational items" (Cx2 p. 13), Article VI Sec. 3.

Sponsors have also argued that since the S.A. would impose legal fees on the losing party in the arbitration, if they were compelled to pay this legal reserve, they would be funding the litigation against themselves. If they then were to be the prevailing party in an arbitration, they would not only be due a reimbursement for their own legal fees but would be compelled to sue to get what they advanced to PLHA to defend against themselves.

Finally as to PLHA's theory of putting the $200,000 assessment in a line item for legal fees, this new alternative was never discussed with the board of PLHA (as per Pecoraro). However, the reserve could be put back into the 2015 budget.

The arbitrator finds the Litigation Reserve Fund was improperly constituted pursuant to the S.A. and the Declaration. Even if it was properly added to the 2014 budget one cannot determine if it was ever funded or why was it dropped from the budget.

Any funds related to the Litigation Reserve Fund that were added to the lien are stricken from such lien.

44

## ELEMENTS OF THE LIEN
## BEST EFFORTS

The PLHA has argued that the Sponsors failed to use Best Efforts to obtain Final Approval and thus were damaged to an amount that was included in the Lien.

The S.A. requires, and the Respondents argue, that Sponsors "at all times make best efforts to seek expeditious Final Approval." (S.A. Article III(C)(4)(a), and IV(A)(4)).

However, it should also be noted that "while the Sponsors shall always use best efforts to seek expeditious Final Approval, the Sponsors shall have sole discretion and control over the pursuit of Final Approval as required herein." (S.A. Article IV(A)(4)(C 10 at p. 15).

Respondent notes that Preliminary Subdivision approval had been obtained by the time the S.A. was entered into April, 2011. However, it took them three years more to get what the Sponsors have defined as Final Approval under the agreement. [The Respondents do not agree with the Sponsors' interpretation of Final Approval].

Putting that aside, Respondents point to three areas where they contend the Sponsors "unexcused foot dragging" delayed the progress of obtaining Final Approval.

April, 2011 to May, 2012. This period that immediately followed the signing of the S.A. and led up to filing of Final Subdivision Approval;

August, 2012 to May, 2013. Failure to file final plat maps for Phases 2 &3 until May of 2013; and

The Sponsors requested a 90-day extension from the Town (which they received).

Each of the above time periods in the opinion of the PLHA violated the Best Efforts obligations of the Sponsors.

45

FILED: ROCKLAND COUNTY CLERK 01/28/2018 11:18 PM    INDEX NO. 035039/2017
NYSCEF DOC. NO. 335    Case 7:18-cv-06900-KMK   Document 1   Filed 08/03/18   Page 137 of 194    RECEIVED NYSCEF: 01/28/2018

137 of 194

Sponsor responds. The majority of the first period was spent waiting for the PLHA to get needed unanimous approval of its members/homeowners for the moving of certain trails across the properties, and for which the Sponsors claim damages due to delay.

The PLHA voted unanimously in June 2011 "that the proposed trail plan was beneficial to the community and resolved to support it." Ms. Amato also testified that the trail realignment benefits (or would have benefitted) the community.

The PLHA eventually gave up on their efforts when three recalcitrant members would not budge. They formally surrendered their efforts in November, 2011.

This topic was discussed earlier in the ruling on Sponsors' Delay Claim. None of this time could be considered as a failure by the Sponsors to use Best Efforts.

As to the balance of the time to May of 2012, Respondents look at Mr. Gueyikian's testimony that they still had to finalize "the metes and bounds of each lot" but the "project manager left the company" "there was a little bit of laxity from [their] engineer" and their employees were not able to be as responsive as [they] would want him to," (Tr 1585).

In April of 2012, Ms. Amato complained to Sponsors' counsel, D. Levy, about the Sponsors' lack of transparency in filing of the subdivision maps.

The Sponsor responds to this latter period of alleged failure to use best efforts. They cite to Mr. Gueyikian's testimony as did the PLHA. But they (Sponsor) provide a fuller recitation of the testimony than did PLHA's counsel who had carefully cut out the pieces most unfavorable to them. They note that the engineer was battling cancer at that time, and that's why he wasn't coming into that office (Tr 1584-1585:16). It is truthfully quite disturbing to see a record manipulated in this fashion. The Sponsor also notes Gueyikian's explanation as to how you get

46

from board approval to being able to submit an application. A lengthy process clearly and carefully explained at the hearing.

The third element of the lack of Best Efforts claim is the 90-day extension applied for and granted to Sponsors.

On February 21, 2013 Sarkissian advised Ms. Amato that Sponsors "still had five additional items to address before submitting for Final Approval of the plat" and also informed her that they had obtained a "90-day extension" from the town.  Respondent argues that by obtaining this extension without an explanation to the PLHA or getting their permission, this additionally breached their "best efforts obligation."  Thus, the PLHA claims it is due an additional 11 months of assessment payments (July-November 2011, February-April, 2012 and January-March 2013).

Sponsor points out that a resolution of subdivision approval is valid for 180 days (NY Town Law §276(7)(c)), and that the resolution of final approval (Claimant Ex. 63, p. 2; Tr 1679:21-25) contained many conditions, many of which were PLHA last minute add-ons, and Sponsors knew it would take at least 9-12 months to meet the conditions.  Thus the extension.

The Arbitrator finds none of these claims of lack of best efforts is supported by the evidence.  The burden is on the PLHA to prove that the Sponsors did not meet their best efforts obligation by "acting with good faith in light of [their] own capabilities."  (from Respondent's quoting from Cruz v. Fx Direct Dealer, LLC, 720 F.3d 115, 124 (2d Cir 2013).

Any claim for damages for lack of Best Efforts is denied and that part of the Lien that is related to Best Efforts is stricken.

47

## COMMUNICATION BY HARRISON/PLHA WITH THE AG'S OFFICE
## AND WHETHER DAMAGES FLOW THEREFROM

I previously ruled that these communications, between Mr. Harrison and the Attorney General's office, breached the Settlement Agreement.

I also have commented on the role of that breach in Sponsor's delay claim and what damages, if any, Sponsors suffered from said breach as it related to the delay claim.

Sponsors, separate and apart from the damages they contend they have suffered by such breach from the delay caused to them by the Harrison communications, also argue they are due damages from the breach itself – the return of the Escrow.

The PLHA has argued that once the escrow ($470,000) was released to them (Article III(C)(4)(c and d), it cannot be recovered as a form of damages.

Sponsor, of course, disagrees. They contend that if the PLHA breached the non-opposition provision, the escrow funds are forfeited and must be returned to Sponsor.

They refer us to the S.A. at p. 13 (Cx10). The section in question is Article III (C)(5) Forfeiture of Escrow.

"(a)    The parties recognize that the settlement of Actions No. 1 and 2 as set forth in this Agreement is an integral part of the consideration for which the payments agreed to in Article III(A) and Article III(C) are being made. If the PLHA and the Individual Plaintiffs commit a material breach of their obligations set forth in Article IV of this Agreement to consent to and support and not oppose, delay or obstruct any aspect of the applications for Final Approval or submissions to the Town of Ramapo Planning Board or any other permitting agency, including the Attorney General's Office, then all the sums placed in escrow shall be forfeited by the PLHA and said funds shall be returned to Sponsors 2 and 3 by the Escrow Agent. Said forfeiture shall

48

occur in the event of a material breach by PLHA and the Individual Plaintiffs even if sponsors 2 and 3 are able to obtain Final Approval in spite of the material breach.

'(b)     Any dispute arising out of the Sponsors' claim of a right to forfeiture of the escrow or regarding the payment of additional funds, including Other Payments, under this Agreement shall be subject to binding arbitration . . .' "

A careful reading of (a) above reveals that the escrow agent is holding the funds when a forfeiture might occur.  Under our facts, the funds have already been transferred to the PLHA. Does it matter?  The PLHA cites to 904 Tower Apartment, LLC v. Cuomo, Attorney General, 2012 WL 6090101 (Sup Ct NY 2010), an otherwise unpublished decision.

In Tower, the court noted that there was "[n]o statute, regulation or provision of petitioners' Purchase Agreements §4 expressly authorizes the court, however, to order respondent to require the sponsor's return of the funds to an escrow account, particularly after he previously released the funds to the sponsor pursuant to his prior determination."

Under our facts, this decision does not preclude the return of the escrow to the Sponsor or perhaps the former escrow agent.

Sponsor refers us to Podolsky v. Citation Abstract, 279 A.D. 2d 559 (2d Dept. 2001).  In Podolsky an unjust enrichment action, the court concluded that the Respondents were not entitled to retain money that had been released to them from an escrow account.  (The underlying facts related to a previously discharged Mechanics Lien.)  The matter was then referred back to trial term for an amended judgment.  Thus, the Appellate Division found that under appropriate circumstances, the Court may direct the return of previously dispersed escrow funds.

From the case law submitted and the evaluation of the facts, the Arbitrator finds that the fact that the escrow agent had released the escrow funds to the PLHA does not preclude the

49

Arbitrator from directing the PLHA to return said funds to the Sponsor.  In that the Arbitrator has found the PLHA breached the S.A., most specifically the non-interference clause (Article IV(A)(2)), it directs that that escrow previously transferred to the PLHA ($470,000) be considered a credit for any sums due to the PLHA by the Sponsors until said sum is extinguished.

The following is a recap of the major rulings of this decision.  It is not necessarily all inclusive of all the rulings but is fairly comprehensive.

1. The PLHA may not be excused from performance of the Settlement Agreement;

2. Sponsors' failure to make monthly payment from October, 2013 through May, 2014 is not a material breach.

3. There was no written waiver of the requirement to file a site plan for the New Security Improvements with Subdivision Approval.

4. Final Approval is not achieved until Article IV sections, which require approval, have attained approval.

5. Failure to submit for Final Approval and site plan approval at the same time was a breach of IV(D)(7).

6. The lawsuit by PLHA was not a SLAPP suit and, if it was, the Settlement Agreement was a waiver of the Anti-SLAPP suit legislation (Civil Rights Law §70-a(2)).

7. The number of lots to be used in the denominator is 74.

8. The sponsors may not opt-out of Security.  They may opt-out of specific services provided to individual lots.

50

1111250

9. The PLHA shall pay taxes on Cranberry Lake from 2008 to 2014 and then from 2014 to current time.

10. Counter Claims –

   The Sponsor is responsible for paying $130,000 to the PLHA as of April 11, 2015 with statutory interest from said date to date of decision.

   The Sponsor is responsible to pay the PLHA $50,000 as of June 14, 2016.

11. The Sponsor is responsible for paying for the Guard House/Gate House construction.

12. Delay Claims

   1. Trail Delay - July 28, 2011 – November 26, 2011;

   2. Action of PLHA with AG's office – eight month delay during January 29, 2014 to December 31, 2014;

   3. Lien – Filing of Lien did not add to delay claim.

13. Lien, validity of the four sections

   1. Road Loan and litigation on Reserve are stricken from Lien;

   2. Arrears on Lot 12 – Insufficient testimony, decision reserved;

   3. Best Effort – Stricken from Lien;

   4. Interest – Stricken in that one and three above are stricken.

14. Sponsors' Damages from Lien unrelated to Delay – None;

15. PLHA breached the non-interference part of Settlement Agreement.

The $470,000 previously released to the PLHA from escrow is forfeited and shall be returned to the Sponsors by crediting same to the Sponsors against any amounts owed by the Sponsors to the PLHA until said amount is extinguished.

51

Decision reserved on (1) damages from Delay Claims and (2) legal fees, both of which will be subject to a further hearing to be scheduled by NAM.

Dated: April 8, 2016
Garden City, NY 11530

Ira B. Warshawsky, Esq.
Arbitrator

52



**NATIONAL ARBITRATION AND MEDIATION**

**VIA EMAIL AND REGULAR MAIL**

March 13, 2017

Andrew Schriever, Esq.
Brendan Goodhouse, Esq.
Cuddy & Feder, LLP
445 Hamilton Ave, 14th Floor
White Plains, NY 10601
Email: Aschriever@cuddyfeder.com ; Bgoodhouse@cuddyfeder.com

David S. Hoffner, Esq.
Hoffner PLLC
800 Third Ave, 13th Floor
New York, NY 10022
Email: hoffner@hoffnerpllc.com

> RE: Pierson Project, LLC, Potake Lake LLC & Rock Hill, LLC d/b/a Rock Hill
> Project vs. Pierson Lakes Homeowners Association, Inc.
> NAM File No.: 188736

Dear Counsel:

I am forwarding to you the decision of Arbitrator Ira B. Warshawsky , dated December 31, 2016, in connection with the Arbitration of the above referenced matter.

Sincerely,

Cynthia Gugliotta
NAM (National Arbitration and Mediation)
Phone: (800) 358-2550 ext. 121
E-Mail: cgugliotta@namadr.com

122 East 42nd Street, Suite 803 | 990 Stewart Avenue, First Floor | 16 Court Street, 35th Floor | 1110 South Avenue, First Floor | 500 Mamaroneck Avenue, Suite 320 | 70 Niagara Street
New York, NY 10168 | Garden City, NY 11530 | Brooklyn, NY 11241 | Staten Island, NY 10314 | Harrison, NY 10528 | Buffalo, NY 14202

All written correspondence and case submissions to NAM should be sent to the Garden City office | Hearing Officers and Conference Facilities Nationwide
**(800) 358-2550 | www.namadr.com**

NATIONAL ARBITRATION AND MEDIATION, INC.

PIERSON PROJECT, L.L.C., POTAKE LAKE, L.L.C.
and ROCK HILL, L.L.C. d/b/a ROCK HILL PROJECT,                NAM No.: 1000188736

*Claimants,*

- *against* -                                                          **DECISION**
**AFTER HEARING ON**
**DAMAGES**

PIERSON LAKES HOMEOWNERS ASSOCIATION, INC.,

*Respondent.*

After a lengthy hearing on the issue of liability concerning the sponsors of the Pierson

project (Pierson Project, LLC, et al) and the homeowners association known as the Pierson Lakes

Homeowners Association, Inc. (PLHA), the arbitrator rendered a ruling on various issues in

April 2016. The arbitrator left open, as the parties were well aware, the damages that flowed

from the different issues of liability that were determined by the arbitrator in said decision.

Further whether any damages flow from the content of a lien filed by the PLHA in February

2015 and not removed until June, 2016; a lien that the arbitrator ruled was legally filed. An

additional issue that was raised by the sponsors to the arbitrator, and which the arbitrator

determined he would rule upon, with the agreement of respondents, is the validity of the Budget

for Pierson Lakes, considering the prior rulings of the arbitrator as well as the facts that have

been adduced during the hearings. The appropriateness of the budget, the contents thereof, is

directly related to the ability of the sponsors to market what is known as phases 2 and 3 of the

project.

1

1156418

Two additional hearings were held on the multiple damage issues. Both sides submitted pre-damage hearing memos as well as post damage hearing memos/summations. They covered the issue of damages, the budget and two important legal issues that heavily impact upon the eventual ruling of the arbitrator on what we have called damages.

The first of these refers to whether forfeiture of escrow, previously awarded to the sponsors in the liability portion of the hearing, is equivalent to a liquidated damage remedy and the second is what interest, if any, should be applied to any areas of damages that the arbitrator finds are the responsibility of the respondent, the PLHA. Therefore, before addressing the quality of the sponsors' damage evidence and their theory of damages, which the respondent colorfully describes as ""contrived and illogical and too remote and too speculative to be cognizable.", and that the "sponsors have colossally failed to meet their burden of proof with respect to their carrying cost damages; their case was completely devoid of the requisite evidentiary proof" the arbitrator will address the two legal issues set forth above.

**Is the forfeiture of escrow equivalent to a liquidated damage remedy and if so does it preclude the awarding of any other damages in this case?**

The respondent argues that the purpose of a liquidated damage clause "is to prevent, in the event of a breach, any question as to the amount of damages that may be recovered, a clause which is reasonable precludes any recovery of actual damages." *Fed. Realty Ltd. P'ship v. Choices Women's Med. Ctr., Inc.*, 289 A.D.2d 439, 440.

The agreement states that if the PLHA "commit[s] a material breach of [its] obligations set forth in Article IV of this Agreement to consent to and support and not oppose, delay or obstruct any aspect of the applications for Final Approval or submissions to the Town of

2

Ramapo Planning Board or any other permitting agency, including the Attorney General's Office, then all the sums placed in escrow shall be forfeited by the PLHA and said funds shall be returned to Sponsors 2 and 3 by the Escrow Agent." The arbitrator found such a material breach after the first hearing.

Thus, the $470,000 that had been placed in escrow by the sponsors pursuant to the 2011 agreement was forfeited.

The respondent argues, therefore, that the parties were fixing a specific remedy in the event the PLHA breached what has been called the non-interference clause. Further, that even though the forfeiture of the escrow is not explicitly called the "exclusive" remedy of the Sponsors, the respondents argue that this was their intent.

However, there is no evidence/testimony in the record on this point. Nor does the agreement speak to any other issue of damages and in fact the term "damages" is not even mentioned. The Escrow Forfeiture section only applies to breaches of the PLHA's obligations under Article IV of the Settlement Agreement. Therefore, by its own terms, the Escrow Forfeiture provision does not apply to other breaches of the Settlement Agreement.

Respondent continues his argument of what the record does or does not contain, contending that the record has no evidence that the parties contemplated the PLHA being responsible for what respondent's counsel calls the Sponsors carrying costs.

3

1156418

The clause in question in our matter does not use the words "liquidated damages"; nor does it at any time state that the forfeiture of the escrow is an "exclusive remedy" for Respondents' violation of the non-interference clause of the Agreement.[12]

A "liquidated damage clause must be the result of an express agreement between the parties; courts will not read such a clause into a contract by implication." *Raymond Weil, S.A. v. Theron, 585 F. Supp. 2d 473, 489 (S.D.N.Y. 2008),* citing *O'Hanian v. Avis Rent a Car Sys.,* 779 F.2nd 101, 109 (2nd Cir 1985), citing *Winkleman v. Winkleman,* 208 A.D. 68, 70 (NY App. 1924).

There is no evidence to support a theory that the parties intended to have the escrow forfeiture clause equivalent to a "liquidated damages" clause. The agreement does not state in any shape, manner, and form or by inference that the sole remedy of the sponsors was the escrow forfeiture.

Further, using common logic, if the escrow forfeiture was the only remedy for PLHA's violation of the non-interference obligation under the agreement, there would be nothing to stop them from continued violation of the non-interference clause. The agreement controls and there is nothing in it that limits the sponsor's remedy for the PLHA's violation of the agreement.

---

[1] From the sponsors, nonlawyer view, this was quite simple. "We had made an agreement that they would not interfere. If they do not interfere, we pay them $470,000. If they interfere they don't get paid, so it was not an issue." (Tr. 2836, l.5).

[2] "Yeah they got the 470, so now of course they have to return that 470, but it was not in terms of-in lieu of expenses. It was something that was- I had agreed to pay because throughout the history of this project with homeowners Association since 2003 the interruption that I was having in terms of leveraging with AG office and creating disputes which puts us into the vicious circle of going into AG's office, filing for the dispute mechanism by the time you get the dispute mechanism over and approved, the delay comes in, so this whole process, in order to stop this, we had said, all right, we're going to pay you "X" amount of dollars if you do not intercept." (Mr. Sarkissian speaks with a heavy accent and at times was difficult to understand) (Tr. 2836, l.12)

4

The arbitrator thus finds that the escrow forfeiture clause is not a liquidated damages clause nor is it equivalent thereto. Further that it does not preclude the awarding of other damages related to the time periods known as the Trail Delay nor the AG Delay.

Though I do not have to reach this issue, based upon my above ruling, it was raised during the hearing, I thus also find that the action of the PLHA vis-à-vis the Attorney General's office not only violated the 2011 agreement, but those actions also violated the 2001 agreement in that they hindered and/or adversely impacted the ability of the sponsors to market or sell lots.

### Interest on Escrow Forfeiture

Sponsors have requested that the arbitrator award statutory interest on the forfeited escrow fund (and actually any other amounts that the arbitrator finds are owed to the sponsors by the respondents). They point out that the arbitrator has already awarded interest on damages from a violation of the bifurcation issue. (Awarded to the PLHA).

The arbitrator failed to address the issue of interest on the escrow forfeiture in its liability decision. This should not be construed by the respondent that the arbitrator did not believe it appropriate to award interest, only that he didn't address it.

The Agreement (April 2011) does not address interest and the PLHA argues therefore that this failure to address interest by the parties would indicate that they "opted not to include . . . interest on the escrow event of forfeiture."

The PLHA cites to the case of *J. D'Addario & Company, Inc., v. Embassy Industries, Inc.*, 20 N.Y.3d 113 (2012) to support its point that if the parties wanted a liquidated damage clause to include interest they could have said it.

5

Interestingly enough, the sponsors also cite to *D'Addario*. They point out that *D'Addario* continues, on pages 118-119 of the decision (not cited by the PLHA), where it states that "the parties have decided that the amount escrowed should be the exclusive remedy to the wronged party."

The Court of Appeals noted that absent an agreement to the contrary, interest should be applied to funds in escrow noting that "the purpose of ordering statutory interest on amounts in escrow is not to punish the breaching party. The breaching party is required to pay interest despite lacking possession or enjoyment of the property in order "to make [the] aggrieved party whole." (Id at 118) Citing to (*Spodek v. Park Prop. Dev. Assoc.*, 96 N.Y.2d at 581, 733 N.Y.S.2d 674, 759 N.E.2d 760).

The PLHA tries to counter this by saying that if the arbitrator finds that the provision is an "exclusive liquidated damages clause" then there cannot be interest awarded in addition to the forfeited escrow.

The Court of Appeals made it clear what their holding meant. "A contract clause providing that no statutory interest would accrue during an escrow dispute would have prevented this litigation altogether. But the language that was used, that the down payment on the property was to be the "sole remedy" for a breach by the purchaser and that the seller had "no further rights" against purchaser, is sufficiently clear in the end to reach the same result. The contract language will always control, as it should in this case." And thus, that was why they denied interest.

It should be noted that Judge Graffeo, in a strong dissent, would have granted interest on the liquidated damage clause amount pursuant to CPLR 5001 (a).

6

1156418

The arbitrator hereby finds, noting that I have determined that the escrow forfeiture clause is not a liquidated damage clause, that an award of statutory interest is appropriate on the amount of escrow forfeiture, and on any other award to sponsors in this matter.

## Carrying Costs as Damages
### Damages Attributed to the 12 Month Period of Delay

In my prior decision I found that there was a four-month period of delay attributed to what we call trail delay and an additional 8 month period that I attributed to interference with the Attorney General. I had stated at one point in time that the sponsors, in proving damages, would have to show something that "they wouldn't have had to pay anyway." This statement has been cited on multiple occasions by respondents. And it is something they themselves have said. Before proceeding it should be clear that my statement at that time was taking a very narrow view of damages without having considered "project delay" damages. In arguing the issue of damages the respondents have essentially referred the arbitrator to case law which arises from real estate purchase contracts, while sponsors have relied on case law that relate to project delays caused by their adversary. The arbitrator has taken both into consideration as will be seen below.

What damages are attributed to this 12 month period?

The sponsor argues that the same costs that they had on a daily basis over a 12 month period are their damages. The PLHA argues that they would've had to spend this money anyway so that they have not been damaged. The sponsor responds that "while the costs caused by delay are not new or different from normal project costs, they are extra costs in that, because of the delay, the developer must repeat that cost more than it would have had to but for the delay. (Tr. 2819:12-23; Mr. Sarkissian explaining that delay causes repetition cost). These costs include the HOA fees, loan interest, utilities, real estate taxes and insurance and that "… the Sponsors would

7

1156418

have paid these costs while marketing and selling lots and approaching an ultimate exit. Now the Sponsors will have to repeat these same costs over the next several years to get to the point in the project where they should be now, and when they ultimately exit the project, they will be millions of dollars worse off than they would have been but for the PLHA's breaches."

Claimants have requested that they be awarded damages equivalent to their carrying costs during the one-year period of delay (as found by the Arbitrator). They also have requested said costs be used for other periods of time when they were unable to proceed due to the actions of the Respondents.

Respondent argues that consequential damages such as carrying costs are not awarded in real estate contract cases and that such costs cannot be deemed proximately caused "by the PLHA's breach of the Non-Interference Provision." Respondent cites to *DiScipio v. Sullivan*, 30 AD 3d 677 (3d Dept. 2006) arguing that that court denied such costs comparing the sponsor's action to those of a party in a real estate transaction. Said case stated "the long recognized rule that an award of consequential damages for property taxes, interest on the contract price, and broker's commission, is against the weight of authority." (at 678) (quoting from *Tator v. Salem*, 81 AD 2d 727 (3d Dept. 1981).

Claimant argues that carrying costs for project delays are routinely awarded and that Respondent has ignored such cases citing to *Gemma Constr. Compl. Inc. v. City of New York*, 246 AD 2d 451 (1ST Dept. 1998). Gemma held that the measure of delay damage claims are increased costs resulting from a longer time required to complete the project and noted that a "significant item in delay damages is the increase in fixed costs and overhead incurred by reason

8

1156418

of the deferral of the completion date of the project (see also *Columbia Asphalt Corp. v. State*, 70 AD 2d 133 (2d Dept. 1979); and *Terry Contracting v. State*, 42 AD 2d 619 (3d Dept. 1973).

The legal argument of Respondent, and the facts upon which it is based (primarily real estate purchase contracts) is unrelated to the facts of our matter. Though our facts are not identical to those of the cases cited by Sponsor, they are similar. The Arbitrator will award carrying costs as damages for the period the project was delayed from moving forward.

It is further noted that *Kenford Co., Inc. v. County of Erie*, 73 NY 2d 312 (1989) (cited by the PLHA) is not relevant to our facts nor to the damages sought by Sponsor. Sponsor is not seeking mythical lost profits, which was the concern in *Kenford* but rather hard out of pocket costs. Respondent has also argued, citing to *Kenford*, that damages should be what the parties reasonably contemplated. That said, damages should be "what liability the defendant fairly may be supposed to have assumed consciously, or to have warranted the plaintiff reasonably to suppose that it assumed, when the contract was made." (*Kenford*, at 319).

The respondent continues "There is no evidence in the record here, however, that the PLHA ever "assumed consciously" or could "reasonably be supposed to assume" that if it breached the Non-Interference Provision, in addition to the $470,000 Escrow Forfeiture, it might be on the hook and have to pay years of the Sponsors' taxes, mortgage interest and utilities. To the contrary, in executing the 2011 Agreement, the PLHA, based on its plain terms, reasonably believed that its liability was capped at the Escrow forfeiture." The problem with this argument is that there was no testimony whatsoever on this issue and if one was to expect, from one side or the other, you would expect the respondent to have put forth testimony to counter the current

9

claims by the sponsors. Further that *Kenford*, as previously stated, dealt with anticipated lost profits and not actual out of pocket loss.

## Mitigation of Damages

Though it is argued by the PLHA that the Sponsors could have mitigated their losses by building roads, (if not homes during this period), they cannot be required to put "good money after bad", while PLHA's efforts continued.  The PLHA's efforts with the AG's office are reflected in the 26th Amendment, followed by the Lien.  In fact, Sponsors argue that due to the budget disagreements, the inability to market actually still exists.

The Sponsors affirmatively decided to halt development to cut losses.  They decided "not to waste money unnecessarily when there is not potential of getting any revenues." (*Sarkissian* Tr. 2905: 4-12).

The Arbitrator finds that cases that deal with project delay are controlling under our facts. The time to be able to market has been extended due to acts of the PLHA.  Therefore, the carrying costs for this period would be most logical for damage assessment.  (See *Clifford R. Gray v. State* 251 AD 2d 728) (3d Dept. 1998),

In other words, no matter when this project ends, no matter when the sponsors are finally able to exit from the project, it will be at least one year later than they otherwise could have exited. Thus one year's worth of costs is attributable to the actions of the PLHA.

The project has been extended by one year (trail delay-4 months, AG delay-8 months); therefore the costs of maintaining the project for one year will be allowed as damages.  The damages for any other period of delay of the project or for extension of time prior to the sponsors being able to market phases two and three, will also be the carrying costs. That time period is

10

often referred to as the lien damage and post lien damage periods and will be ruled upon further in this decision.

### Budget Issues

The parties argued miscellaneous issues of the proposed budget, which the sponsor contends will further damage sponsors if allowed to remain in place. The Settlement Agreement required  "Upon release of the escrow to the PLHA as provided for in Article III of this Agreement, the PLHA's reserves will be replenished to a minimum of their level as they existed at the end of the 2008 fiscal year, or any higher amount as may be required by a report prepared by an independent engineer acceptable to both the PLHA and the Sponsors."   The escrow was released in mid-2014. After that an engineering firm, Kipcon, was selected by the PLHA to perform the study that  previously had been agreed upon in the Settlement Agreement. From the evidence produced both orally and by documents that study found that the reserves were underfunded. These reserves have never been replenished. There was an earlier study, (also by Kipcon) known as the 2012 report, which recommended additional funding of the reserve. Mr. Rice (current Treasurer) testified that the PLHA complied with the 2012 report of Kipcon.  That is incorrect.  That report was not followed but contained now outdated information that related to the road work. There apparently was never a request to revise the Kipcon report by the PLHA.

The PLHA contends that the sponsors are twisting the facts, that is when they integrate the road repair element of the reserves into their argument and the PLHA then states "it is nonsensical for the sponsors to argue that the PLHA was obliged to re-fund that portion of the reserve as Kipcon had recommended, reserves that were premised on a road repair obligation that was already funded and addressed. Once you remove the road repair element, so they argue,

11

1156418

that component of the Kipcon recommendation becomes moot, and "not a material breach by the PLHA of the 2011 agreement." The problem with that position is that the escrow was not released until 2014 and therefore whatever happened as it relates to the 2012 report would not be relevant to our issue of funding the reserves. But it is an example of how the homeowners association chose to ignore an important report without having the engineering firm revise it, as it should have done.

The sponsors as noted, have further argued that the 2011 agreement was violated by the PLHA due to the failure to accrue reserves in line with the 2015 Kipcon report,(prepared in 2014; released January 2015) which **did follow** the release of escrow (in 2014).

The PLHA's response to this argument was that the Board determined "there were things included in the report (2015) that did not require funding." and it therefore was not acceptable to them (as per Mr. Rice). However, once again, there was no evidence that Kipcon was questioned and or challenged on any part of their report. There was testimony by Mr. Rice (Tr. 3468) that "you don't reserve for what you need for replacement all at once you do it over time, and everybody in the community participates..." He also pointed out that you don't reserve for something that you've already done, for example, the road replacement or, for example, putting a roof on a building. He continued "therefore the amount of money identified in the '15 report was never **accepted** and is still not accepted" (Emphasis supplied).

Ms. Amato testified that she believes that Mr. Pecoraro, who was the treasurer at the time in 2015, when the report was received (Jan. 2015?) reached out to Kipcon after the PLHA received the report and said that there were inaccuracies. That is the extent of her recollection. One can assume that there were no amended Kipcon reports (2012 or 2015) or they would've

12

been presented to the arbitrator. It should be noted that despite multiple requests, the Sponsors were not provided with a copy of the Kipcon report until June or July of 2015.

As noted above, Mr. Rice testified and the PLHA states that "any report giving rise to a replenishment obligation be "acceptable" to the PLHA." (Mr. Rice Tr. 3469 et al.). The PLHA has completely misread that section of the agreement (intentionally or unintentionally) and how the word "acceptable" is used. It is not the report that must be "acceptable" to the PLHA but the independent engineer that must be acceptable and they chose the engineer.

The sponsors emphasize the reserves remain underfunded, the funding of which is the responsibility of the PLHA pursuant to the 2011 agreement and not the responsibility of the sponsors. The question remains however, what should the reserves be?

The arbitrator finds that pursuant to the agreement, upon the release of the escrow, the PLHA was required to replenish the reserves pursuant to the independent engineer's report of 2015. Until the reserves are replenished the sponsor will have no responsibility for paying toward the reserve as part of the budget. The problem with the strict reading of the 2011 agreement and an analysis of the 2015 Kipcon report provided by PLHA witnesses, would be that the 2015 Kipcon report apparently, should have been modified. Why it was not modified, accepting the testimony of Mr. Rice and Ms. Amato, has not been explained. The only inference that can be drawn from the testimony of these two witnesses is that the PLHA board didn't really give it much thought. As far as they were concerned it was an inaccurate report so they just ignored it and moved on. They apparently treated the 2012 report in similar fashion. The arbitrator would accept the testimony of Ms. Amato and to some extent Mr. Rice, that there were errors in the Kipcon reports or that Kipcon did not understand certain issues. But these errors

13

stand because they were never corrected in any way whatsoever by Kipcon and it does not appear that there was much effort, if any, made to correct them. Kipcon should have been asked to revise the report when it was received in January 2015 but they were not, thus it stands and unless it is revised, sponsors are not responsible for funding the reserves until said reserves are brought up to the level of the January 2015 Kipcon report or as they were in 2008, whichever is higher.

There is however, an alternative if the parties could agree on it.  If the PLHA has a more recent report than the one done as of January 2015, then it would be only logical and equitable to use that report for the purposes of funding the reserve prior to the sponsor's duty to resume funding its portion of the reserve.

### The Security Part of the Budget

The other budget issue was the cost of security that sponsors argue they should not be paying for but that the budget has required them to pay. It was clear from my prior decision that the sponsors would not be able to opt out of paying for the entirety of such security. In their memo the sponsors agree to pay two thirds share of the roaming security services, (2/3 of $21,580, see Claimant's exhibit D and U), for which they argue provides, at least theoretically, to secure portions of phases 2 and 3, but at the rates that existed prior to the rate increases that the board agreed to (without notice to the sponsors).

The sponsors argue that they receive little benefit from the security costs as set forth in the budget. They contend they get no benefit from the guard in the gate House and that it is unreasonable for the PLHA to charge them with the majority of the security costs.

14

The sponsors further point out that the projects area is readily accessible from many points by two wheeled bikes and ATVs and the guard at the gate House serves no purpose in protecting their property (phases 2 and 3) from such intrusion. They also argue that the contracted cost of the security is unreasonable, and/or that the services provided are not needed by sponsors and therefore it is unreasonable for them to pay them. This is the theory that is being argued by sponsors.

The settlement agreement, Article V.A.(1)(b) states "Upon Final Approval, sponsors shall not object to the provision of 24 hour security, at reasonable cost." Though the 2016 security contract apparently went to nearly the low bidder, the PLHA added to that agreement an addendum which added approximately 30% to that amount (as per the sponsors memo) making what was reasonable unreasonable (so sponsor argues).

The sponsor relies on the 2001 agreement and argues that they have the right to avoid security costs if they pertain to a task they deem unreasonable. The PLHA points out that the 2011 agreement, which they argue trumps the 2001 agreement, only allows the sponsors to object to "reasonableness" of the costs of the security. PLHA also notes that Sponsors website touts the security patrol as an amenity of the project.

From the reading of the testimony of sponsors witnesses and that of Ms. D'Amato and Mr. Rice we are looking at an expanse of land that truly is difficult, perhaps even impossible, to secure. The gatehouse may serve to deter an interloper that enters from that direction, but is meaningless for all other purposes (security-wise). A roaming patrol, as currently configured, and I believe it is only one guard (a supervisor) in a car, is also probably of little value to protect phases 2 and 3 from an invasive party. The contract (RxD) indicates this would be an "off hours"

15

patrol. In fact, only 20 hours of the security services are dedicated to these patrols per week.   It is almost a meaningless amount based upon the picture painted by Ms. Amato and Mr. Rice themselves. The ridiculousness of the 20 hour amount for roving patrols was brought to the attention of the arbitrator by the examination of respondent's witnesses by the respondent's counsel. Apparently the 20 hours of patrol appears to be a throwaway for the benefit of the sponsors while they pick up two thirds of the cost of the balance of the security contract. How much of the 20 hours per week actually goes to phases 2 and 3 versus the occupied section, Phase 1, was never explained.

Thus, it may be argued that it is "reasonable" to conclude that for the sponsors to pay two thirds of the cost of the security (as per the budget) is not reasonable. But what then is "reasonable"? The PLHA's decision to add to the security contract that was bid out and accepted, falls on their shoulders. You cannot honestly argue you bid out to the lowest or practically lowest bidder, and then add $5.00 or more to the hourly rate of the security staff via an addendum because the owners liked the security personnel). The sponsor thus argues it makes a "reasonable overall cost for security unreasonable." (Claimant's memo at page 28). The arbitrator cannot rewrite the security contract though clearly someone should.

It is the arbitrator's opinion that the 2011 settlement agreement takes precedence over the 2001 agreement in this matter. The parties specifically addressed the issue of 24 hour security and the fact that the sponsors would have responsibility for their share of a reasonable cost of said security. The sponsor shall be responsible for two thirds the cost of the original security contract (exclusive of the addendum). Just as the arbitrator has held the PLHA to the language of the 2011 agreement related to reserves so shall the sponsors be held to the 2011 agreement related to

16

security. The arbitrator is unable to determine from respondents Exhibit A whether the correct amount for the sponsors is as listed in the exhibit because I cannot determine whether the $147,410 in the column for the security contract either does or does not include the increased hourly rate that was part of any addendum to the security contract. It appears by my math to be higher than the terms of the contract reflected in RxD would indicate, and thus probably does include the Addendum.

The parties are to revise the budget pursuant to my above rulings on the security and reserve portions of the budget.

### Damages Related to the Filing of the Lien

In a decision rendered after the first hearing in this matter the arbitrator had ruled that the agreement was not violated by the PLHA filing a lien. The arbitrator further ruled that "unless the sponsors wish to argue some other theory of damages, they will be limited to the damage they may have suffered pursuant to their Delay Claim that relate to the filing of the lien" (Decision-P. 35). The arbitrator further found that "the lien is not a blanket lien, it is therefore, not an illegal lien and it will stand, subject to ruling on the specific parts of the lien." (Decision-P. 36). The Decision then proceeded to find practically every single element of the lien invalid. The arbitrator would not have bothered to go back into the original decision to clutter the current decision up with his own personal words, however, he finds it necessary since respondent's counsel seems to be taking great liberty with the language of the arbitrator's decision when using it in his opposition to claimant's damage application.

17

1156418

Though the Arbitrator has ruled that the PLHA had the right to file a lien, Sponsors argue they have been damaged by the filing and that the lien was filed maliciously and in bad faith. There has been no testimony in this hearing on that issue from the respondents.

They also argue that the lien was not "properly" filed and the PLHA, though continuously stating that their lien was properly filed, has not refuted the sponsor's argument.

The PLHA refutes Sponsors' claim that 99% of the lien was improper pointing to the arbitrators ruling on the bifurcation argument.  It also argues that Sponsors have set forth no cognizable theory to support post lien damages.

Initially, the arbitrator has now returned to the lien and examined it carefully. It finds no part of the lien was found valid by the arbitrator,  and that the bifurcation issue was not raised or claimed as part of the lien by the Respondents at any time during the first Hearing. Thus we are dealing with a lien that was 99% if not 100% improper though it was not technically an invalid filing. There has never been a definition of the word proper or improper during our lengthy proceedings. If proper means that the PLHA had the right to file **a lien**, then it was properly filed. If proper means that the content of the lien was invalid, then it was improperly filed.

It should also be noted, while referencing the bifurcation issue, that though respondents counsel states that the arbitrator determined that the PLHA breached the non-interference provision after the arbitrator determined that it was in response to the sponsors breach of the non-bifurcation obligation (Respondents Post Damage Hearing Submission at page 16), this is completely inaccurate. As far as the arbitrator is concerned these were unrelated issues and no PLHA witness claimed differently.

18

The Sponsors have argued that the "invalid and frivolous" amounts in the lien violate the 2001 Agreement by hindering and/or adversely impacting the ability of the Sponsors to market or sell (Phases II and III). (CX 4, p. 2). More specifically the clause of the agreement referred to by the sponsors reads "  . . . the Association or its Board of Directors may not without written consent of the New Sponsor take any action which will hinder and/or adversely impact the ability of the New Sponsor to market or sell the Lots or Homes constructed on such lots."

In response, the PLHA argues that these claims by Sponsor of a violation of the 2001 Agreement are "untimely" and a "last ditch" effort to impose liability on the PLHA. They have also argued that the 2001 agreement was no longer binding after the April 2011 settlement agreement. That is incorrect. There are parts of the settlement agreement that moot parts of the 2001 agreement but it does not eliminate its validity.

The Sponsors argue their claims of a violation of the 2001 Agreement are not new and they also argue (correctly) that the Arbitrator allowed them to argue some other theory of damages with respect to the lien when ruling that (on its face) it could be legally filed. That is absolutely correct.

Thus the test becomes whether the content of the lien filed on February 6, 2015 hindered or adversely impacted the ability of the sponsor to market or sell homes. If the arbitrator finds that it did then we must determine what damages if any were suffered by the sponsors from that breach.

Let us take a quick look at the chronology of the filing of this lien before we go any further into the sponsor's argument for damages and the defenses raised by the PLHA. This timeline was set forth in claimant's memo and the emails of February 5-6, 2015 support it:

19

1156418

Feb. 5, 10:03 a.m.    Sponsors send the PLHA the 26th Amendment. (Cl. 39.) [References are to Exhibits in Liability Hearing]

Feb. 5, 10:06 a.m.    Ms. Amato forwards the Amendment to Mr. Harrison. (Cl. 41.)

Feb. 5, 11:25 a.m.    Mr. Harrison [Legal Advisor to the PLHA] emails Sponsors' counsel stating that he has not reviewed the Amendment but that the HOA will review it. (Cl. 41.)

Feb. 6, 1:33 a.m.    Aaron Klein, counsel for the PLHA, emails the Sponsors' lender's attorney and Sponsors' counsel attaching an unfiled Notice of Lien. (Cl. 40.)

Feb. 6, 9:07 a.m.    The PLHA files the Notice of Lien in the Rockland County Clerk's office. (Cl. 12, p. 1.)

Feb. 6, 10:30 a.m.    Mr. Harrison emails Sponsors' counsel ordering that the Sponsors cease distribution or use of the 26th Amendment. (Cl. 41.)

Feb 6, 10:43 a.m.    Mr. Harrison emails Ms. Wallace [Assistant Attorney General] stating that the PLHA will review the "proposed amendment" and informing her that it had filed a lien against the Sponsors' lots. (Cl. 38.)

It should be noted that the 26th amendment was not a proposed amendment but was now a fait accompli. For whatever reason, and there was no testimony on this, the PLHA through Mr. Harrison was intent on stopping the sponsors from moving forward. They clearly succeeded.

They cannot now honestly deny their success.

The Arbitrator concludes that the PLHA clearly acted in bad faith in the filing of the lien. That it is the content of the lien that makes it a bad faith filing not the filing itself. A lien consisting of claims with no footing in reality is filed in bad faith. **There still remains the question whether the content of this lien, filed by the PLHA, violated the 2001 agreement by hindering or adversely impacting on the sponsors ability to "market and sell" the lots in phases 2 and 3.**

20

1156418

Is there evidence to support the inference that the sponsor wishes the arbitrator to draw that the lien hindered the marketing of the project or are there other reasons that the marketing of the property at that period of time would have been difficult even without the lien? We are aware that the lien was filed immediately after the filing of the 26th amendment. The PLHA poses the question of whether the real estate market in that county, where Pierson Lake is located, would have been susceptible to the marketing of these high-end lots and homes. They produced no evidence on this issue. The PLHA also notes that the arbitrator had concluded in the decision after the first hearing that the sponsors could have bonded the lien. It would have of course been quite expensive, but it could have been done. We are also aware as the PLHA has noted that Mr. Sarkissian has testified that it would not have mattered (if he had bonded the lien) because he still would not have been able to market the properties due to the content of the lien, and the content of the 26th amendment. At one point in time respondent's counsel had argued that the sponsors never even tried to market the property once they had achieved the 26th amendment. He seems to have forgotten that in that flurry of emails on February 6, at 10:30 AM, Mr. Harrison, PLHA's legal advisor, had emailed the sponsor's counsel and stated:

"This proposed amendment contains a number of great misstatements and omissions, including among others the failure to mention the lien filed against the sponsors and the fact that the sponsors ceased altogether making monthly payments in December 2014. The sponsors are instructed not to distribute or use this amendment until it has received the HOA's full set of comments and corrected the misstatements and omissions."

Mr. Harrison had apparently forgotten that the lien was filed only 1.5 hours earlier, unless he was referring to another lien, and that Amendment 26 was not "a proposed amendment." It also should be remembered that nine hours earlier at 1:30 AM on February 6, Aaron Klein, counsel for the PLHA, had reached out to Sponsors' counsel and one of the sponsors' lender's

21

1156418

counsel advising them that this lien was going to be filed and it had priority over their loans. He was incorrect on that as well.

The sponsor argues that "the only reasonable inference that can be drawn from the actions of the PLHA and the content of the frivolous lien, is that the PLHA intended to, and did, damage the Sponsors throughout the lien period by making it practically, if not literally, impossible for the Sponsors to sell lots. See *Cristallina S.A. v. Christie, Manson & Woods Int'l, Inc.*, 117 A.D.2d 284, 295 (1st Dep't 1986) (while damages may not be determined by speculation and guess, "evidence that "as a matter of just and reasonable inference", shows their existence and the extent thereof will suffice, even though the result is only an approximation.") (quoting *Story Parchment Co. v. Paterson Parch. Paper Co.*, 282 U.S. 555, 563 (1931))."

PLHA argues that *Cristallina* doesn't sanction the establishment of causation based on a mere inference without the benefit of actual evidence. Is it possible then to draw such an inference "a just and reasonable inference" from our evidence that the lien, the content thereof, served to hinder the marketing of phases 2 and 3? Additionally counsel for the PLHA has argued that this matter has dragged on due to the actions of sponsors' counsel in the damage portion of this action by including in it the budget issues as well as the delay due to the filing of the lien and thus adding to the length of the process and increasing damages.

The parties are reminded that a home owners association budget must be attached to any proposed amendment of an offering plan, so that a final budget ordered by the arbitrator becomes important and not a mere side issue. Though I am sure the PLHA itself does not need to be reminded, but for the record, it should be clear that the sponsors attempted to mediate this issue and sit down with Ms. Amato right after Mr. Harrison had renewed his relationship with the

22

1156418

Attorney General's office at the end of January 2014. Mr. Sarkissian contacted Ms. Amato, asked that the email to the Attorney General be withdrawn and requested that the parties negotiate or go to arbitration (Rx90, email Sarkissian to Amato, 2/12/14). An additional attempt was made by Mr. Gueyikian in May of 2014 but was rebuffed (Cx118, Gueyikian email to Amato). Furthermore it should be clear that the actions of the PLHA and its counsel (prior and current) served to delay this case from going to arbitration for many months despite the existence of a clear arbitration clause in the settlement agreement, by the filing of multiple motions including a claim that the April 2011 agreement somehow violated Civil Rights Law Section 70-a (2), related to what is known as a SLAPP suit or anti-slapp suit legislation. The Arbitrator allowed the respondent great leeway when they terminated original counsel, after the hearing had already started, and granted an extension of time to bring in new counsel. At every turn the Respondents' new counsel were given leeway in pleading and amending their defensive position. I do not know how many tens of thousands of dollars have been spent on legal fees in this matter over the last 2 ½ years but I'm sure I will learn of it when both counsel ask for legal fees.

The arbitrator concludes that the amazingly overblown lien wrapped around the necks of the sponsors like the proverbial albatross. That it would clearly prevent or at least hinder, the marketing of phases 2 and 3. It thus breached the 2001 agreement. Anyone looking to buy in phases 2 or 3 of Pierson Lakes, viewing this $800,000 lien (which, even if bonded, would still be there and visible to the prospective buyer doing normal due diligence), would have serious doubts about the financial stability and reliability of the sponsors, who, according to the lien have saddled the homeowners association with onerous debt.

23

Even Mr. Harrison, in his renewed communications with the Attorney General's office in January 2014, when accusing the current offering plan at that time of being misleading, stated that "new buyers into our community" should be told "the full story regarding the economic landmine they would be buying into (Harrison to AG's office January 29, 2014 at 1:56 PM)." Now this is not related directly to the lien but does relate to what a buyer would be interested in knowing before buying into the Pierson Lake community.

In the first part of our case, on November 11, 2015, Ira Adler was called as a witness by the respondent. Mr. Adler is an attorney, experienced in such projects and represented the sponsors in presenting amendments to the offering plan to the various governmental authorities. His examination generally centered on the presentment of an offering plan, the withdrawal of the plan (January 2014) and then the re-presenting of the plan in August 2014. He testified it was impossible for the sponsors to sell while the Association kept coming up with objections and changes to the offering plan. When confronted on this issue, of how he would know that it would be impossible he testified "you have to sell to people who want to buy your product, and if you put something out in an amendment that's totally crazy that there's this dispute and their alleging various things, no one is going to want to buy your unit." When Mr. Hoffner (PLHA's attorney) followed up on the bonding of the lien, Mr. Adler continued: "they could have bonded the lien, but the upset caused by the continuation of the Association coming up with issues, okay, would have my client in a position where no one will want to buy it."

An arbitrator, as factfinder, should not have to put on blinders and ignore common sense.

If our hypothetical buyer is going to spend a large amount of money to buy a plot of land and build what I understand to be a multimillion dollar house, he doesn't want to buy trouble.

24

That is the signal sent by this lien. For as long as that lien sat on the property, bonded or not, it served to prevent or at least hinder dramatically the ability of the sponsors to market and sell phases 2 and 3. To recap – the content of the lien violated the 2001 agreement by preventing or at least hindering the ability to market or sell property in Phases 2 and 3. The damages related to this period are the carrying costs during this period.

Regretfully due to the arbitrator schedule he was unable to render a decision in the first part of the case until April 8, 2016, the matter having been fully submitted on or about the middle of February, 2016. Then due to a clerical error the actual decision was not distributed to the parties until early May 2016, with the lien not being lifted by the PLHA until June 7, 2016. Assuming the PLHA would have taken 30 days to lift the lien after receiving the decision, damages (costs) will be assessed for the period of time from the filing of the lien on February 6, 2015, until May 8, 2016, 30 days after the date of the first decision. Interest will be imposed from May 8, 2016 to December 31, 2016.

**Post Lien Damages-The Continuing Damages Argument**

Sponsors also claimed damages for the period of time that the lien was lifted (June 2016) until the conclusion of this matter at $64,000 per month. These costs are the same costs that were proffered for the earlier periods including the delay related to the lien. As Mr. Sarkissian said on multiple occasions during his examination (Tr. 2865, l.15) "The saga continues." Essentially the same problems faced by the filing of the 26th amendment, the content of which was greatly dictated by the actions of Mr. Harrison and his conversations with the Attorney General's office, then followed by the filing of the lien, realistically prevented the marketing of the project. Even to file a 27th amendment now, without correcting the inconsistencies that were part of 26, as well

25

1156418

as correcting the currently posted budget of the PLHA, would be useless. No buyer looking at these problems would want to buy in to Pierson Lake. Mr. Hoffner, PLHA's counsel, frequently objected to Mr. Sarkissian testifying to what a buyer would or would not do. That he could not give his opinion and in any event it has no weight without additional evidence/testimony from prospective buyers who did not buy or real estate experts. The arbitrator rejects such argument. When a court charges a jury it makes it very clear that we do not ask them to check their common sense at the door when they deliberate on a case. That is what Mr. Hoffner is asking the arbitrator to do in striking and/or disregarding Mr. Sarkissian's view of how a buyer would act in considering investing in Pierson Lake. As previously pointed out in this decision the PLHA's own people have stated and know very clearly that no prospective buyer, doing their normal due diligence, viewing amendment 26 as well as the filed lien, would buy into this property.

Mr. Sarkissian testified (Tr. 2890 l.18):

"The development business is based on trust and certainty selling products. I cannot sell a product with uncertainty and disclosure of Association about money owing for about liens which was found very clearly by the judge that was in error so these are deterrent to ability to market." And he further stated that that was his opinion. Mr. Hoffner dedicated numerous pages of transcript trying to get Mr. Sarkissian to say it was his opinion. And the witness continued (Tr. 2892 l.10) "according to my opinion, the market norms are such that when you have this kind of information put out for marketing, you will not be able to sell the product. If you want to have to bring an expert for that, be my guest." The arbitrator finds if there was anyone capable of rendering such an opinion who was involved in this matter it was Mr. Sarkissian and the

26

1156418

arbitrator accepts this opinion. An experienced layperson can offer his opinion. Clearly the sponsor continues to bleed dollars as the process continues.

However, though the actions of the PLHA have caused these delays and prevented the marketing/sale of phases 2 and 3, once these periods of delay and inability to market and sell have passed, where, as Mr. Hoffner queried is the "but for" for continued damages going forward? How would the carrying costs, which claimant places upon the respondents, be avoided? If ever? Would they ever not have to be paid? Mr. Hoffner argued that all we ever hear is a 10 year plan or something like it. You have to have an exit strategy "they still don't have an exit strategy. They still haven't finished the roads. Still haven't built the guardhouse, gate House. They've done nothing. Even if the poison pill is removed, it was as of today, they still have a lot of work to do before they can do anything, before they can sell the property, close the properties, so how can they possibly be seeking damages?"

Mr. Schriever attempted to answer this argument. "We're not saying that we are going to continue to hold liable while we have to do that work. We're saying we're effectively stopped from marketing, we got to keep shelling out this money. It is the prevention of our ability [to market]. (Tr. 2932-2933; l. 22-4). Though only quickly referred to by Mr. Sarkissian, he noted the possibility of their moving forward would be to sell all or part of the undeveloped phases 2 and 3 to one or more developers. This actually may shine some light on the true endgame for sponsors. As continually expressed by Mr. Sarkissian on multiple occasions during his direct, cross and redirect he believes that the actions of the PLHA on many fronts, including the creation of the poisonous pill, Amendment 26, followed by the filing of the lien (the contents of

27

which have been found improper by the arbitrator) the sponsors will be forever tainted by those filings and it will be impossible for him to market these properties.

The arbitrator finds he is unable to award continuous damages from the time the lien was eventually lifted to some unknown time in the future. The arbitrator does not disagree with sponsors that it is continuously suffering from the costs that are extant on the properties but he cannot impose those costs on the PLHA going forward until a decision or beyond. There was no liability on this issue in the original hearing and the arbitrator will not create one now.  It is different than the Lien Delay period.  The application for an award of said continuous costs until the decision is rendered is denied.

### Costs

The sponsor has set forth in great detail in Appendix A to its closing argument a summary of their delay damages presented at the hearing.  The essential argument of the respondent's counsel is that sponsors were paying too high an interest rate on the loans that they had taken out to fund the project. He argues that Sarkissian borrowed, at "usurious interest rates" which he "conclusively agreed to" to pay "in related party transactions to other entities he controls."

Mr. Hoffman further argued that Sarkissian's explanation of his inability to get traditional loans is hearsay and should be rejected by the arbitrator. The arbitrator denied that during the hearing and that ruling is not being changed. Mr. Hoffner further opined that there was no admissible evidence to support why the sponsors needed to obtain financing from Lynx (an institutional lender) "on outrageous terms." [There was a 10% interest rate with other "kickers" that could go over $1 million. The sponsors are not claiming any of those prospective expenses

28

as part of their claim of costs, only the interest payments]. Respondents counsel argued further that the sponsors have not "met their burden with respect to the Lynx loan "that they were obligated to obtain financing from Lynx on outrageous terms "because without that financing we would not have been able to prevail."" The principal on the Lynx loan is $3.5 million. This particular loan adds the most interest to the costs that are being claimed as damages by the sponsors. There is no indication that the sponsors have any relationship to Lynx which is considered an institutional lender. It accounts for $190,000 in costs during the Attorney General delay period, and $474,000 in costs during what is known as the Lien Delay period. This loan closed on June 16, 2014, the borrowers being Potake Lake and Rock Hill. This money was being borrowed during the PLHA campaign with the Attorney General's office. The 10% is no higher than all the other loans except Caldale Holding.

Boiling Springs Savings Bank is also an institutional lender. The loan appears to have been for $1,620,031.48 at an interest rate of 6%. The borrower was Pierson Project, LLC. This loan relates to the Model Home owned by the Sponsors in Phase I..

Sponsors borrowed funds from three other lenders who were in some fashion related to the sponsors. One was Byron Hill Homebuilders, a development company that had a 1% interest and managed the project. They made loans to Pierson Project and to Potake Lake. These loans were made at a 10% rate of interest.

Caldale Holdings was also a lender, at 30% interest. They have no relationship to the sponsors. They loaned a total of $200,000 to Potake and Rock Hill, $134,700 and $65,300 respectively. That loan closed on June 27, 2011 and was paid off on June 17, 2014, one day after the Lynx loan closed.

29

Borden Brooke is another entity from which the sponsors borrowed. The sponsors have ownership in Borden Brooke. Borden Brooke made separate loans to Rock Hill, Potake Lake and Pierson Project each at 10% per annum. Some principal and interest have been paid on these loans but not all of them. (Sarkissian Tr. 2854-2856). Mr. Sarkissian testified that there has never been forgiveness of a loan from a related entity.

An additional lender was Pierson Lakes Investors. That was a loan that closed on July 11, 2012 and had a 12% interest rate. The loan was paid off on June 16, 2014. The principle of that loan was $885,246.45. Clearly that lender was related to the sponsors. It truly is an example of how the sponsors financed their project long before the issues that are before the arbitrator today arose. That loan was active during only a small part of the time attributed to the Attorney General Delay.

Sponsor's counsel counters respondent's claim of usurious rates and collusive loans, opining that there is no legal authority for the argument that they ( the Sponsors) must prove the necessity of obtaining financing from Lynx (or anyone else) because without it they would not have been able to prevail.

Mr. Sarkissian testified that he was compelled to pay these rates in order to get funding, that traditional lenders would not lend money on what is called raw property, especially in light of the content of the 26th Amendment which had the sponsors responsible for such things as legal reserves, making payments on the loan on the roads as well as the interest.  This is of course his opinion but the arbitrator accepts it.

The borrowing process is explained by Mr. Sarkissian, and it is one that is not unfamiliar in this area of development, that you build high-end home projects then you borrow from those

30

projects once they are sold or are being sold to fund new projects. That is apparently what is done and what was done here. Though a 10% interest rate is not something that would be acceptable to a suburban homebuyer, there is no evidence that it was not an acceptable rate in the world of high-end residential development. If the Respondents wished to present any evidence on this issue, they were free to do so. These loans were not usurious and there is no evidence whatsoever that they were collusive.[3] It should be clear that merely arguing a point, using broad and colorful language, does not make it so. The Arbitrator accepts the "costs' as set forth by the Sponsors.

### Setting of Damages

The arbitrator finds that the damages related to the period of trail delay (July 28-November 26, 2011) as set forth in Appendix A is acceptable and will be set at $45,216.43. The elements of taxes, insurance and loan interest are appropriate. Statutory interest of 9% from November 26, 2011 to December 31, 2016 shall be applied to this amount.

The arbitrator further finds that the damages attributed by the sponsor to the Attorney General delay (May 1, 2014-December 31, 2014) are appropriately attributed to taxes, insurance, PLHA fees, the utility costs on the model home, and the interest on various loans as set forth by the sponsor. The arbitrator accepts the values placed on these categories by the sponsor and finds the damages during this period of time were $564,262.20. Statutory interest of 9% from January 1, 2015 to December 31, 2016 shall be applied to this amount.

As to the period of time known as the lien delay, between February 6, 2015 and May 8, 2016 the sponsors have set forth damages similar to those above that include taxes, PLHA fees,

---

[3] Definition: Secret agreement or cooperation especially for an illegal or deceitful purpose.

31

1156418

insurance, interest on loans as well as the model home utilities during this period and amount to

$966,839.53. Statutory interest of 9% shall be applied to this amount from May 8, 2016 to

December 31, 2016.

The same 9% interest rate shall be applied to the Cranberry Lake Taxes and to each of the

awards made to the Respondents.

| **AMOUNT DUE CLAIMANTS** | **AMOUNT** | **INTEREST** |
|---|---|---|
| Cranberry Lake Taxes (2008-2014) Plus Statutory Interest from June 1, 2014 to December 31, 2016 | $13,998.00 | $3,254.53 |
| Damages relating to the period of trail delay (July 28-November 26, 2011) Plus Statutory Interest from November 26, 2011 to December 31, 2016 | $45,216.43 | $20,737.62 |
| Damages attributed by the sponsor to the Attorney General delay (May 1, 2014 – December 31, 2014) Plus Statutory Interest from January 1, 2015 to December 31, 2016 | $564,262.20 | $101,475.24 |
| Damages relating to the period known as the lien delay (between February 6, 2015 and May 8, 2016) Plus Statutory Interest from June 7, 2016 to December 31, 2016 | $1,023,340.00 | $56,500.51 |
| **SUBTOTALS** | $1,646,816.63 | $181,967.90 |
| **"A" FINAL TOTAL (AMOUNT + INTEREST)** | $1,828,784.53 | |

| **AMOUNT DUE RESPONDENTS** | **AMOUNT** | **INTEREST** |
|---|---|---|
| Bifurcation Breach Plus Statutory Interest from June 1, 2014 to December 31, 2016 | $115,200.00 | $26,811.77 |
| First Counter Claim Plus Statutory Interest from April 11, 2015 to | $130,000.00 | $20,162.46 |

32

1156418

December 31, 2016
Second Counter Claim                                    $50,000.00        $2,279.20
Plus Statutory Interest from June 30, 2016 to
December 31, 2016

**SUBTOTALS**                                          $295,200.00       $49,253.43

**"B" FINAL TOTAL (AMOUNT + INTEREST)**    $344,453.43


      **NET TOTAL (A-B)**    **$1,484,331.10**


**FINAL AWARD TO CLAIMANTS:**
**PIERSON PROJECT LLC, POTAKE LAKE, L.L.C.**
**and ROCK HILL, L.L.C.d/b/a ROCK HILL PROJECT  $1,484,331.10.**




Dated:  December 31, 2016
Garden City, NY 11530                          Ira B Warshawsky, Esq.
                                               Arbitrator




33

1156418

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF ROCKLAND

-------------------------------------------------------------------X

PIERSON LAKES HOMEOWNERS ASSOCIATION, INC.,

                                Plaintiff,                **VERIFIED ANSWER**
                                                          **AND COUNTERCLAIMS**

                -against-
                                                          Index No.: 35039/17

EONS Properties, LLC; "JOHN DOE" and "JANE DOE,"
which names refer to fictitious parties who are possible
tenants or occupants of the premises or who may be other
presently unknown parties who claim or may claim a lien
against the premises,

                                Defendants.

-------------------------------------------------------------------X

        **PLEASE TAKE NOTICE** that the Defendant EONS Properties, LLC, by its attorneys,

OGEN & SEDAGHATI, P.C., upon information and belief, answers the Complaint as follows:

        1.      As to paragraph 1 of the Complaint: Deny having knowledge or information

sufficient to form a belief as to the truth of the allegations contained therein.

        2.      As to paragraph 2 of the Complaint: Denied.

        3.      As to paragraph 3 of the Complaint: Denied.

        4.      As to paragraph 4 of the Complaint: Deny having knowledge or information

sufficient to form a belief as to the truth of the allegations contained therein.

        5.      As to paragraph 5 of the Complaint: Deny having knowledge or information

sufficient to form a belief as to the truth of the allegations contained therein.

        6.      As to paragraph 6 of the Complaint: Deny having knowledge or information

sufficient to form a belief as to the truth of the allegations contained therein.

7.    As to paragraph 7 of the Complaint: Deny having knowledge or information sufficient to form a belief as to the truth of the allegations contained therein.

8.    As to paragraph 8 of the Complaint: Deny having knowledge or information sufficient to form a belief as to the truth of the allegations contained therein.

9.    As to paragraph 9 of the Complaint: Denied.

10.    As to paragraph 10 of the Complaint: Denied.

11.    As to paragraph 11 of the Complaint: Denied.

12.    As to paragraph 12 of the Complaint: Denied.

13.    As to paragraph 13 of the Complaint: Denied.

14.    As to paragraph 14 of the Complaint: Defendant repeats, reiterates and realleges each and every response set forth above, together with the same force and effect as though fully set forth herein at length.

15.    As to paragraph 15 of the Complaint: Denied, and refers all questions of law to the Court.

16.    As to paragraph 16 of the Complaint: Denied.

17.    As to paragraph 17 of the Complaint: Denied.

**AS AND FOR A FIRST AFFIRMATIVE DEFENSE**

18.    The Complaint, and each count thereof, fails to state a claim upon which relief may be granted.

## AS AND FOR A SECOND AFFIRMATIVE DEFENSE

19.     Plaintiff has failed to obtain personal jurisdiction over Defendant; this Answer is filed subject to, and without waiving, full preservation of Defendant's objection to said lack of personal jurisdiction.

## AS AND FOR A THIRD AFFIRMATIVE DEFENSE

20.     To any extent that Plaintiff was damaged, Plaintiff failed to mitigate the damages claimed.

## AS AND FOR A FOURTH AFFIRMATIVE DEFENSE

21.     To any extent that Plaintiff was damaged, the damages alleged to have been suffered by Plaintiff were caused or contributed to by the culpable conduct of persons over whom Defendant had no authority or control.

## AS AND FOR DEFENDANT'S COUNTERCLAIMS

22.     EONS Properties, LLC, as and for its Counterclaims against PIERSON LAKES HOMEOWNERS ASSOCIATION, INC., alleges the following, on information and belief, and demands that PIERSON LAKES HOMEOWNERS ASSOCIATION, INC. provide an answer thereto:

## AS AND FOR A FIRST COUNTERCLAIM
### (Breach of Fiduciary Duty)

23.     EONS Properties, LLC repeats, reiterates and realleges each and every one of the foregoing paragraphs, with the same force and effect as though fully set forth herein at length.

24.     EONS Properties, LLC is a domestic limited liability company qualified to do business in the State of New York.

25.     Counterclaim Defendant PIERSON LAKES HOMEOWNERS ASSOCIATION, INC. is a not-for-profit corporation organized under the laws of the State of New York, with a principal place of business in Sterlington, Town of Ramapo, County of Rockland, State of New York, which is a homeowners' association that controls and manages real property known as "Pierson Lakes."

26.     Counterclaim Defendant PIERSON LAKES HOMEOWNERS ASSOCIATION, INC. had a duty to act on behalf of, to the benefit of, and in the best interest of its homeowner members, including Counterclaim Plaintiff EONS Properties, LLC, and to act in a reasonable manner and in the best financial interests of its homeowner members, including Counterclaim Plaintiff EONS Properties, LLC.

27.     Counterclaim Plaintiff EONS Properties, LLC put its trust and confidence in Counterclaim Defendant PIERSON LAKES HOMEOWNERS ASSOCIATION, INC. to properly manage, control, and operate its affairs in a reasonable manner and in the best financial interests of its homeowner members, including Counterclaim Plaintiff EONS Properties, LLC.

28.     As a result of the foregoing, Counterclaim Plaintiff EONS Properties, LLC had and has a fiduciary relationship with Counterclaim Defendant PIERSON LAKES HOMEOWNERS ASSOCIATION, INC.

28.     As a result of the foregoing, Counterclaim Defendant PIERSON LAKES HOMEOWNERS ASSOCIATION, INC. have and had a fiduciary duty to Counterclaim Plaintiff EONS Properties, LLC.

29.     Counterclaim Defendant PIERSON LAKES HOMEOWNERS ASSOCIATION, INC., through its Board, members, employees, agents, associates, contractors, subcontractors, consultants, and/or attorneys, breached that fiduciary duty by: failing to perform its obligations to the sponsors of the development and others; failing to timely and properly pay its tax obligations; improperly delaying payment of its obligations, causing the payments to increase; improper conduct relating to the attorney general's office and others; causing forfeiture of funds belonging to the homeowners, including Counterclaim Plaintiff EONS Properties, LLC, and otherwise causing damages to accrue to Pierson Lakes homeowners and others.

30.     Counterclaim Defendant PIERSON LAKES HOMEOWNERS ASSOCIATION, INC., through its Board, members, employees, agents, associates, contractors, subcontractors, consultants, and/or attorneys, breached that fiduciary duty by failing to put forth its best efforts regarding the foregoing.

31.     Counterclaim Defendant PIERSON LAKES HOMEOWNERS ASSOCIATION, INC., through its Board, members, employees, agents, associates, contractors, subcontractors, consultants, and/or attorneys, breached that fiduciary duty by acting in bad faith in its conduct with the sponsor and others.

32.     Counterclaim Defendant PIERSON LAKES HOMEOWNERS ASSOCIATION, INC., through its Board, members, employees, agents, associates, contractors, subcontractors, consultants, and/or attorneys, breached that fiduciary duty by improperly expending the money it had collected from homeowners.

33.   Counterclaim Defendant PIERSON LAKES HOMEOWNERS ASSOCIATION, INC., through its Board, members, employees, agents, associates, contractors, subcontractors, consultants, and/or attorneys, breached that fiduciary duty by retaining and keeping incompetent counsel for its dealings and proceedings with the sponsors.

34.   As a direct and proximate result of the forgoing, Counterclaim Plaintiff EONS Properties, LLC has been injured and damaged in an amount not less than Nine Hundred Thousand Dollars ($900,000.00), plus interest.

## AS AND FOR A SECOND COUNTERCLAIM
### (Action for Waste)

35.   EONS Properties, LLC repeats, reiterates and realleges each and every one of the foregoing paragraphs, with the same force and effect as though fully set forth herein at length.

36.   The conduct of Counterclaim Defendant PIERSON LAKES HOMEOWNERS ASSOCIATION, INC., as set forth in the preceding paragraphs, constituted a waste of its member and homeowner assets.

37.   As a direct and proximate result of the forgoing, Counterclaim Plaintiff EONS Properties, LLC has been injured and damaged in an amount not less than Nine Hundred Thousand Dollars ($900,000.00), plus interest.

WHEREFORE, Defendant/Counterclaim Plaintiff EONS Properties, LLC demands judgment as follows:

A.   Dismissing the Complaint and denying all relief demanded therein.

FILED: ROCKLAND COUNTY CLERK 01/28/2018 10:56 PM INDEX NO. 035039/2017
NYSCEF DOC. NO. 28 Case 7:18-cv-06900-KMK Document 1 Filed 08/01/18 Page RECEIVED NYSCEF: 01/28/2018

184 of 194

B.    Awarding Counterclaim Plaintiff EONS Properties, LLC damages as set forth in the First and Second Causes of Action, in an amount to be determined at trial, but no less than $900,000.00;

C.    Awarding Defendant the costs, disbursements and attorneys' fees of the instant action.

D.    Such other and further relief in favor of Defendant as the Court deems just and proper.

Dated:    New York, New York
        January 26, 2018

Yours, etc.

**EITAN ALEXANDER OGEN**
**OGEN & SEDAGHATI, P.C.**
**Attorneys for Defendant/Counterclaim Plaintiff**
**EONS Properties, LLC**
202 East 35th Street
New York, New York 10016
(212) 344-3440

TO:    GOLDENBERG & SELKER
       399 Knollwood Road, Suite 112
       White Plains, NY 10603
       (914)997-0999

## VERIFICATION

Natalie Sedaghati, being duly sworn, deposes and says:

I am a member of EONS Properties, LLC, Defendant/Counterclaim Plaintiff in the action within. I have read the annexed **ANSWER AND COUNTERCLAIMS** and know the contents thereof, and the same are true to my knowledge, except those matters therein which are stated to be alleged upon information and belief, and as to those matters I believe them to be true. My belief, as to those matters therein not stated upon knowledge, is based upon facts, records, and other pertinent information contained in my files.

ED:      New York, New York
        January 26, 2018

_____
Natalie Sedaghati

Sworn to before me this
26th day of January 2017

_____
Eitan Alexander Ogen
Notary Public State of New York
No.: 02OG5081205
Qualified in New York County
Commission Expires 6/30/19



# NYSCEF - Rockland County Supreme Court

# Confirmation Notice

This is an automated response for Supreme Court cases. The NYSCEF site has received your electronically filed documents for the following case.

**035039/2017**

**PIERSON LAKES HOMEOWNERS ASSOCIATION INC - v. - EONS PROPERTIES LLC**

**Assigned Judge: Rolf Thorsen**

## Documents Received on  01/28/2018 10:56 PM

| Doc # | Document Type | Motion # |
|-------|---------------|----------|
| 25 | ANSWER WITH COUNTER-CLAIM(S) | |
| | Does not contain an SSN or CPI as defined in 202.5(e) or 206.5(e) | |

## Filing User

Name: **EITAN ALEXANDER OGEN**
Phone #: **2123443440**          E-mail Address: **eitan@osfirm.com**
Fax #:          Work Address: **202 East 35th Street**
                               **New York, NY 10016**

## E-mail Notifications

An e-mail notification regarding this filing has been sent to the following address(es) on 01/28/2018 10:56 PM :

**GOLDENBERG, IRA S - igoldenberg@goldenbergselkerlaw.com**

**OGEN, EITAN ALEXANDER - eitan@osfirm.com**

**NOTE: If submitting a working copy of this filing to the court, you must include
as a notification page firmly affixed thereto a copy of this Confirmation Notice.**

---

Paul Piperato, Rockland County Clerk - Piperatp@co.rockland.ny.us
Phone: 845-638-5094     Fax: 845-638-5073     Website: http://www.rocklandcountyclerk.com

**NYSCEF Resource Center - EFile@nycourts.gov**
**Phone: (646) 386-3033     Fax: (212) 401-9146     Website: www.nycourts.gov/efile**

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF ROCKLAND

-------------------------------------------------------------------X

PIERSON LAKES HOMEOWNERS ASSOCIATION, INC.,

                    Plaintiff,

          -against-

EONS Properties, LLC; "JOHN DOE" and "JANE DOE,"
which names refer to fictitious parties who are possible
tenants or occupants of the premises or who may be other
presently unknown parties who claim or may claim a lien
against the premises,

                    Defendants.

-------------------------------------------------------------------X

**AFFIDAVIT OF MERIT**

Index No.: 35039/2017

STATE OF NEW YORK

COUNTY OF NEW YORK

Natalie Sedaghati, being duly sworn, deposes and says:

1.      I am a member of EONS Properties LLC, a New York limited liability company.

2.      Plaintiff EONS Properties LLC is the owner of a vacant lot located in the Pierson Lakes development in Sloatsburg, Rockland County, NY.

3.      Defendant PIERSON LAKES HOMEOWNERS ASSOCIATION, INC. is the homeowners' association for the development.

4.      Plaintiff herein has sued Defendant for unpaid assessments and charges and to foreclose on the Plaintiff's property, located at 12 Pierson Lakes Drive (a/k/a) 7 Lodge Road, Sloatsburg, NY.

5.      According to the affidavits of service, it appears that service of the Summons and Complaint was made upon the vacant property on November 3, 2017, with a mailing to said vacant

1

lot on November 6, 2017 (Ex. "G" and "H" to Plaintiff's motion.)  It was thus never received by EONS Properties, LLC.

6.      It appears that another service was made upon the Ogen & Sedaghati, PC law office on October 27, 2017 to a secretary in the law office.  (Ex. "F" to Plaintiff's motion.)  However, the law office was never designated as the agent of EONS Properties, LLC until it made an appearance herein.  Moreover, what was dropped off at the time of service was only the Notice of Pendency, not the Summons and Complaint.

7.      It also appears that Plaintiff served Defendant via the Secretary of State on or about October 19, 2017.  (Ex. "E" to Plaintiff's motion.  However, it appear that the additional mailing was not made until November 14, 2017, again, to the undersigned's law office. (Ex. "I")

8.      In any case, the summons and complaint was not actually received until on or about January 22, 2018, upon the receipt of the instant motion by Plaintiff.

9.      In addition, our defense is also meritorious as set forth in the Verified Answer.

10.      PIERSON LAKES HOMEOWNERS ASSOCIATION, INC. has caused significant harm to the members of the association, including Defendant.

11.      Ex. "A" to Defendant's motion, the "account" submitted, shows that about half the charges are "sponsor payment deficits."  These deficits have been caused, in large part, by improper conduct of PIERSON LAKES HOMEOWNERS ASSOCIATION, INC.

12.      In fact, in binding Arbitration, the Hon. Ira B. Warshawsky found considerable misconduct by PIERSON LAKES HOMEOWNERS ASSOCIATION, INC., its board members, and agents.  As a result, a huge judgment of over $1.4 Million PIERSON LAKES HOMEOWNERS ASSOCIATION, INC. was directed.  (See Exs. "C" and "D")

2

13.     Thus, there is certainly a meritorious defense, as much of the money being charged is due to the Plaintiff's own errors, misconduct and miscalculations.

14.     Accordingly, it is respectfully requested that the instant cross motion be granted and Plaintiff's motion be denied.

**WHEREFORE**, Defendant respectfully request that the within cross motion be granted in all respects, the default motion by Plaintiff be denied, together with such other and further relief as this Court deems just and proper.

DATED:       New York, New York
             January 26, 2018

_Natalie Sedaghati_
_____
Natalie Sedaghati

Sworn to before me this
26th day of January 2017

_Eitan Ogen_
_____
Eitan Alexander Ogen
Notary Public State of New York
No.: 02OG5081205
Qualified in New York County
Commission Expires 6/30/19

3

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF ROCKLAND

------------------------------------------------------------------------X

PIERSON LAKES HOMEOWNERS ASSOCIATION, INC.,

                        Plaintiff,

         -against-

EONS Properties, LLC; "JOHN DOE" and "JANE DOE,"
which names refer to fictitious parties who are possible
tenants or occupants of the premises or who may be other
presently unknown parties who claim or may claim a lien
against the premises,

                        Defendants.

------------------------------------------------------------------------X

**REPLY AFFIRMATION IN FURTHER SUPPORT OF DEFENDANT'S MOTION**

Index No.: 35039/2017

Eitan Alexander Ogen, an attorney duly admitted to practice law before the Courts of the State of New York, and a member of **OGEN & SEDAGHATI, P.C.**, attorneys for Plaintiff herein, affirms the following to be true under the penalties for perjury.

1.      Your affirmant, fully familiar with the facts and circumstances surrounding the within issues, submits this Reply Affirmation in further support of the within application for an Order, pursuant to CPLR § 3012(d), extending the time for Defendant to interpose the Answer herein and compelling Plaintiff to accept same; and for such other and further relief as to this Court seems just and proper.

2.      As a first matter, it is clear that the Plaintiff is not disputing the brevity of the delay, the lack of willfulness, and the utter lack of prejudice to Plaintiff.

3.      In fact, prejudice is not even addressed—not in the initial moving papers by Plaintiff, nor in the opposition to our cross motion.

1

4.    In fact, had Plaintiff merely accepted our Answer when we offered it or when it was filed, the litigation could have already progressed,

5.    Thus, Plaintiff has utterly failed to offer, let alone establish, any prejudice.

6.    Nor could such a showing be made belatedly on Reply of Plaintiff's motion, as it has not been addressed in opposition to Defendant's cross motion, and as well, it is well established that one cannot use evidence submitted on Reply to meet one's prima facie burden on a motion. See, e.g., L'Aquila Realty, LLC v. Jalyng Food Corp., 103 A.D.3d 692 (2d Dep't 2013); GJF Constr. Corp. v. Cosmopolitan Decorating Co., Inc., 35 A.D.3d 535 (2d Dep't 2006); Voytek Tech. v. Rapid Access Consulting, 279 A.D.2d 470, 471 (2d Dep't 2001); Cotter v. Brookhaven Mem. Hosp. Med. Ctr., Inc., 97 A.D.3d 524, 525 (2d Dep't 2012); Malanga v. Chamberlain, 71 A.D.3d 644, 646 (2d Dep't 2010); David v. Bryon, 56 A.D.3d 413, 414-415 (2d Dep't 2008); Barrera v. MTA Long Is. Bus, 52 A.D.3d 446, 447 (2d Dep't 2008); Rengifo v. City of New York, 7 A.D.3d 773, 773 (2d Dep't 2004).

7.    As far as proper service of process, which has not been shown, Defendants' principals' sophistication or lack thereof is not the standard by which proper service is evaluated. A "sophisticated" person or principal of entity is entitled to no less rights than anyone else.

8.    Nor is "awareness" of a complaint sufficient to satisfy the statutory requirements of proper service on a limited liability company.  The complaint itself must be properly served.

9.    In any case, in order to move the litigation forward, Defendant is not contesting service.  It was merely raised as part of the reasonable excuse for the brief delay herein.

2

10.     If Plaintiff has a meritorious claim as it asserts, then it certainly should not fear proceeding on the merits.  Had it accepted Defendant's Answer, the case could have already proceeded to discovery.

11.     Finally, the defenses asserted herein are interwoven with the counterclaims.

12.     As stated in our moving papers, much of the money being charged for assessments is due to the Plaintiff's own errors, misconduct and miscalculations, and that is why the amount charged for common charges for which Plaintiff is suing is nearly **double what should ordinarily be charged.**

13.     Thus, the amounts charged were incorrect and based on Defendant's mistakes.  In addition, Plaintiff has the burden to prove its case and, respectfully, mere allegations on a complaint do not constitute evidence nor proof.

14.     Finally, Plaintiff also does not contest that, in a case that seeks foreclosure, as this one does, the courts are even less likely to grant a default in a situation such as this, and more freely invoke their broad power to achieve an equitable and just result, on the merits.

15.     Accordingly, it is respectfully requested that the instant cross motion be granted and Plaintiff's motion be denied.

3

**WHEREFORE**, Defendant respectfully request that the within cross motion be granted in all respects, the default motion by Plaintiff be denied, together with such other and further relief as this Court deems just and proper.

Dated:     New York, New York
           January 31, 2018

_____
                    Eitan Alexander Ogen

4

# Goldenberg & Selker, LLP

**Attorneys at Law**

Ira S. Goldenberg*+
Diane E. Selker*

399 Knollwood Road, Suite 112
White Plains, New York 10603

Alexander M. Jeffrey, Jr.*
Of Counsel

* Admitted in New York
+ Admitted in Vermont

914-997-0999 ♦ 212-922-0990 ♦ Fax: 914-682-1512

www.goldenbergselkerlaw.com

March 29, 2018

VIA FIRST CLASS MAIL &
Email

Hon. Rolf M. Thorsen, AJSC
Rockland County Courthouse
One South Main Street
New City, NY 10956

      Re:   *Pierson Lakes Homeowners Assoc. v EONS Properties, LLC*
           Index No. 035039-17

Dear Judge Thorsen:

     This office represents plaintiff, Pierson Lakes Homeowners Association. This morning we received notice that Pierson Lakes Homeowners Association had filed for Chapter 11 bankruptcy protection on March 27, 2018. As a result, this action is automatically stayed.

     We will let you know if the case is dismissed or discharged.

                      Yours truly,

                      Diane E. Selker

Cc:    Pierson Lakes Homeowners Association
       OGEN & SEDAGHATI, P.C. (by electronic filing)